# 22-1237-cv

# United States Court of Appeals

*for the*

# Second Circuit

KRISTEN KING,

*Plaintiff-Appellant,*

– v. –

ARAMARK SERVICES INC.,

*Defendant-Appellee.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK

## BRIEF AND SPECIAL APPENDIX FOR PLAINTIFF-APPELLANT

JOSEPHINE A. GRECO, ESQ.
GRECO TRAPP, PLLC
*Attorneys for Plaintiff-Appellant*
14 Lafayette Square
Suite 1700
Buffalo, New York 14203
(716) 856-5800

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES .......... iii

JURISDICTIONAL STATEMENT .......... 1

STATEMENT OF ISSUES .......... 1

STATEMENT OF THE CASE .......... 2

STATEMENT OF FACTS .......... 3

SUMMARY OF ARGUMENTS .......... 19

ARGUMENT .......... 20

POINT I THE COURT ERRED IN GRANTING SUMMARY JUDGMENT DISMISSING KING'S CLAIMS OF SEX DISCRIMINATION, SEXUAL HOSTILE WORK ENVRONMENT AND RETALIATION UNDER TITLE VII .......... 20

A. STANDARD OF APPELLATE REVIEW .......... 20

B. A REASONABLE JURY COULD FIND DIRECT EVIDENCE OF SEX DISCRIMINATION .......... 22

C. A REASONABLE JURY COULD FIND THE FACTS GIVE RISE TO AN INFERENCE OF SEX DISCRIMINATION .......... 28

D. A REASONABLE JURY COULD FIND ARAMARK'S PURPORTED REASONS FOR KING'S TERMINATION WERE A PRETEXT FOR SEX DISCRIMINATION AND RETALIATION .......... 49

E. A REASONABLE JURY COULD FIND KING'S TIMELY CLAIMS OF HWE WERE ACTIONABLE AND PART OF A CONTINUING VIOLATION OF DISCRIMINATION ......52

POINT II THE COURT ERRED IN DISMISSING KING'S NYSHRL CLAIMS ......58

CONCLUSION ......65

CERTIFICATE OF COMPLIANCE ......66

## TABLE OF AUTHORITIES

**Cases:** **Page(s)**

*Aiello v. Stamford Hosp.*,
No. 3:09cvl 161(VLB), 2011 WL 3439459 (D. Conn. Aug. 8, 2011)..........25

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986)..........21

*Back v. Hastings On Hudson Union Free Sch. Dist.*,
365 F.3d 107 (2d Cir. 2004)..........47, 49

*Bass v. World Wrestling Fed'n Entm't, Inc.*,
129 F. Supp. 2d 491 (E.D.N.Y. 2001)..........59

*Betterson v. HSBC Bank, USA, N.A.*,
139 F. Supp. 3d 572 (W.D.N.Y. 2015)..........47

*Cargo Partner AG v. Albatrans, Inc.*,
352 F.3d 41 (2d Cir. 2003)..........59

*Carlton v. Mystic Transp., Inc.*,
202 F.3d 129 (2d Cir. 2000)..........21

*Chambers v. TRM Copy Ctrs. Corp.*,
43 F.3d 29 (2d Cir. 1994)..........21, 28, 49

*Chertkova v. Conn. Gen. Life Inc.*,
92 F.3d 81 (2d Cir. 1996)..........22

*Chin v. Port Auth. of N.Y. & N.J.*,
685 F.3d 135 (2d Cir. 2012)..........48, 53

*Cornwell v. Robinson*,
23 F.3d 694 (2d Cir. 1994)..........53

*Curto v. Med. World Commc'ns, Inc.*,
388 F. Supp. 2d 101 (E.D.N.Y. 2005)..........59, 60

*Cushman-Lagerstrom v. Citizens Ins. Co. of Am.*,
72 F. App'x 322 (6th Cir. 2003)..........24

*Czerwinski v. NYS Dep't of Corr. & Cmty. Supervision*,
394 F. Supp. 3d 210 (N.D.N.Y. 2019)..........24

*Danzer v. Norden Sys., Inc.*,
151 F.3d 50 (2d Cir. 1998)..........47

*Dawson v. Bumble & Bumble*,
246 F. Supp. 2d 301 (S.D.N.Y. 2003) ....................................................25

*Dotson v. City of Syracuse*,
763 F. App'x 39 (2d Cir. 2019) ............................................................42

*Feingold v. N.Y.*,
366 F.3d 138 (2d Cir. 2004) ..................................................................28

*Fincher v. Town of Brookline*,
26 F.4th 479 (1st Cir. 2022) ..................................................................58

*Fitzgerald v. Henderson*,
251 F.3d 345 (2d Cir. 2001) ..........................................................53, 54

*Forsyth v. Fed'n Emp't and Guidance Serv.*,
409 F.3d 565 (2d Cir. 2005)..........................................................20, 21

*Gorzynski v. JetBlue Airways Corp.*,
596 F.3d 93 (2d Cir. 2010) ....................................................................46

*Graham v. Long Island R.R.*,
230 F.3d 34 (2d Cir. 2000) ...............................................................33, 46

*Hargett v. Nat'l Westminster Bank*,
78 F.3d 836 (2d Cir. 1996) ....................................................................42

*Harte v. Woods Hole Oceanographic Inst.*,
No. 10 CV 3916 (RJD)(MDG),
2012 WL 12951525 (E.D.N.Y. Jan. 6, 2012).....................................63, 64

*Hayes v. N.Y.C. Dep't of Corr.*,
84 F.3d 614 (2d Cir. 1996) ....................................................................21

*Hernandez v. Coughlin*,
18 F.3d 133 (2d Cir. 1994) ...............................................................58, 59

*Holcomb v. Iona Coll.*,
521 F.3d 130 (2d Cir. 2008) ..................................................................48

*Int'l Healthcare Exch., Inc. v. Global Healthcare Exch., LLC*,
470 F. Supp. 2d 345 (S.D.N.Y. 2007) ....................................................59

*Johnson v. J. Walter Thompson USA, LLC*,
224 F. Supp. 3d 296 (S.D.N.Y. 2016) ....................................................24

*Kamrowski v. Morrison Mgmt. Specialist*,
No. 05-CV-9234 (KMK), 2010 WL 3932354
(S.D.N.Y. Sept. 29, 2010)....25

*Kassner v. 2nd Avenue Delicatessen Inc.*,
496 F.3d 229 (2d Cir. 2007)....58

*Kaytor v. Elec. Boat Corp.*,
609 F.3d 537 (2d Cir. 2010)....54

*Ledbetter v. Goodyear Tire and Rubber Co., Inc.*,
550 U.S. 618 (2007)....20

*Lewis v. City of Buffalo Police Dep't*,
311 F. App'x. 417 (2d Cir. 2009)....22

*Lightfoot v. Union Carbide Corp.*,
110 F.3d 898 (2d Cir. 1997)....22

*Meyers v. Medco Health Solutions, Inc.*,
No. 09 Civ. 09216(RKE), 2012 WL 4747173
(S.D.N.Y. Oct. 4, 2012)....64

*Nat'l R.R. Passenger Corp. v. Morgan*,
536 U.S. 101 (2002)....53

*Patterson v. Cty. of Oneida*,
375 F.3d 206 (2d Cir. 2004)....57

*Price Waterhouse v. Hopkins*,
490 U.S. 228 (1989)....23

*Ramseur v. Chase Manhattan Bank*,
865 F.2d 460 (2d Cir. 1989)....21

*Rasmy v. Marriott Int'l, Inc.*,
952 F.3d 379 (2d Cir. 2020)....54

*Sassaman v. Gamache*,
566 F.3d 307 (2d Cir. 2009)....32

*Sherwood v. Olin Corp.*,
772 F. Supp. 1418 (S.D.N.Y. 1991)....64

*Skubel v. Fuorli*,
113 F.3d 330 (2d Cir. 1997)....21

*Stewart v. Fashion Inst. Of Tech.*,
No. 18-cv-12297 (LJL), 2020 WL 6712267
(S.D.N.Y. Nov. 16, 2020)....................................................................29

*Taperell v. Tegan Lighting, Inc.*,
18-CV-3343, 2019 WL 1118053 (E.D.N.Y. Mar. 11, 2019)..................59, 64

*Zann Kwan v. Andalex Grp. LLC*,
737 F.3d 834 (2d Cir. 2013) ...............................................................50

**Statutes:**

28 U.S.C. §1291.........................................................................................1

42 U.S.C. §2000e et. seq.............................................................................1

Fed. R. Civ. P. 12(b)(6)...............................................................................58

Fed. R. Civ. P. 56(c) ...................................................................................21

New York Exec. Law §290 et. seq. ......................................................*passim*

## JURISDICTIONAL STATEMENT

Plaintiff-Appellant, Kristen King ("King") brought this action against Defendant-Appellee, Aramark Services Inc. ("Aramark") under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e et. seq., and the New York State Human Rights Law, New York Exec. Law §290 et. seq. ("NYSHRL"). The gravamen of King's claim is that Aramark discriminated against her based-on sex. A-10-48. The District Court ("Court") had subject matter and supplemental jurisdiction over this case.

On July 30, 2019, the Court granted in part Aramark's Partial Motion to Dismiss dismissing King's NYSHRL claims. SPA-1-5,28-34,47. On May 9, 2022, the Court granted Aramark's motion for summary judgment, dismissing King's claims in their entirety and judgment was entered. SPA-48-114.

King filed her notice of appeal on June 6, 2022. A-1863-1864. The jurisdiction of this court arises from 28 U.S.C. §1291.

## STATEMENT OF ISSUES

1. Whether the Court erred in finding no direct evidence of sex discrimination.
2. Whether the Court erred in finding King did not establish an inference of sex discrimination.

3. Whether the Court erred in finding Aramark's purported reasons for King's termination were not a pretext for discrimination and retaliation.

4. Whether the Court erred in finding King's claims of hostile work environment ("HWE") were time barred.

5. Whether the Court erred in dismissing King's NYSHRL claims.

## STATEMENT OF THE CASE

King filed her Complaint on January 14, 2019 against Aramark for sex discrimination in violation of Title VII, and the NYSHRL alleging discrimination regarding her terms and conditions of employment; HWE; and retaliation for her protected activity. A-10-48.

On March 13, 2019, Aramark filed a Partial Motion to Dismiss King's Complaint. A-49. On July 30, 2019, Hon. Geoffrey W. Crawford, U.S.D.C., dismissed King's NYSHRL claims. SPA-1-5,28-34,47. On November 1, 2021, Aramark moved for summary judgment dismissing King's remaining claims. A-174. On May 9, 2022, the Court granted Aramark's motion. SPA-48-114. King takes this appeal with respect to the July 30, 2019 Order dismissing her NYSHRL claims and May 9, 2022 Order granting Aramark summary judgment dismissing her remaining claims. A-1863.

## STATEMENT OF FACTS

King was hired by Aramark in June 2005 as the retail manager in its Healthcare Division with the Kaleida Health account in Buffalo, NY. A-1079.

She was identified as a high performer and soon promoted to Director of Food and Nutrition where she successfully rolled-out the first hotel-style food service for hospital patients in the northeast. A-1079. In June 2010 when Aramark lost the account King received severance. She attained a Master's Degree in Creativity and Innovation around February 2012. A-1080.

King, who desired a lifelong career with Aramark, was rehired as a reinstated employee, beginning April 23, 2012, as the General Manager ("GM") of Food and Nutritional Services with Valley Health System ("VHS") where Aramark provided food and facilities services at seven hospitals in Virginia and West Virginia. A-1080,1082-83. She reported to District Manager ("DM") Michael McCarthy, who allowed mileage reimbursement from her rented Stanley, Virginia home to her work locations as did her subsequent four DMs. A-1083. King always at least satisfactorily performed her job receiving annual discretionary bonuses based on corporate criteria for operations and financial achievement and salary increases based on her manager's subjective performance evaluation. A-1082.

In February 2015 Griffith Thomas ("Thomas") became DM of Food and EVS. Thomas had King perform the duties of VHS dual GM of Food and EVS

without any change in pay or title until October 6, 2015. Even then, despite her complaints to Thomas, she did not receive her pay increase effective September 15, 2015, until January 2016. A-1087,1093-94.

As DM, Thomas' direct reports were the direct contact for the client at that specific location. Thomas DeGori ("DeGori"), Christopher Harriman ("Harriman"), John Wilson ("Wilson"), Christopher Drayton ("Drayton"), and King, who had healthcare clients in different states, directly reported to Thomas who treated them as holding equal positions. They were required to attend weekly meetings chaired by Thomas, District Meetings and various other overlapping work-related matters. They were all directly responsible to interface with, maintain and retain the client; manage the day-to-day operations; grow the business; manage the budget; implement and oversee company standards, procedures and programs; supervise and manage employees; hire, fire and discipline employees; and were held to the same performance standards. As DM Thomas would send emails to them as a group relative to these duties and supervise, manage, evaluate, and discipline them. A-980-81,1063,1087-88.

In Fall 2015 Jacob Williford ("Williford"), VHS Controller, became a direct report to Thomas managing the financials and assisting Thomas's male direct reports at facilities outside of VHS although King hired Williford in April 2015 to work for VHS and his salary continued in the VHS budget. A-981-82,1089,1091-

92. All employees are subject to the Business Conduct Policy ("BCP"), A-1499-1531, and Employee Handbook ("Handbook"), A-1484-97, among other policies. A-973-74,1081-82.

Thomas made King aware of his displeasure that her physical appearance did not fit his stereotype of a businesswoman. King was heavier in the belly as were Williford, Harriman and DeGori. A-982,1097. Approximately two-three times a week Thomas would stare disapprovingly at King's midsection where she was heavier in the belly furrowing his brow in disgust. He also made comments regarding King's lunch tray, "Wow you must be hungry" "Wow, look at that tray" implying she was overeating and should not be while not commenting on others' trays. A-982-83,1030,1097,1123. On a couple different occasions Thomas said things like King should go to the gym at 5:30 a.m. because Mr. Merill, CEO of VHS, would be there and would like to see King actively working out at the gym. This implied to King that she would be more favorably recognized by her client's CEO if she exercised and changed her body image as a woman. A-982,1097. Despite King being in the presence of Thomas and Williford, who had his office in Winchester Medical Center ("WMC"), on many occasions she never saw Thomas look at Williford's belly in disgust, nor make comments regarding his need to exercise let alone at the WMC gym in view of the CEO. A-982,1097. King also attended various other meetings where Thomas, DeGori and Harriman were

present such as District Meetings and various other overlapping work-related matters yet never saw Thomas look at DeGori or Harriman in this manner nor make those comments. A-982,1063,1097. Thomas spoke to King in a rude and condescending way which was observed on March 19, 2017, by Aramark's Director of Business Development, Alexis Duckett ("Duckett"), and used King's performance as negative examples. King never heard Thomas speak in a rude and condescending way to his male direct reports nor use their performance as negative examples. A-983-84,1013,1089,1112. Thomas also told jokes about women. King recalled that during the 2015 VHS proposal review, when King was with an all-male team with vice presidents present, Thomas told a joke about women. They all laughed except King, who found the conduct offensive and undermining to her as a manager. A-983,1098.

Thomas engaged in a course of conduct aimed to force King to quit or be terminated. *See* A-1451-59,1777-80. Thomas undermined and impeded King's work, which he did not do to his male direct reports, by:

- denying her a private office leaving her to handle confidential telephone calls and emails in her vehicle when she could not find a private location. A-972,984-85,1021-22,1083-84,1089-90,1117-18,1347.
- disregarding the directives of her clients. A-987-88,1091.
- forcing King to personally support facilities other than her own clients'

while either not asking or allowing male managers to refuse to do so. A-987-88,1096-97,1105.

- reducing services to King's team by poaching high performance employees and Williford from her facility. A-985-87,1091-92.
- limiting her ability to effectively purchase. A-1017-18,1113,1116,1710.
- excluding her from meetings, attending meetings with her direct reports in her absence and without her knowledge, meeting alone with her subordinates, meeting alone with her clients, imposing unrealistic deadlines, impeding her job performance. A-986-87,994-95,1001,1029,1091,1098,1100,1123.
- showing up to her locations without advance notice. A-986,1091.
- not assisting her in training, presentations, nor proposals. A-1012-13,1031,1110,1124-25,1127-29.
- interfering with her supervision of her subordinates regarding hiring and discipline. A-998,1025,1037,1093,1120,1127-29.
- undermining her authority regarding merit pay increases. A-998,1093,1111-12.
- failing to provide coverage of her facilities while she was on FMLA leave despite assurances to King's client Thomas would. A-993,1096.
- making unreasonable demands of her work. A-994-95,1095.

- disciplining her for conduct for which he did not discipline male direct reports. A-987-88,999,1003-08,1015-17,1027,1033-34,1054-55,1096-97,1102,1114-16,1121-22,1126-27.
- failing to meet with her to discuss her PIP progress while he worked with Drayton and Soloway on their performance before any discipline. A-1035-36,1127-29.
- requesting she take actions against company policy relative an employee under her charge. A-1025,1120-21.

King repeatedly complained about the Thomas' conduct to management and human resources ("HR") saying Thomas was discriminating, harassing and retaliating against her but no action was taken to stop Thomas' conduct and King was subjected to further discrimination and retaliation. *See* A-1777-80.

While King was on medical leave beginning December 8, 2015, her twenty-one-year-old son unexpectedly died on December 28, 2015. She remained on disability until March 2, 2016. Thomas made frequent efforts to communicate with her about her job duties and his unhappiness with the amount of work backing up. He advised King she was to visit most of her facilities within the first two days of her return to work, which would have required visiting five facilities across two states and approximately 600 miles of travel. A-991,993-94,1094-95,1129. King complained to Thomas' supervisor Deborah Hetrick ("Hetrick"), Regional Vice

President ("RVP"), about the unreasonable demand, being targeted and retaliated against by Thomas, and being uncomfortable reporting to Thomas and being alone with him because of his conduct. Hetrick laughed at King and denied her request that Hetrick arrange for a neutral third-party to mediate a reporting relationship between King and Thomas. A-995,1095.

Around April 20, 2016, King complained again to Hetrick about Thomas excluding King from important meetings, meeting with King's subordinates without notifying King, imposing unrealistic deadlines, and impeding King's job performance. Hetrick advised King to inform Rebecca Adams ("Adams"), the new Regional Director of HR. That same day, King informed Adams that Thomas was treating King differently than his male direct reports, imposing unrealistic deadlines on King, excluding King from important meetings, meeting alone with her subordinates without notifying King, failing to provide support to King, and negatively interfering with King's job performance. Adams took no action to stop such conduct. A-1001,1098.

In May 2016, while working with Carmine DiCicco ("DiCicco"), Vice President of Strategic Partnerships, on a project to expand and extend VHS' contract, King complained that Hetrick and Adams did nothing to address Thomas' conduct. DiCicco instructed Thomas in King's presence to set up conference calls with HR to resolve these ongoing issues. A-989,1099.

In June 2016 Thomas told King she would no longer be dual GM due to a corporate-wide decision abolishing the dual manager positions. Thereafter, while at a meeting with her overall client, Bob Amos ("Amos"), VP of VHS, they learned that Brian Marsh ("Marsh") was still a dual manager. When Amos asked in front of everyone why Marsh was a dual GM and not King Thomas said it was his and Timothy Knight's ("Knight") decision. Amos was not happy. A-989-90,1099. Likewise, Wilson remained a dual GM. A-990. When Knight became the DM of Facilities (previously EVS) King complained to him that Thomas was excluding her from important meetings, meeting with her subordinates without notifying her, and was aggressive, condescending, and dismissive when meeting with King one-on-one. Knight told King she would "never fit into Griff's mold" and suggested that King quit. A-990,1099-1100.

In July 2016, King complained to the new RVP, Tracy Miller ("Miller"), regarding Thomas' conduct. Miller told King that Miller would have HR set up recurring calls. King also complained again to Adams who said she would set up recurring calls with Thomas, Adams, and King, but these calls did not begin for several months. A-990-91,1100. On August 1, 2016 King was officially told she was the GM of Food only. A-989,1099.

On August 29, 2016, King was given a First Written Documentation signed by Thomas and Adams containing eleven items with no supporting documentation.

King disagreed with all of the items except one. King requested a Performance Improvement Plan ("PIP") but was denied. A-1000-01,1101-02. King was given four days to submit a written response and documentation. She did the best she could in that short time and refuted ten of the eleven items. A-1000-10,1102-08,1681-83. Thomas was given eight days to reply to King's response. A-1011,1109,1685-1705. On September 29, 2016 King was issued a Revised First Written Documentation which had five of the original eleven items on it and contained an additional item regarding an EVS employee, depriving King of an opportunity to respond. A-1011-12,1109,1707.

After this disciplinary meeting, Adams arranged for biweekly telephone conferences between King, Thomas, and Adams to help King move forward and correct any performance issues. Before these conferences Thomas required King to complete a "Top 15" report on each facility without prior training. The one time he sat with King to go through such report King saw a computer file on his desktop labeled "Kristen King legal file" which Thomas created after he was aware of her complaints to Hetrick, Adams and DiCicco. After only a few of these conferences, however, Thomas informed Adams that she was no longer needed and Adams did not participate in any future conferences. Thereafter, Thomas failed to conduct meetings on a regular basis and did not address King's performance when the meetings did occur, other than to say that King was doing fine. A-996-97,1012-

13,1110.

In King's 2016 performance review, covering October 1, 2015 to September 30, 2016, Thomas rated King as "inconsistently meeting expectation" and gave her a 0% annual merit salary increase. Despite this rating, King received a bonus of $15,300, where performance was measured by objective financial and individual objectives rather than Thomas' subjective findings. In contrast, when Thomas observed ongoing persistent food safety issues with Harriman, Thomas rated Harriman as "On Target" and Harriman received a $3,000 raise. A-997,1110-11.

On March 19, 2017, after Duckett told King she observed Thomas speaking to King in a rude and condescending way, King complained to Duckett that Thomas did not support her, undermined her management and career and King had complained to HR in the past. Duckett told King to come to Duckett if King needed anything. A-1013-14,1112. King complained again to DiCicco around March 21, 2017 that Thomas' unfair targeting, discrimination, harassment, and retaliation had increased since the last time they spoke in May of 2016. King also advised that Adams knew about the situation but failed to stop the conduct. A-1014,1112-13.

On March 27, 2017, King appeared at WMC for a meeting with Thomas to review King's "Top 15" report. When King arrived Thomas called Adams and issued King a Final Written Documentation dated March 24, 2017, with no

supporting documentation. In the "Actions to be Taken" section, King was required to obtain Thomas' advance approval for any financial decisions exceeding $1,000, which would have been impossible to comply with since King's subordinates regularly placed orders well in excess of that amount and King had to approve those orders. Thomas' male direct reports did not have any spending limitation that needed approval from Thomas. A-1014-15,1113,1116,1710-11.

On or about March 27, 2017, King contacted the Employee Hotline ("Hotline") and complained about Thomas' discriminatory, harassing, and retaliatory treatment and HWE. That same day, King experienced an anxiety attack. She visited her doctor who took her out of work for approximately four days. A-1020-21,1117.

On March 30, 2017, Evelyn Miller, Employee Relations Specialist in charge of the Hotline investigation, contacted King. King again relayed her complaints about Thomas but the Hotline Report did not contain all the information relayed by King. Neither Evelyn Miller nor anyone else asked for a written statement from King. A-1021,1117,1717-18.

On or about April 6, 2017, Thomas and Adams informed King that she would no longer receive mileage reimbursement for traveling from her home in Virginia to her VHS facilities nor be allowed to work from her home office. King complained to Colleen O'Donnell ("O'Donnell"), Director of Employee Relations,

that Thomas was setting her up for termination as a result of discrimination, harassment, and retaliation for King's prior complaints and that nobody took her complaints seriously or did anything to address them except for DiCicco and Duckett. A-1021-22,1117-18.

On or about April 27, 2017, Evelyn Miller contacted King and told her that King's Hotline complaints were unfounded. When King asked why none of her witnesses were contacted, Miller said only relevant witnesses are contacted. A-1022,1118. King then contacted Adams asking to meet alone with Adams to discuss how to successfully continue her employment and requesting a PIP so she would know the areas that needed improvement and goals to work toward. Adams agreed, but around May 7, 2017, Thomas sent a request to King setting a meeting with Thomas, Adams and King on May 9, 2017 at WMC. A-1023,1118-19.

On May 9, 2017, Thomas and Adams issued King a Final Written Documentation with no supporting documentation which contained a list of five items that were either untrue or did not violate Aramark policy/procedure. King again requested a PIP but was denied. King was very upset. She went to her doctor, who removed King from work for four days due to the anxiety she was experiencing. King was not given an opportunity to provide a written response or any supporting documentation. A-1023-24,1028,1119,1123,1720-21.

In or about July 2017, King complained to Kelly Barrett ("Barrett"), who

replaced Adams as Regional Director of HR, about Thomas' discrimination, harassment, and retaliation, that King had complained numerous times to Aramark management and Thomas retaliated because of those complaints. Barrett took no action to stop Thomas' conduct. A-1030,1124.

In about July or August 2017, Thomas made efforts to remove King from the VHS proposal that she had been working on for about eighteen months. Thomas held frequent closed-door meetings with Williford concerning this proposal, and when King asked to be included Thomas denied her request. A-1031,1125.

On July 24, 2017, Thomas prepared a termination document to fire King and sent it up the chain to HR and his manager for review and approval. For the first time, Thomas included supporting documentation for this disciplinary document, but the documentation included documents regarding Hourly Turnover Rate of EVS employees even though Thomas knew King was no longer responsible for EVS. Three days later, O'Donnell responded to Thomas stating "An important factor in determining appropriate next steps is looking at how are these scores as compared to each of her peers? We need to look not only at her scores but how she stacks up to peers." There is no indication in the record that King's scores were compared to her male peers, despite her longstanding complaints of discrimination, harassment, and retaliation. This termination document was never issued to King.

Around August 1, 2016, Thomas, Adams, Miller, Barrett, and O'Donnell discussed Thomas's decision to terminate King in emails and a confidential conference call with Aramark's legal counsel. A-1032-33,1125,1723-39,1741-43,1745-46.

On or about August 16, 2017, King was given a ninety-day PIP dated August 11, 2017, addressing three areas not previously addressed in any prior discipline. Although the PIP states King would be provided with specific goals and ongoing feedback, the PIP did not have any specific targets, locations, or improvement goals. The PIP was literally cut and pasted from the Executional Framework on Aramark's website, which is the responsibility of all of Thomas' direct reports. One of the PIP items was regarding her score for the Voice of the Customer ("VOC") program, a confidential program designed to allow consumers to report the service and quality of their food. Thomas knew King was utilizing the program correctly, but Wilson, DeGori, and Harriman were not. When King noticed their higher scores she told Thomas, but he allowed them to do it incorrectly. A-1033-35,1126-27,1748-52.

Thomas failed to meet with King weekly or biweekly to discuss her PIP progress, as required under Aramark policy and procedure. Thomas gave King a one-time brief training on access to QuickView and Performance Dashboard data around August 28, 2017, which she told him left her with questions, but he provided no further assistance. In contrast, Thomas worked with Drayton on his

performance before any discipline or written improvement plan and directed King to provide assistance to Drayton when he had areas of weakness. A-1035-36,1127-29.

On August 29, 2017, King asked Thomas if Aramark would authorize payment for a rental car because hers was having mechanical problems as her prior DMs had done. Thomas refused, denied King's PTO request and directed her to be at WMC on August 31, 2017. A-1038,1130. King had previously scheduled a Food Directors' meeting at WMC on August 30, 2017 and a meeting with Brittany Cubbage ("Cubbage") Page Memorial Hospital's ("Page") Food Director at Page to meet regarding time sensitive matters – Meals on Wheels ("MOW") and Prima – on August 31, 2017. King requested that Cubbage work with King at WMC on August 31, 2017. When King requested employees stationed at one VHS facility meet her at another VHS facility to work on a specific project, Aramark's policy and procedure entitled the traveling employee to mileage reimbursement. As Cubbage and King lived one mile apart they drove together to WMC on both dates and King approved Cubbage's travel expenses. A-1038-39,1130-31,1754-59. Thomas attended the Food Directors meeting on August 30, 2017, and saw Cubbage and King inside WMC on August 31, 2017. A-1039-40,1050,1131-32.

On September 18, 2017, Thomas requested King meet to review her PIP progress. When King arrived Thomas called Barrett who advised King was under

investigation for a violation of the BCP due to her authorization of Cubbage's travel reimbursement. King was not given any documentation nor asked for the details of what happened. King did not violate the BCP. This continued discrimination, harassment, and retaliation by Thomas caused King severe emotional distress. She reported she was ill, unable to work, and was going to her physician for treatment, and was given until October 4, 2017, to submit the required documentation. A-1051-52,1132-33.

On September 19, 2017, King again contacted the Hotline to complain about Thomas's discrimination, harassment, creation of a HWE, and retaliation. She reiterated her prior complaints, complained regarding the PIP she was given, the alleged BCP violation against her, and the continued failure of management to take action to stop Thomas's conduct causing her to apply for short-term disability. There was no investigation of this Hotline complaint, as King was never interviewed. A-1057,1134.

Further, Thomas, who instigated the BCP investigation against King, admitted to Barrett he saw Cubbage in an office in WMC on August 31, 2017 in direct conflict with the alleged BCP violation, namely, Williford's complaint to Thomas that Cubbage dropped King off at WMC on August 31, 2017. Barrett and Thomas nevertheless investigated the allegation against King with Barrett not even following the most basic of her own investigatory procedures. A-1043-46.

On September 20, 2017, after Thomas was notified King would be out on disability leave starting September 19, 2017, he informed Barrett he knew King was out on leave and intended to inform King's client, Amos, VP of VHS, later that day that Thomas was terminating King for a BCP violation. Doing so would violate Aramark's personnel policies and BCP. A-1056,1058,1134,1772,1775,1792.

On or about September 21, 2017, Thomas and Barrett called King and terminated her. King immediately called Miller and told her she had been unfairly terminated, but Miller took no action in response to this complaint. A-1058-59,1134-35. Shortly thereafter, King received a letter of termination from Aramark dated September 21, 2017, with no written documentation as to the reason for her termination. When King asked Barrett for a copy of documentation stating the reason for her termination, Barrett told King she would need a written subpoena to obtain it. A-1059,1135.

## SUMMARY OF ARGUMENTS

1. A reasonable jury could find direct evidence of sex discrimination.
2. A reasonable jury could find the facts give rise to an inference of sex discrimination.
3. A reasonable jury could find Aramark's purported reasons for King's termination were a pretext for sex discrimination and retaliation.

4. A reasonable jury could find King's timely claims of HWE were actionable and part of a continuing violation of discrimination.

5. Aramark's discriminatory acts affected King's terms and conditions of employment in New York establishing her NYSHRL claims.

# ARGUMENT

## POINT I

## THE COURT ERRED IN GRANTING SUMMARY JUDGMENT DISMISSING KING'S CLAIMS OF SEX DISCRIMINATION, SEXUAL HOSTILE WORK ENVRONMENT AND RETALIATION UNDER TITLE VII

As set forth below, the entry of summary judgment in favor of Aramark was erroneous for numerous reasons, all of which independently and collectively require reversal of that decision by this Court. The record demonstrates that the Court ignored critical evidence, failed to draw all reasonable inferences in King's favor as the non-moving party, and improperly made credibility determinations.

### A. STANDARD OF APPELLATE REVIEW

This Court reviews *de novo* a grant of summary judgment, applying the same standards of those applied by the District Court. *Forsyth v. Fed'n Emp't and Guidance Serv.*, 409 F.3d 565, 569 (2d Cir. 2005), *abrogated on other grounds by Ledbetter v. Goodyear Tire and Rubber Co., Inc.*, 550 U.S. 618 (2007).

Those standards require that summary judgment may not be granted unless there are no genuine issues of material fact present so that the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c); *see also, Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 247 (1986). The record must be construed in the light most favorable to the non-moving party, resolving all ambiguities and drawing all inferences against the moving party. *Skubel v. Fuorli,* 113 F.3d 330, 334 (2d Cir. 1997). Further, the District Court should not engage in making credibility determinations. When evaluating if an issue of material fact exists, the District Court "should not weigh evidence or assess the credibility of witnesses." *Hayes v. N.Y.C. Dep't of Corr*., 84 F.3d 614, 619 (2d Cir. 1996).

This Court has repeatedly cautioned against affirming the grant of summary judgment to a Defendant in discrimination cases since intent and state of mind are ordinarily in dispute and because "smoking gun" evidence of discrimination is rarely found. *Forsyth*, 409 F.3d at 569; *see Carlton v. Mystic Transp., Inc.*, 202 F.3d 129, 134 (2d Cir. 2000). This Court has recognized that "employers are rarely so cooperative as to include a notation in the personnel file that their actions are motivated by factors expressly forbidden by law." *Chambers v. TRM Copy Ctrs. Corp*., 43 F.3d 29, 37 (2d Cir. 1994) (internal quotations omitted), citing *Ramseur v. Chase Manhattan Bank*, 865 F.2d 460, 464-65 (2d Cir. 1989). Accordingly, the depositions, affidavits and other materials before the Court must be carefully

scrutinized for circumstantial evidence which would support an inference of discrimination. *Chertkova v. Conn. Gen. Life Inc.*, 92 F.3d 81, 87 (2d Cir. 1996).

### B. A Reasonable Jury Could Find Direct Evidence Of Sex Discrimination

Title VII provides King a cause of action for gender-based disparate treatment. *See Lewis v. City of Buffalo Police Dep't*, 311 F. App'x. 417, 419-20 (2d Cir. 2009) (summary order). Under that framework, the first inquiry is whether King can identify direct evidence of discrimination. Direct evidence includes "statements by persons involved in the decision-making process that may be viewed as directly reflecting the alleged discriminatory attitude." *Lightfoot v. Union Carbide Corp.*, 110 F.3d 898, 913 (2d Cir. 1997) (statement demonstrating surprise and disbelief that employee wanted to work until he was 70 was direct evidence of age discrimination).

The Court properly determined that Thomas was a decisionmaker. SPA-104. However, the Court erred in assessing whether there was direct evidence of sex discrimination by failing to view the evidence in the light most favorable to King, disregarding significant evidence that would be admissible at a trial and failing to examine the evidence as a whole.

The Court found no direct evidence that King's termination was based on sex discrimination for three reasons. SPA-79.

First, the Court found that the comments made to King did not reflect gender-based stereotyping that a jury could use to find the presence of discrimination. It was the province of the jury, not the Court, to determine if the comments made to King reflected gender-based stereotyping based on all the evidence and not just the Complaint. This case involves King's male DM telling her to exercise in the presence of her largest client, the male CEO of VHS, thereby directly tying the need for her to change her physical appearance as a woman with the need to please her male client and retain business. The stereotype is that a businesswoman should be physically attractive to be successful in business relationships.

In *Price Waterhouse v. Hopkins*, 490 U.S. 228, 250-51 (1989), the stereotypical enhanced image of a woman was that she be feminine; in the instant matter, that King should be thin. That the same criterion was not demanded of the male managers raises a question of fact as to whether such comments were based on gender. A-982.

Thomas' multiple comments to King ("Wow you must be hungry" "Wow, look at that tray") about the quantity of food she ate implying she should eat less,

together with his expression of disgust after staring at her belly two to three times a week during her tenure while she reported to him—which the Court ignored—and telling King a couple of different times she should go to the gym at 5:30 a.m. because the CEO of VHS would be there and like to see King actively working out raises a question as to whether Thomas' conduct was based on her sex. A-982-83,1066,1097-98,1170-71; *see Johnson v. J. Walter Thompson USA, LLC*, 224 F. Supp. 3d 296, 309 (S.D.N.Y. 2016) (supervisor's snide remark about Plaintiff eating at a work event, implying she should eat less, were perhaps not obviously sexual, considered in context were potentially sexual or sexually hostile in nature and implication).

Further, there is no non-discriminatory business reason for Thomas' conduct and statements to King, as Thomas' manager, Tracy Miller, RVP, testified that a male DM should not stare at a female's body parts nor tell a female GM that she should visit the fitness center early in the morning because the VHS CEO was there at that time and would like to see she was working out. A-1345-46.

The Court's reliance on cases dealing with comments regarding bodyweight, and not tied to job performance, are inapplicable. *See Cushman-Lagerstrom v. Citizens Ins. Co. of Am.*, 72 F. App'x 322, 325 (6th Cir. 2003) (poking fun at a heavy-set woman who wore a muumuu); *Czerwinski v. NYS Dep't of Corr. & Cmty. Supervision*, 394 F. Supp. 3d 210, 220-21 (N.D.N.Y. 2019) (only evidence

was a general statement included in the 12(b)(6) motion response, but absent in the Complaint, that male supervisor "has made statements about [Plaintiff's] weight and referenced [her] working out"); *Aiello v. Stamford Hosp.*, No. 3:09cvl 161(VLB), 2011 WL 3439459, at *2 (D. Conn. Aug. 8, 2011) (told plaintiff he was getting heavy and would routinely push on his stomach with his hands); *Kamrowski v. Morrison Mgmt. Specialist*, No. 05-CV-9234 (KMK), 2010 WL 3932354, at *13-14 (S.D.N.Y. Sept. 29, 2010) (referring to two of plaintiff's coworkers as "fat ass" and "dumb as a door bell").

Moreover, the Court's reliance on *Dawson v. Bumble & Bumble*, 246 F. Supp. 2d 301 (S.D.N.Y. 2003) is misplaced. Unlike *Dawson*, Thomas' comments and conduct made it known to King that working to change her body image by exercising where her male client could see her and eating less would be favorably perceived by her male client. King is not asking the Court for speculation. Viewing the facts in the light most favorable to King shows that King is not adding a gendered gloss to the comments. A reasonable jury could conclude that the comments made to King by Thomas reflected gender-based stereotyping.

Second, the Court found King did not have personal knowledge that Thomas did not make such statements to Williford, Harriman or DeGori. SPA-79. In doing so the Court failed to view the evidence in the light most favorable to King. The facts most favorable to King show she had personal knowledge that Thomas did

not make such statements to Williford, Harriman or DeGori. Regarding Williford, he and Mr. Merrill, CEO of VHS, had offices in Winchester where the gym was located. King was in the presence of Thomas and Williford on many occasions and never heard Thomas say these things to Williford or saw Thomas disapprovingly stare in disgust at Williford's midsection although he was heavy in the stomach area. A-982,1097. The Court relied on Aramark's factually unsupported statement that King was not present for most interactions between Thomas and Williford. *See* A-1853(citing A-244-45,¶¶166-67). Thus, the Court erred in finding that King's statements concerning Williford are not supported by personal knowledge. Regarding Harriman and DeGori, who also were heavy in the stomach and reported directly to Thomas, A-980-82,1097, the Court relied on Aramark's assertion that King had approximately 15 interactions with them. *See* A-1853(citing A-244-45,¶¶166-67). King had more than approximately 15 interactions with them. While Harriman and DeGori were at different locations they, like Williford and King, participated in Thomas' weekly district meetings/conference calls (approximately 52 times each year), and attended various other scheduled meetings such as District Meetings and overlapping work related matters. A-1063,1247-51,1264-65,1313-16. Further, despite representing and questioning Thomas, Williford, Harriman and DeGori at the depositions in this case, Aramark's counsel did not ask them if Thomas made such comments to them,

did not address it in Thomas' Declaration nor submit a Declaration of Williford, Harriman or DeGori, although they could have done so to refute King's testimony. Thus, taking the facts in the light most favorable to King, a reasonable jury could find that Thomas did not make similar comments to Williford, Harriman or DeGori.

Third, the Court found King relied on a single instance where Thomas made a joke about women and determined it was a stray remark. SPA-79. Taking the evidence in the light most favorable to King, Thomas told *jokes* about women. King recalled that during the VHS proposal review in 2015 Thomas told a joke about women when King was with an all-male team. A-983,1065,1098. Aramark did not argue Thomas did not tell jokes about women but rather the one joke King recalled was a stray remark. The Court disregarded this evidence by not taking into account or properly crediting that it occurred multiple times.

Based on the foregoing a reasonable jury could find that Thomas' comments together with his frequent staring at King's belly and jokes about women reflect his discriminatory attitude.

### C. A REASONABLE JURY COULD FIND THE FACTS GIVE RISE TO AN INFERENCE OF SEX DISCRIMINATION

Because direct evidence of discrimination, i.e., a "smoking gun" is typically unavailable, courts frequently rely upon the *McDonnell Douglas* three-part burden shifting analysis. *Chambers*, 43 F.3d at 37. To establish a prima facie case of gender-based disparate treatment, plaintiff must show that: (1) she belongs to a protected class; (2) she was performing her duties satisfactorily; (3) she suffered an adverse employment action; and (4) the adverse employment action occurred in circumstances giving rise to an inference of discrimination on the basis of her membership in that class. *Feingold v. N.Y.*, 366 F.3d 138, 152-53 (2d Cir. 2004).

Aramark only contended that King did not satisfactorily perform her job and there was no inference of discrimination. A-200-04.

The Court properly ruled that whether King satisfactorily perform her job was a question of fact for the jury. SPA-85. However, the Court erred in finding there was no inference of sex discrimination. SPA-105.

First, as set forth in Point I(B) *supra*, Thomas' comments and conduct create an inference of sex discrimination. Thomas also engaged in additional conduct of speaking to King in a rude and condescending tone, as witnessed by an Aramark executive, while King never heard Thomas speak in a rude and condescending tone to any male manager. A-983,1013,1089,1112. Additionally, Thomas used King's

performance with VHS as a negative example at meetings or on calls while Thomas never coached or criticized any male manager during these calls or in-person meetings nor acted annoyed or agitated because of something male managers did wrong. A-983-84,1089. The Court's reliance on *Stewart v. Fashion Inst. Of Tech.*, No. 18-cv-12297 (LJL), 2020 WL 6712267, at *9 (S.D.N.Y. Nov. 16, 2020) is misplaced because there, unlike here, the only evidence was that of being harshly criticized in a condescending, rude and unfounded manner. Contrary to the Court's determination, a reasonable jury could determine that Thomas' comments when considered in combination with the other evidence create an inference of sex discrimination.

Thomas was also intimately involved with Aramark's sham investigation of King's alleged BCP violation further creating an inference of discrimination. The facts taken in the light most favorable to King show that King did not have a car on August 30, 2017, and August 31, 2017. A-1038,1130,1176. Cubbage and King, who live one mile apart, drove together to WMC on both dates for business reasons. A-1038-39,1131. On August 30, 2017, they had to be at WMC for a Food Directors meeting previously scheduled by King. A-1038-39,1131,1761. On August 31, 2017, King's meeting with Cubbage on two time-sensitive matters, MOW and Prima, had to be moved from Page to WMC because King was directed by Thomas to be at WMC. A-1038-39,1050,1130-31,1176-77. While at WMC on

August 31, 2017, Cubbage left to take her dog to an emergency vet appointment and went to Page afterwards to work. A-1039-40,1131-32,1179-80,1764-65. When King directs an Aramark employee to go to a VHS facility which is not his/her VHS home station to work on a specific project, Aramark policy and procedure entitles the employee to mileage reimbursement. A-351,1040,1132. Cubbage submitted travel expenses to WMC on both dates approved by King. A-1039-40,1131-32,1754-59.

On September 18, 2017, when King arrived at a meeting with Thomas allegedly about her PIP progress, Thomas immediately telephoned Barrett who advised King she was under investigation for violating the BCP for authorizing travel reimbursement for Cubbage. A-1048-49,1132,1174. King had only authorized Cubbage's travel expenses in accordance with the BCP. A-351,1040,1132. Thomas saw Cubbage and King at WMC on both dates engaged in work. A-1048-49,1133. King told Thomas and Barrett that she did not do anything wrong and why would she approve an expense if it was a BCP violation as opposed to trying to hide it. A-1405-06,1782. King was not given any documents nor asked any details of what occurred on August 30, 2017, or August 31, 2017. King would have explained had she been given the opportunity to do so by Thomas or Barrett. A-1048,1132-33,1175-76.

Barrett's investigation process requires interviewing the complainant, the witnesses, the person being complained about, any additional witnesses and the person being complained about again if necessary, getting signed statements from those interviewed, and not making a decision before getting all of the facts. A-1043-44,1364-70. Thomas brought the complaint to Barrett based on Williford allegedly telling Thomas that Williford saw Cubbage dropping King off at WMC. A-1044,1233-34,1327-28,1381,1383. Thomas admitted to Barrett that he saw Cubbage in an office inside WMC on August 31, 2017, thereby refuting Williford's claim that Cubbage dropped King off. A-1047,1384-85,1389. The ultimate question Barrett had to resolve was whether Cubbage was inside WMC on August 31, 2017 and, if so, why? Despite this, Barrett did not question Williford or obtain his statement. A-1044,1327-28,1381-84. She did not ask Thomas if King was with Cubbage when he saw her or what he saw Cubbage doing there. A-1046,1390,1407-08. Further, Thomas was present when Barrett interviewed Cubbage and Barrett only asked Cubbage if she drove King to WMC and not if Cubbage was there working, or when Cubbage traveled to Page. A-1045-46,1387-88,1402-04,1442-45. Most importantly, Barrett did not give King a chance to explain the reason she approved this business expense. A-1048,1132-33,1175-76. No signed statements were obtained from anyone. A-1385-86,1396-97,1410-11,1442-44.

King had complained directly to Barrett in July 2017 that Thomas was engaging in further discrimination and retaliation against King and seeking to terminate her. A-1030,1124. Barrett was also personally involved in Thomas' July 24, 2017 attempt to terminate King using inaccurate or inapplicable data and not demonstrating through comparisons that King was performing at a lower level than the males reporting to Thomas, A-1032-33,1125,1723,1741,1745, as well as his continued failure to provide King a PIP as provided by Aramark policy. A-995-96,1033,1037,1101,1126,1646-47.

Although an insufficient investigation leading to an adverse employment action against the accused is, alone, insufficient, where the plaintiff can point to evidence tied to the adverse employment action that could be interpreted as indicating that discrimination drove the decision, an insufficient investigation can support an inference of discriminatory intent. *Sassaman v. Gamache*, 566 F.3d 307, 314-15 (2d Cir. 2009).

Here, the evidence shows that Barrett departed from her own investigation procedure and failed to seek foundational information essentially conducting no investigation at all. A-1043-44. Barrett did not interview Williford despite admitting it would be important to have done so. A-1044,1327-28,1381-84. Although Barrett knew Thomas had seen Cubbage in an office inside WMC, Barrett failed to question Cubbage or Thomas about why Cubbage was inside

WMC on August 31, 2017. Barrett accepted as true Thomas' accusatory version of events without getting King's side of the story, which would have revealed Cubbage was at WMC for a business reason. A reasonable jury could find that on August 31, 2017, Cubbage drove with King to Winchester where they worked on the time sensitive MOW and Prima matters, left Winchester to go home to bring her dog to the veterinarian and then drove to Page to finish working resulting in her request for reimbursement which was properly approved by King. Further, that there was no real investigation as to why Cubbage drove to Winchester on August 31, 2017. In light of the evidence showing Thomas' discriminatory, harassing, and retaliatory treatment of King, in conjunction with his involvement in the investigation of King, whether the departure from procedural regularity gives rise to an inference of discrimination is a question for the jury.

Thomas' disparate treatment of similarly situated males also evidences his discriminatory animus. Discriminatory animus can be established by showing King was similarly situated in all material respects (subject to the same workplace standards and comparable seriousness of conduct disciplined) to individuals with whom she seeks to compare herself, which is a question of fact for the jury. *Graham v. Long Island R.R.*, 230 F.3d 34, 39-40 (2d Cir. 2000). Thomas treated his direct reports as equal positions regardless of their client size and location. They were the highest-level operations managers and direct contact for the client at

the location. DeGori, Harriman, Wilson, Drayton and King were all directly responsible to interface with, maintain and retain the client; manage the day-to-day operations; grow the business; manage the budget; implement and oversee company standards, procedures and programs; supervise and manage employees; hire, fire and discipline employees; and were held to the same performance standards. The DM would send emails to them as a group relative to these duties. They were supervised, managed, evaluated, and disciplined by the DM. They were required to attend weekly meetings chaired by Thomas, District Meetings, and various other overlapping work-related matters. A-980-81,1063,1087-88. Soon after hire Williford became a direct report to Thomas. He then attended the meetings Thomas held for his direct reports and was accountable for those financial aspects that interfaced with Thomas' other direct reports. A-981-82,1088. Further, they held comparable intermediate managerial positions subject to the same workplace rules and workplace standards. A-973-74,976-78,1063,1484-97,1499-1531,1533-35,1538-40,1646-48.

King was allegedly terminated for violating the Aramark BCP which applied to all employees and required compliance with health and safety laws, sexual discrimination and harassment laws, as well as business conduct and practices addressing expense reports. A-973-74,978,1499-1531. "Food safety is absolutely critical" at Aramark. A-1374. Despite this, Harriman was permitted by Thomas to

have "ongoing, numerous and frequent Food Safety issues" for over a year in violation of safety standards. A-1650. This conduct violated the BCP which mandates that all employees comply with all health and safety laws and protect human health and safety. A-1512. Instead of Thomas disciplining Harriman, Harriman was rated as "On Target" and promoted to a higher position at a new location which became a COVID epicenter within five months. A-996-98,1666,1670-71. In contrast, King was issued as part of her First Written Documentation dated August 29, 2016, discipline for not advising Thomas that a safety regulatory agency was onsite at one of her locations, even though subsequent to the inspection the Department of Health chose that location as a training center. A-997,1003-04,1653. Further, Harriman was rated as "On Target" and promoted, A-997-98, while King was terminated for an alleged violation of authorizing a $56.68 travel expense for her subordinate to travel to another location to work with King on time sensitive matters. A-1038-40,1058,1130-32. King's work with Cubbage assisted her in securing the Aramark contracts with MOW for three locations. A-1039,1131. Contrary to the Court's finding, a reasonable jury could conclude that food safety issues in a hospital setting are of a comparable seriousness with King's alleged misconduct.

Additionally, Thomas violated Aramark's BCP by directing King to rate Heather Rizzo ("Rizzo"), a high performing EVS manager who reported to King, a

"0" and receive no salary increase and not advance her to interim EVS director or assistant EVS director position. A-998,1037. Rizzo complained to King that Rizzo refused Thomas' directive to fraudulently change numbers on a report to make the results look more positive which is a violation of the BCP. Rizzo contacted the Hotline but no investigation was conducted and no one contacted her. A-1111-12,1129-30,1517. A reasonable jury could conclude that Thomas directing King and Rizzo to falsify performance and financial documents respectively is of comparable seriousness with King's alleged misconduct yet no action was taken against Thomas.

Thomas' discriminatory animus was further evidenced by his repeated disparate treatment of King relative to her terms and conditions of employment compared to Thomas' other male head of operations.

Despite King's complaints, Thomas allowed Harriman, DeGori and Wilson to intentionally violate the Aramark VOC program rules to ensure more favorable customer results to meet their VOC performance targets and positively impact their performance ratings while utilizing King's accurate VOC data in Thomas' attempt to terminate King on July 24, 2017 and in King's PIP stating "overall retail satisfaction YTD is below 60% VOC target." A-1032-34,1166-68,1271-75,1310-12,1725,1750. The Court erred in finding that because King did not violate the VOC rules nor ask Thomas to do so there is no discrimination. SPA-94-95,102. A

reasonable jury could conclude that Thomas allowing male comparators to falsely enhance their performance results and utilizing King's accurate results in an attempt to terminate her demonstrates a discriminatory animus toward King.

Male operational heads were given offices at their main hospital in which to conduct necessary confidential business such as meeting with the client and employees and maintaining confidential records. A-984-85,1089-90,1243-47,1268,1290-91,1298-99. Thomas' boss, Miller, testified that GMs typically have their offices in the client's largest hospital, and she has never seen in her region a GM not housed in the client location. A-1347. Before Thomas was her supervisor King had an office at WMC, her largest client location, until there was a space issue. A-972,1083-84. Once an office became available again Thomas was her manager and gave it to Williford who did not oversee anyone or anything at WMC and could have had a secured office for his financial records and conversations at Cork Street Hospital ("Cork"), a VHS fifteen-bed facility in Winchester, where other VHS corporate officers had offices. A-984-85,1089-90. King had to share an all-windowed small conference room with hourly supervisors giving her no privacy to handle confidential matters. A-984,1089-90. The Court found that they were not similarly situated with respect to an office because they worked in different locations and office space was limited at WMC. SPA-93,97-98,101. A reasonable jury could find Thomas' denial of an office for King at her client's

largest hospital, while male operational heads had offices at their clients' hospitals, demonstrates a discriminatory animus toward King.

In the Action to be Taken relative to King's Final Written Documentation dated March 24, 2017, Thomas required King to obtain his advance approval for financial decisions exceeding $1,000 because she had contacted US Foods in connection with a Market Basket Study. A-1015-18,1116,1710. King told Thomas compliance was impossible to do her job day-to-day as she managed up to $23 million in total managed volume and had employees reporting to her requesting approval to place food orders 28-45 times a week for over $5,000 each. Thomas created this directive knowing that King could not comply, and it would paralyze her business if she did so. A-1018,1116. Male operation heads Wilson, DeGori, and Harriman never had such a requirement. A-1239,1262,1293,1309. Further, although Williford contacted US Foods regarding the same Market Basket Study Thomas took no action against him. A-1017,1116. Williford was never told by Thomas not to contact US Foods regarding the Market Basket Study, A-1322, and it is unclear if Williford contacted US Foods after King as his March 22, 2017, email states that he reached out to US Foods "a while ago." A-1019,1714-15. In addition, when Williford made errors relative to important matters Thomas would joke about "Money's"(Thomas' nickname for Williford) mistakes and provide general guidance on how to handle it in the future. A-1000,1027,1122,1323. A

reasonable jury could find Thomas' imposition of an impossible requirement was not a result of any performance issue by King but evidence of his discriminatory animus toward King.

Thomas' direct reports as operational heads were Aramark's direct contact to each of their clients. A-980,1087. The Court did not address that Thomas would undermine King's relationship with her client by: directing her to cancel previously scheduled meetings with her client; ignoring requests of the client such as not to poach trained staff; agreeing to provide coverage during King's FMLA leave but failing to do so; and removing EVS responsibilities from King but refusing to inform her client. Thomas did not undermine the authority of his direct male reports. A-987,993,1007-08,1091,1302-03,1305.

Thomas would undermine King by meeting with King's subordinate employees without her knowledge and tell her afterwards. A-986,1091. Thomas did not meet the subordinate employees of his male direct reports without their knowledge. A-1256,1258,1270-71,1287,1305. The Court ignored deposition testimony of DeGori, Harriman and Wilson choosing instead to rely on Thomas' Declaration and found that there was no support in the record for King's assertion. SPA-93,98-99,103. Thomas would also meet with King's client without her and did not do so with his male direct reports. A-987,1091,1256,1270,1287,1325-26. A reasonable jury could find Thomas' meeting with King's subordinates and her

client without her knowledge undermined her authority and was further evidence of his discriminatory animus toward King.

King rolled out Aramark's Treat Yourself Program ("TYP") throughout Thomas' district. All of Thomas' direct reports, including King, were required to implement the program for their own client accounts. A-1030-31,1124,1231. When Harriman and Drayton did not comply Thomas said it was fine. A-1124,1276-77. The Court mistakenly found that King, Harriman and Drayton were not similarly situated because King rolled out the program districtwide ignoring that all three of them were required to implement the program for their own client accounts. SPA-97-98. A reasonable jury could find Thomas' requiring King to meet the TYP deadline while permitting males not to do so was further evidence of his discriminatory animus toward King.

Despite providing suitable coverage, A-1212,1217-18, Thomas disciplined King for not personally supporting Norton despite her client's objection while not even asking Wilson and DeGori to do so. A-987-88,1096-97,1105,1254-55,1308,1653. Thomas' failure to ask DeGori does not make them not similarly situated. Contrary to the Court's finding, a reasonable jury could find such conduct demonstrates a discriminatory animus toward King. SPA-92.

After King hired Williford in April 2015 as the VHS financial controller, Thomas, over her client's objection, diverted approximately 50% of Williford's time to managing the financials of and assisting Thomas' male direct reports leaving King to bear Williford's full cost without his full services, negatively impacting her VHS budget and performance. A-981,985-86,1035-36,1089,1091-92,1128,1624. The Court erroneously found the hospital system size and location between Thomas' direct reports made them dissimilar. SPA-93,102. A reasonable jury could find Thomas' utilizing Williford's financial services paid for by King to assist Thomas' male direct reports demonstrates a discriminatory animus.

Despite having access to her computer calendar, Thomas disciplined King for not sending him her weekly schedule on Sundays while not requiring his male direct reports, including DeGori and Harriman who managed multiple locations, to do so. A-1003,1102,1214-16,1252,1324,1360,1378-79,1653. The Court found because King managed more facilities further away from each other she was not similarly situated with Thomas' male direct reports. SPA-94,99,103. A reasonable jury could conclude that Thomas, who had access to King's computer calendar, was harassing King demonstrating his discriminatory animus.

Thomas provided thorough PowerPoint training and conference call prior to his male reports having to prepare "Top 15" reports while requiring King to do so without such training. When Thomas sat with King on one occasion to do the

"Top 15" report, King saw a "Kristen King legal file" on his computer. A-996-97,1012-13,1110,1171. When Thomas learned that King had complained about him he began maintaining this legal file on her while not doing so for his male direct reports. A-1210-11,1213-14. The Court's speculative finding that because King had a larger account she may have been in the vanguard of this initiative merely elevates her need for at least equivalent training to utilize the report, which a reasonable jury could find she was denied due to Thomas' discriminatory animus. SPA-94,102.

Aramark's policy is that all employees be advised of performance issues and given an opportunity to correct them. A-995,999,1343-44,1356,1646. Employees need not be of the exact same rank to be similarly situated so long as they are subject to the same workplace rules and policies. *See Hargett v. Nat'l Westminster Bank*, 78 F.3d 836, 840 (2d Cir. 1996); *Dotson v. City of Syracuse*, 763 F. App'x 39, 43 (2d Cir. 2019) (summary order). In August 2016, Thomas disciplined King without any coaching, A-999-1000,1362,1653, and denied King's request for a PIP to determine Thomas' expectations. A-1000,1101-02. When he finally gave her a PIP on August 16, 2017, it was deficient having no specific goals or areas of improvement. A-1033,1749-52. Instead of discipline, Thomas gave male direct reports opportunities to correct deficiencies along with general guidance and training/assistance. A-1000,1323. When a client refused to tolerate Jeff

Soloway's ("Soloway") performance issues Thomas moved Soloway to King's client reporting to her. When his performance issues continued Thomas prohibited King from disciplining Soloway and instead worked with Soloway to avoid further discipline. A-1036,1129,1162-63. Thomas also directed King to train and provide assistance to Drayton in weak areas. A-1035,1128. Contrary to the Court's finding a reasonable jury could find that Thomas controlled King, Soloway and Drayton's opportunity to correct performance issues prior to discipline and due to his discriminatory animus denied King the opportunity to do so. SPA-96-97,100.

King was disciplined for not being present during a joint commission site survey at Shenandoah Memorial Hospital ("Shenandoah"). A-1653. Shenandoah's results were so strong that the Department of Health chose that location to train their staff, and Thomas confirmed that King had overseen approximately thirty-six successful surveys. Knight was not disciplined for failing to attend that survey even though he was responsible for the EVS portion. A-1003-04,1102-03,1219-20. The Court's finding that this item of discipline was removed when the revised First Written Documentation was issued, SPA-99, ignored Thomas' conduct in issuing the initial written discipline, that Thomas did not independently remove the item as well as the revised First Written Documentation, A-1707, which included a new discipline item under Knight's area of responsibility, not King's, to which King was denied the opportunity to respond. A-1011-12,1109-10. A reasonable jury

could find that Thomas disciplining King for issues that he did not discipline males and issuing discipline for conduct she was not responsible for demonstrates Thomas' discriminatory animus.

Shortly after King complained about Thomas, she was advised by Thomas and Adams that she would no longer be allowed to work from her Virginia home office, which she had been authorized to do since the beginning of her employment and was not dependent her son's illness, leaving her no private office in the VHS area. A-971-72,992,1021,1083-84,1086,1117-18. Thomas continued to allow Williford to work from his WMC office and home office less than ten miles from WMC. A-984,1021-22,1118. The Court mistakenly concluded that King and Williford are not similarly situated on the issue of a home office because King was allowed to work at her NY home office when her son was ill overlooking that King had no private office and Williford was allowed a private WMC office and home office ten miles apart. SPA-100-01. A reasonable jury could conclude that Thomas denying King the opportunity to work from her Virginia home office when she had no designated private office space at WMC while permitting Williford to work from both his WMC office and close by home office further demonstrates Thomas' discriminatory animus.

In or about June 2016 while King was the dual GM of Food and EVS for VHS Thomas told King that Aramark was abolishing all dual manager positions,

so King was to be only GM of Food. However, both Wilson and Marsh continued as dual GMs. A-981,989-90,1088,1099. Wilson testified that Food and Valet were separate and distinct areas. The client would direct Aramark as to how they wanted things to be done. His client wanted him to remain in the role of dual GM of food and valet which he did. A-1295-98,1302. King's client wanted her to remain in the role of dual GM of Food and EVS but Thomas disregarded her client's wishes and removed her. A-990. Further, King's replacement was hired as a dual GM of Food and EVS for VHS. A-1060,1333-36. Contrary to the Court's finding, a reasonable jury could find that Thomas removing King's dual GM role despite her client's wishes while permitting Thomas' male direct reports to retain their dual GM role demonstrates a discriminatory animus. SPA-99-100,102.

The court also ignored in its determination the following instances of disparate treatment: Thomas would contact King with work-related issues while she was on FMLA but would not interrupt Williford's leave, A-978-79,1002,1092-93,1203-04,1257; Thomas would exclude King from important meetings and meet alone with her clients while not doing so with his male direct reports, A-986-87,1001,1029,1091,1098,1100,1123,1256,1269,1287,1325-26; Thomas would show up to King's locations without advance notice while not doing so to his male direct reports, A-986,1091,1256,1270; Thomas would not assist King in training, presentations, nor proposals but would provide such assistance to his male direct

reports, A-1031,1124-25,1127-28; Thomas interfered with King's supervision of subordinates with regard to hiring, discipline, and merit pay increases while not doing so to his male direct reports, A-998,1025,1036-37,1093,1111-12,1120-21,1129-30,1256,1270,1305; and Thomas made unreasonable demands of King's work. A-994-95,1095.

Importantly, instead of evaluating whether King and Thomas' male direct reports were similarly situated in all material respects, the Court relied on minor differences between them to conclude they were not similarly situated. King's evidence established that all of Thomas' direct reports shared the same duties, were subject to the same workplace rules and standards, and engaged in conduct of comparable seriousness. *See Graham*, 230 F.3d at 40. Moreover, the treatment of males is relevant evidence of Thomas' attitude about gender. *See Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 109 n.7 (2d Cir. 2010). From the evidence of disparate treatment proffered by King, a reasonable jury could find that Thomas demonstrated a discriminatory animus.

Finally, considering all of the evidence in the light most favorable to King a reasonable jury could find the facts give rise to an inference of sex discrimination.

Moreover, the Court erroneously weakened King's prima facie case in multiple ways. First, the Court improperly undercut the plausibility that King was

terminated because she is a female because two of three decisionmakers were female. SPA-103-04. This Court has recognized "[t]he proposition that people in a protected category cannot discriminate against their fellow class members is patently untenable." *Danzer v. Norden Sys., Inc.*, 151 F.3d 50, 55 (2d Cir. 1998). The Court erroneously relied on *Betterson v. HSBC Bank, USA, N.A.*, 139 F. Supp. 3d 572, 587-88 (W.D.N.Y. 2015) (older female supervisor initially interviewed and hired plaintiff, and multiple supervisors made the same complaints). Importantly, the Court failed to consider that the impermissible bias of a single individual who played a meaningful role in the process may taint the ultimate outcome. *Back v. Hastings On Hudson Union Free Sch. Dist.*, 365 F.3d 107, 125-26 (2d Cir. 2004).

The Court also ignored Thomas' treatment of other females finding that King's evidence regarding the treatment of other female employees is conclusory. SPA-103. Thomas directed King to falsely rate Rizzo at "0" with no salary increase and not advance Rizzo's career. Rizzo told King she refused Thomas' directive to falsify documents and reported him to the Hotline who did nothing. A-998,1037,1068,1111-12,1129-30. While Thomas did not recall Allison Siegel ("Siegel") believing he retaliated against her because of her Hotline complaint against him, he recalled Siegel saying she was "frustrated working with him," and admitted being removed from the location at the client's request while Siegel remained with a new DM. A-1067,1194-1200. Further, in Winter 2017 Mara

Rakowski ("Rakowski") became dual GM of Food and EVS reporting to Thomas as DM of Food and Knight as DM of EVS. Williford testified that Rakowski made multiple complaints about Thomas and resigned after about one year. A-1060,1067,1333-38. This Court has recognized that evidence of discrimination against other employees can be relevant to prove evidence of a discriminatory intent. *See Chin v. Port Auth. of N.Y. & N.J.*, 685 F.3d 135, 147, 150 (2d Cir. 2012). Thus, a reasonable jury could infer that Thomas' treatment of females demonstrates his discriminatory animus toward King.

Finally, the Court erred in finding that King's prima facie case is undermined because her replacement, Rakowski, is female. SPA-104-05. Considering the prima facie evidence proffered by King, Thomas' maintenance of a "Kristen King legal file", and Thomas' treatment of Rakowski, a reasonable jury could conclude that Rakowski was hired to conceal Thomas' prior discrimination. *See Holcomb v. Iona Coll.*, 521 F.3d 130, 143 (2d Cir. 2008).

### D. A Reasonable Jury Could Find Aramark's Purported Reasons For King's Termination Were A Pretext For Sex Discrimination And Retaliation

Although the Court found King did not establish a prima facie case of sex discrimination it addressed the remaining prongs of the *McDonnell Douglas* framework "for completeness". SPA-105.

Regarding King's retaliation claim, the Court found King established a prima facie case of retaliation due to her multiple complaints, termination on September 21, 2017, and the causal connection between her July 2017 complaint to Barrett about Thomas' discrimination, harassment and retaliation and September 21, 2017, termination within three months of that complaint. SPA-111-112.

The Court next found that Aramark articulated a legitimate non-discriminatory and non-retaliatory reason for King's termination satisfying the next prong, SPA-105,112, and shifting the burden back to King for the final prong to show Aramark's explanation is a pretext for discrimination and retaliation. SPA-106,112.

King may rely upon the same evidence that comprised her prima facie case to meet her burden, regardless of whether she relied on direct or circumstantial evidence. *Back*, 365 F.3d at 124; *see Chambers*, 43 F.3d at 37-38. Here, the Court erred in finding that King did not establish a prima facie case for discrimination,

*see supra* pp. 22-48, and the Court's reliance on that determination in evaluating pretext is likewise erroneous.

"'[B]ut for' causation does not require proof that retaliation was the only cause of the employer's action, but only that the adverse action would not have occurred in the absence of a retaliatory motive." *Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 846 (2d Cir. 2013).

Aramark's proffered legitimate, non-discriminatory, non-retaliatory reasons to terminate King are:

> Aramark's investigation determined that she violated Aramark policy by having Aramark essentially cover the expense of her normal commute on August 31, 2017 when she had Ms. Cubbage drive and drop her off at WMC and then told Ms. Cubbage to submit a mileage reimbursement request that Ms. King then approved thereby violating Aramark policy, and her continued performance issues, including not having the requested items for her September 18, 2017 PIP review meeting.

A-207-08. However, the jury may reject that explanation. While Aramark claims Barrett fully investigated this incident, A-1857-58, the facts as set forth in Point I(C), *supra* pp. 29-33, belie such claim.

In light of Barrett's knowledge of King's prior complaints about Thomas, Thomas' recent unfounded attempt to terminate King, and Thomas' admission of seeing Cubbage inside WMC in an office on August 31, 2017, *see supra* p. 31, the

jury may find that Barrett did not follow her normal investigation procedures nor seek evidence from King and Cubbage to determine the investigation's essential question, whether King's approval of Cubbge's travel reimbursement was an appropriate business expense, in order to substantiate the articulated false reason for King's termination and that the real reason for her discharge was further discrimination and retaliation against King.

The jury may also reject Aramark's second explanation for King's termination, her continued performance issues, including not having the requested items for her September 18, 2017, PIP review meeting.

On August 16, 2017, Thomas with Barrett placed King on a ninety-day PIP with no specific targets, specific locations, or improvement goals in violation of Aramark policy. A-1033-35,1126-27,1749-52. Thomas wanted to review her PIP on September 18, 2017, at WMC but King had a conflict and needed to be at Warren Memorial Hospital ("Warren"). A-1051,1132,1784. Just before King left home for Warren the morning of September 18, 2017, she received Thomas' email sent September 17, 2017, at 8:34 PM setting the PIP meeting in Warren. Some of the documents King had gathered for the PIP meeting were at WMC and unavailable to her. A-1050-52,1132,1786. Further, at the PIP meeting King was immediately advised she was under investigation and there was no discussion regarding the PIP. A-1052,1132-33. A jury may find that Aramark's termination

of King because she failed to produce documents at her September 18, 2017 PIP meeting held without reasonable notice and no PIP discussion is another false reason for King's termination.

The Court also erroneously failed to consider whether King's alleged continued performance issues were pretextual finding it was not a "super-personnel department." SPA-109. A jury may find that Aramark's termination of King because of continued performance issues when Thomas disparately disciplined her, A-988,996,999,1003-10,1014-17,1023-28,1054-55,1096-97,1101-08,1113-16,1119-23, actively impeded her performance, A-1017-18,1116, attempted to terminate King using false data and no comparison to data male direct reports, A-1032-33,1125, continually failed to provide King a PIP, A-1000,1012,1023-24,1101-02,1109-10,1118-19,1126, and when he did placed her on a bogus PIP, A-1033-35,1126-27,1749-52, is untruthful and the real reason for her discharge was further discrimination and retaliation against King.

### E. A Reasonable Jury Could Find King's Timely Claims Of HWE Were Actionable And Part Of A Continuing Violation Of Discrimination

The Court erred in granting Aramark's motion for summary judgment dismissing King's HWE claim on the basis that it was limited to only three acts within the statutory period of September 20, 2017 to July 18, 2018, namely: (1)

Thomas's September 20, 2017 email to Barrett stating he was prepared to tell Mr. Amos that Aramark is terminating King; (2) the September 21, 2017 phone call advising King of her termination; and (3) the response to King's September 19, 2017 Hotline call, and they were not actionable or part of an actionable HWE practice. SPA-75-77.

The continuing violation doctrine demonstrates that acts occurring before the statutory periods can establish HWE liability in Title VII cases. *See Fitzgerald v. Henderson*, 251 F.3d 345, 363-64 (2d Cir. 2001); *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 115 (2002).

Moreover, the continuing violation doctrine applies when a plaintiff files a timely charge is relative to an incident of discrimination in furtherance of an ongoing policy of discrimination, rendering all claims of discrimination under that policy timely even if they would not otherwise be timely standing alone. *Chin*, 85 F.3d at 155-56; *Cornwell v. Robinson*, 23 F.3d 694, 703-04 (2d Cir. 1994).

> [E]ven where there is no formal policy, the continuing violation theory may be used where there have been specific and related instances of discrimination, and the employer has permitted them to continue unremedied for so long that its inaction may reasonably be viewed as tantamount to a policy or practice of tolerating such discrimination.

*Fitzgerald*, 251 F.3d at 362. A continuing violation is not limited to a widespread identifiable discriminatory practice or policy as it may be established by demonstrating a series of related acts against a single person. *Id*..

Explicit acts of discrimination render facially neutral acts relevant to a hostile working environment. *Rasmy v. Marriott Int'l, Inc*., 952 F.3d 379, 388 (2d Cir. 2020). In any HWE claim, facially neutral incidents may be included when considering the totality of the circumstances, so long as there is some evidentiary basis for inferring that they were in fact based-on sex. *Kaytor v. Elec. Boat Corp*., 609 F.3d 537, 547-48 (2d Cir. 2010).

The continuing violation doctrine warrants this Court's consideration of Thomas' harassing and discriminating acts against King before September 20, 2017 and Aramark's failure to take action to address them. As the facts taken in the light most favorable to King show, King made repeated complaints regarding Thomas' discriminatory, harassing, and retaliatory conduct and Aramark failed to take action in response to King's repeated complaints about Thomas which is tantamount to a policy or practice of tolerating discrimination in the workplace. *See supra* Point I(C); A-989-91,995,1000-01,1013-14,1020-22,1030,1059,1062-63,1095,1098-1101,1112-13,1117-18,1124,1134-35,1451-59,1777-80.

Aramark's response to King's September 19, 2017 Hotline Complaint is another continuance of Aramark's practice of tolerating workplace discrimination. On September 18, 2017 King attended a meeting that was supposed to be a review of her PIP progress, but instead was told by Thomas and Barrett that she was under investigation for a BCP violation. Thomas instigated the allegation of a BCP violation by King and investigated it alongside Barrett. The investigation was a sham. *See supra* pp. 29-33. On September 19, 2017, King made another complaint to the Hotline regarding Thomas and Aramark's continued failure to take action in response to her complaints. King even requested a new investigator because nothing was done relative to her prior Hotline complaint. The Hotline Report shows that no independent investigation was done as no witnesses are listed as being interviewed and King was not contacted. A-1057,1134,1192,1799. Despite no interviews with King or anyone else, Thomas' involvement in the investigation is demonstrated throughout the Hotline Report by specific references to him such as: "per Griff", "Griff felt", "Griff points to", "Griff ....". A-1799-1801. Further, Thomas was the instigator of and decisionmaker in her termination. *See supra* pp. 22, 31.

The Court erred in concluding that the failure to investigate could not constitute part of the same actionable HWE practice because there was no evidence Thomas directed the investigation procedures. This conclusion ignores the fact

that this was a continuation of Thomas' campaign to get rid of King, her complaining about Thomas' conduct and Aramark's inaction following its policy or practice of discrimination. A reasonable jury could conclude that Aramark's failure to investigate King's September 19 Hotline call is simply part of the continuing course of discriminatory conduct underlying the HWE claim caused by Aramark's policy or practice of ignoring or downplaying her numerous prior complaints and tolerating discrimination.

Thomas advising Barrett on September 20, 2017 that he was telling King's client, Amos, VP of VHS, that Thomas was terminating King for violating BCP is another continuance of Aramark's practice of tolerating workplace discrimination.

On September 20, 2017, Thomas was notified that King was out on FMLA and short-term disability leave starting September 19, 2017. A-1772,1792. That same day, Thomas informed Barrett that he knew King was out on leave and intended to inform King's client, Amos, later that day that Thomas was terminating King for a BCP violation. A-1775. Thomas informing King's client that King is being terminated for a violation of the BCP is a violation of Aramark personnel policies and the BCP. A-1056,1134,1488. Aramark has not proffered any business reason Thomas would advise King's client that Thomas was terminating King for violating the BCP.

The Court failed to view this email in context and the light most favorable to King. That Thomas sent the email to HR and not King makes it no less harassing. Taking the evidence in the light most favorable to King a reasonable jury could find that this email was continued harassment, another way for Thomas to demean King and make her otherwise exemplary performance look deficient, and part of the continuing course of discriminatory conduct underlying the HWE claim caused by Aramark's continued policy or practice of ignoring or downplaying King's numerous prior complaints and tolerating discrimination.

With regard to the Court's conclusion that King's September 21, 2017 termination was a discrete act that cannot be part of the HWE claim, such a conclusion was a misapplication of the facts to the law. While it is true that a termination is generally viewed as a discrete act, if that termination was in furtherance of a discriminatory policy or practice it can be considered as part of an actionable HWE claim. *See Patterson v. Cty. of Oneida*, 375 F.3d 206, 220 (2d Cir. 2004) ("Patterson proffered no evidence to show that the termination, even if discriminatory, was in furtherance of the alleged practice of racial harassment. Accordingly, the district court properly dismissed all of Patterson's Title VII claims of hostile work environment as untimely."). Other Circuits have likewise used the continuing violation doctrine to consider untimely conduct when the only act occurring within the statutory period is the plaintiff's termination and there are

allegations that such termination was part of the same unlawful employment practice as the earlier actions. *See Fincher v. Town of Brookline*, 26 F.4th 479, 486 (1st Cir. 2022). Unlike the cases the Court relied on, as demonstrated herein, King proffered ample evidence of a policy or practice of discrimination due to Aramark's inaction in the face of King's repeated complaints, and Thomas took advantage of such policy or practice by continuing his campaign to get rid of King with the final act being her termination.

As demonstrated by the foregoing, the Court erred in failing to consider all of King's discrimination allegations.

Because the Court found King's HWE claims to be time barred it did not address the merits of the matter. Thus, this matter should be remanded to the Court for further proceedings to address that issue.

## POINT II

## THE COURT ERRED IN DISMISSING KING'S NYSHRL CLAIMS

This Court reviews *de novo* the Court's grant of a motion to dismiss. *Kassner v. 2nd Avenue Delicatessen Inc.*, 496 F.3d 229, 237 (2d Cir. 2007). In deciding a FED. R. CIV. P. 12(b)(6) motion, "the court must accept the material facts alleged in the complaint as true and construe all reasonable inferences in the plaintiff's favor." *Hernandez v. Coughlin*, 18 F.3d 133, 136 (2d Cir. 1994). "The

complaint may be dismissed only where it appears beyond doubt that the plaintiff can prove no set of facts in support of his [or her] claim which would entitle him [or her] to relief." *Id*. (internal quotation marks omitted); *see also Cargo Partner AG v. Albatrans, Inc.*, 352 F.3d 41, 44 (2d Cir. 2003). "This standard is applied with even greater force where the plaintiff alleges civil rights violations …." *Hernandez*, 18 F.3d at 136.

Discrimination occurring in NY can be shown if the Complaint plausibly alleges that Aramark's discriminatory conduct impacted King in NY. To show impact in NY, the Complaint need only allege that Aramark's conduct affected "the terms, conditions, or privileges of employment ... within [NY]." *Int'l Healthcare Exch., Inc. v. Global Healthcare Exch., LLC*, 470 F. Supp. 2d 345, 362 (S.D.N.Y. 2007) (internal quotation marks omitted) (having a workplace in NY brought the conduct within the scope of the NYSHRL). Where an employee works across multiple states, a motion to dismiss should be denied where there are allegations that a portion of the employer's conduct had a NY impact. *See Bass v. World Wrestling Fed'n Entm't, Inc.*, 129 F. Supp. 2d 491, 505-06 (E.D.N.Y. 2001). Thus, where a plaintiff alleges work from a NY home office, her complaint alleges a sufficient NY impact and should not be dismissed. *See, e.g., Taperell v. Tegan Lighting, Inc., 18-CV-3343, 2019 WL 1118053*, at *2-3 (E.D.N.Y. Mar. 11, 2019); *Int'l Healthcare Exch., Inc.*, 470 F. Supp. 2d at 362; *Curto v. Med. World*

*Commc'ns, Inc.*, 388 F. Supp. 2d 101, 106-07 (E.D.N.Y. 2005) (denying motion to dismiss where complaint alleged work in NY home office).

With this background, the following allegations in the Complaint show that Aramark's unlawful conduct had a NY impact. Specifically:

- King resides in the Town of Hamburg, County of Erie, State of NY. A-11,¶3.
- Aramark provided King with a company laptop for use at her home offices in NY and Virginia. A-13,¶14.
- King, on a regular basis, performed Aramark's work from her home office in Hamburg, NY. Aramark agreed that King could work from her NY home office. A-13,¶15.
- From April 2012 through December 2015, Aramark on a regular basis, authorized King to work from her NY home office, as needed to allow her to care for her ill son. Given that her job duties required that she be available on an as needed basis, she regularly performed Aramark's business while in her NY home office, and Aramark authorized her to do this. For example, King read and responded to emails; conducted conference calls; reviewed data; made business decisions; and analyzed business reports. A-14,¶18.
- From between December 2015 and March 2016, King worked exclusively

from her NY home office and regularly performed Aramark's work. A-15,¶23.

- During this time and while King was working from her NY home office, Thomas discriminatorily denied her request for an extension of time to complete her team's performance reviews in 2015. A-15-16,¶24.
- Thomas made frequent efforts to communicate with King about her job duties, and he made clear to her that he was unhappy about the work that was backing up because of her absence. Thomas intentionally reached out to King in NY with these communications. While King was in NY Thomas also criticized her and complained about her to other of Aramark's employees, accusing her of and blaming her for being unavailable to work. Additionally, prior to King's son's death, Thomas also questioned whether the severity of her son's illness required her to be on leave in discussions with Aramark's management employees. A-16,¶ 25.
- While King was working in her NY home office, Thomas had emailed her and demanded that, on her first three days back from leave, she visit all VHS facilities, which spanned over two states and 600 miles of travel, with no opportunity to reacclimate back to work. Thomas did not require his male direct report, DeGori, to visit all of his facilities immediately upon returning from a four-week leave after surgery. A-17,¶29.

- As an act of discrimination, harassment, and retaliation, Thomas advised King that he would no longer allow her to work from her home office. Prior to this instruction, King had, for years, worked from her NY and Virginia home offices on about a once weekly basis, taking the time to catch up on data review and paperwork. A-25,¶51.
- Even after Aramark terminated King, it continued to discriminate, harass, and retaliate against her. For example, Aramark failed to provide King with materials necessary to return her company laptop by mail, despite King's requests for the necessary material. Instead, on or about November 14, 2017, Aramark contacted King at her NY home office and directed King to return a company laptop to Virginia. Aramark made this demand despite being aware that King was not in Virginia. When King offered to return the laptop to one of Aramark's many Western NY facilities, Aramark refused to let her do so, forcing her to return to Virginia as a further act of discrimination, harassment, and retaliation. A-32-33,¶74.

These allegations show that some of Aramark's unlawful conduct was directed at King in NY and, therefore, had an impact in NY. King's significant work from her NY home office meant that Aramark's unlawful conduct affected the terms and conditions of her employment in NY. A-13,¶15,A-14¶18,A-15-

16,¶23-25,A-17,¶29,A-25,¶51. For example, while King was in NY, Thomas discriminatorily denied her an extension of time to complete her team's performance reviews, A-15-16,¶ 24; questioned the legitimacy of her need to work remotely and her son's illness, A-16,¶25; demanded that she visit all VHS facilities immediately upon returning to Virginia, A-17,¶ 29; and revoked King's authorization to work from NY. A-25,¶51.

After Thomas issued King discriminatory and retaliatory written discipline on or about August 29, 2016, September 26, 2016, March 24, 2017, and May 9, 2017, on or about September 21, 2017, Aramark, on Thomas' decision, terminated King. A-21,¶¶40,42,A-26¶53,A-28-29,¶61,A-32¶73. Following this unlawful termination, King left Virginia and returned to her fixed, permanent home in NY. A-32-33,¶74. Thereafter, Aramark continued to discriminate, harass, and retaliate against her in NY by denying her request to return a company laptop to one of Aramark's many Western NY facilities, and, instead, demanding that she drive to Virginia to return the laptop. *See id*.

The Court erred in finding that for King's terms and conditions of employment to be affected she must be employed in NY, and even though she alleged that some of her work was performed in NY, she was still not "employed in New York". SPA-30-31. The Court's reliance on *Harte v. Woods Hole Oceanographic Inst.*, No. 10 CV 3916 (RJD)(MDG), 2012 WL 12951525, at *5

(E.D.N.Y. Jan. 6, 2012), *Sherwood v. Olin Corp.*, 772 F. Supp. 1418, 1425-26 (S.D.N.Y. 1991) and *Taperell*, 2019 WL 1118053, at *2 in coming to this conclusion is misplaced. In *Harte*, plaintiff, who worked for defendant Massachusetts company on its research ships based out of a Massachusetts home port, only alleged he was a NY resident and received his termination letter in NY. 2012 WL 12951525, at *4-5. In *Sherwood*, the plaintiff alleged she was a NY resident and the discriminatory acts occurred in Connecticut. 772 F. Supp. at 1426. In *Taperell*, plaintiff alleged she was a NY resident who worked for a California company as a regional sales manager from her NY home office and was terminated in California. 2019 WL 1118053, at *3. The Court misinterpreted *Taperell* as requiring the plaintiff to solely have an office in NY. King alleged discrimination in NY in that she had no formal office in Aramark's locations and worked with Aramark's knowledge and assistance from two home offices, Virginia and NY, and the discriminatory conduct that affected her terms conditions and privileges of her work in NY. Also, contrary to the Court's conclusion, *Meyers v. Medco Health Solutions, Inc.*, No. 09 Civ. 09216(RKE), 2012 WL 4747173, at * 5 (S.D.N.Y. Oct. 4, 2012) is not controlling as that plaintiff alleged she was a NY resident who occasionally worked from her NY home office and no discriminatory conduct that affected her terms conditions and privileges of her work in NY.

Since the Complaint's allegations allow for the plausible inference that the NYSHRL provides King a private cause of action against Aramark this matter should be remanded for further proceedings.

## CONCLUSION

The Court erred in dismissing King's NYSHRL claims and granting Aramark summary judgment dismissing King's remaining claims. Such Orders should be vacated, and this matter remanded to the Court for further proceedings and trial.

Dated: September 12, 2022

Respectfully submitted,

GRECO TRAPP, PLLC
Attorneys for Plaintiff-Appellant

By: s/ Josephine A. Greco
Josephine A. Greco, Esq.

**Federal Rules of Appellate Procedure Form 6. Certificate of Compliance With Type-Volume Limit**

Certificate of Compliance With Type-Volume Limit,
Typeface Requirements, and Type-Style Requirements

1. This document complies with the type-volume limit of Fed. R. App. P. 32(a)(7)(B) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f):

   ☑ this document contains 13,978 words, **or**

   ☐ this brief uses a monospaced typeface and contains [*state the number of*] lines of text.

2. This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because:

   ☑ this document has been prepared in a proportionally spaced typeface using Microsoft Word for Microsoft 365 in 14 point Times New Roman font **or**

   ☐ this document has been prepared in a monospaced typeface using [*state name and version of word-processing program*] with [*state number of characters per inch and name of type style*].

(s) Josephine A. Greco, Esq.

Attorney for Appellant - Kristen King

Dated: September 12, 2022

**TABLE OF CONTENTS**

**Page**

Opinion and Order of the Honorable Geoffrey W. Crawford, dated June 29, 2019 .............................. SPA-1

Opinion and Order of the Honorable Geoffrey W. Crawford, dated May 9, 2022 ................................ SPA-48

Judgment in a Civil Case, dated May 9, 2022 ........... SPA-114

UNITED STATES DISTRICT COURT
FOR THE
WESTERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| KRISTEN KING, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:19-cv-77 |
| | ) | |
| ARAMARK SERVICES, INC., | ) | |
| | ) | |
| Defendant. | ) | |

**OPINION AND ORDER**
**(Docs. 5, 6)**

Plaintiff Kristen King has filed this gender-based discrimination, hostile work environment, and retaliation action against Defendant Aramark Services, Inc. ("Aramark") under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. ("Title VII"), and under the New York State Human Rights Law, N.Y. Exec. Law § 290 et seq. ("NYSHRL"). (Doc. 1.) Aramark has filed a Partial Motion to Dismiss under Fed. R. Civ. P. 12(b)(6) seeking dismissal of Ms. King's NYSHRL claims (Counts 2, 4, and 6) and her federal gender-based discrimination and hostile work environment claims (Counts 1 and 5). (Doc. 5.) At the same time, Aramark filed a Motion to Transfer Venue from the Western District of New York ("WDNY") to the Western District of Virginia ("WDVa") under 28 U.S.C. § 1404(a). (Doc. 6.)

**<u>Background</u>**

The complaint includes the following allegations. Ms. King resides in the Town of Hamburg, County of Erie, State of New York. (Doc. 1 ¶ 3.) At all relevant times, Aramark was a foreign business corporation authorized to do business in New York. (*Id.* ¶ 5.) Aramark is incorporated in Delaware and its principal place of business is in Pennsylvania. (*Id.*) Aramark is a publicly traded company with over 270,000 employees. (*Id.*) It has substantial operations

within WDNY, with employees present at locations in Buffalo and elsewhere within this district. (*Id.* ¶ 11.)

Ms. King worked for Aramark between approximately June 2006 and June 2010, and from approximately April 2012 until September 21, 2017. (*Id.* ¶ 9.) According to the complaint, Ms. King's performance was always at least satisfactory during this employment. (*Id.*) During her initial employment period with Aramark, she worked as Director of Food and Nutrition for Aramark's operation at Kaleida Health (Buffalo General Hospital) in Buffalo, New York. (*Id.* ¶ 10.) In about June 2010, Aramark lost its contract with Kaleida Health, and Ms. King was laid off. (*Id.* ¶ 12.)

After being laid off, Ms. King pursued and obtained a Master of Science degree in Creativity and Innovation, which was conferred in February 2012. (*Id.*) As she was nearing the end of her degree program, Ms. King contacted an Aramark official she knew from her prior period of employment and learned that a General Manager position would soon be available in the food services department of Aramark's operation at Valley Health System ("VHS"). (*Id.*) VHS consists of six hospitals in Virginia and West Virginia. (*Id.* ¶ 14.)

Ms. King applied for the Aramark General Manager position at VHS. After an interview at Aramark's office in Georgia and another interview at VHS in Virginia, Ms. King accepted the position. (*Id.* ¶ 13.) She then attended a two-week training at Aramark's training facility in Illinois. (*Id.*) Aramark provided her with the benefits of a reinstated employee rather than designating her as a new hire. (*Id.*) Upon accepting the General Manager position, Ms. King rented a home in Stanley, Virginia. (*Id.* ¶ 15.)

In or about April 2012, Ms. King began working as General Manager, Food at Aramark's operations at VHS. (*Id.* ¶ 14.) Her duties required that frequent travel between the Virginia and

West Virginia VHS facilities. (*Id.*) Aramark authorized her to work from home on days that her presence at a specific facility was not required. (*Id.* ¶ 16.) Aramark provided her with a company laptop for home use. (*Id.* ¶ 14.) She regularly performed Aramark work from her home in Hamburg, New York and from the Stanley, Virginia home that she rented. (*See id.* ¶¶ 14–16.) She was initially given an office at VHS's largest flagship facility, Winchester Medical Center. (*Id.* ¶ 16.) But she lost that office due to space constraints in or about October 2012, requiring her to work from her home on a more frequent basis. (*Id.*)

On a regular basis from April 2012 through December 2015, Aramark authorized Ms. King to work from her New York home as needed to allow her to care for her ill son. (*Id.* ¶ 18.) On or about October 30, 2013, Aramark approved Ms. King's application for leave under the Family Medical Leave Act ("FMLA") to provide for intermittent leave to care for her ill son. (*Id.* ¶ 19.) That approval provided coverage through November 2014. (*Id.*) She recertified for FMLA leave on March 24, 2015, which provided coverage through November 2015. (*Id.* ¶ 23.) She continued to perform Aramark work while on leave, and during the period prior to her son's death on December 28, 2015 she was in her New York home office performing her Aramark job duties with Aramark's approval. (*Id.*) She also performed Aramark job duties from her New York home office between December 7, 2015 and March 1, 2016 while she was recovering from a surgery. (*Id.*)

Aramark has both "Food" and "Environmental Services" ("EVS") operations at VHS. (*Id.* ¶ 17.) When Ms. King joined Aramark's operations at VHS, she became the General Manager, Multiunit-Food. (*Id.*) Griffith Thomas was the General Manager, Multiunit-EVS. (*Id.*) Ms. King and Mr. Thomas both reported to the same District Manager. (*Id.*) In the fall of 2014, the District Manager position at VHS was vacant. (*Id.* ¶ 20.) Ms. King expressed interest

in that position and upper management told her that a reorganization was occurring. (*Id.*) In or about January 2015, Ms. King learned that Aramark had scheduled Griffith Thomas to interview for the District Manager position. (*Id.*) She immediately contacted Aramark's corporate headquarters and advised that she was also interested in interviewing for the position. (*Id.*)

Aramark scheduled Ms. King to interview on the same day as Mr. Thomas's interview, but she asserts that based on the substance of her own interview, "it was apparent that ARAMARK had already decided that it would hire Griffith Thomas to be District Manager." (*Id.*) Aramark hired Mr. Thomas to be District Manager. (*Id.* ¶ 21.) Mr. Thomas became Ms. King's direct supervisor in about February 2015, and she became the de facto General Manager of both Food and EVS at VHS. (*Id.*)

It is unnecessary to recite here all of Ms. King's allegations supporting her substantive claims. Generally, she alleges that Mr. Thomas, as her District Manager:

> [S]ubjected her to different terms and conditions of employment because of her sex, harassed her because of her sex, created a sex-based hostile work environment, retaliated against her for her numerous complaints of harassment, discrimination, and retaliation, and terminated her because of her sex and in retaliation for her numerous complaints.

(*Id.* ¶ 22.) "During most of her employment, MS. KING was the only female General Manager who reported to Griffith Thomas." (*Id.*) Aramark terminated Ms. King's employment on or about September 21, 2017. (*Id.* ¶ 73.) Additional facts are set forth as necessary below.

**<u>Analysis</u>**

"Where district courts are presented with both a motion to dismiss, under Fed. R. Civ. P. 12(b)(6), and a motion to transfer venue, under 28 U.S.C. § 1404(a), they commonly address the venue motion first, and, where transfer is appropriate, leave the motion to dismiss to be decided by the transferee court." *Hart v. Crab Addison, Inc.*, No. 13-CV-6458 CJS, 2014 WL 2865899,

at *2 (W.D.N.Y. June 24, 2014). The court accordingly begins its analysis with the venue motion.

## I. Venue Motion (Doc. 6)

Aramark seeks transfer to WDVa under 28 U.S.C. § 1404(a), which provides that "[f]or the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought or to any district or division to which all parties have consented." Section 1404(a) represents "merely a codification of the doctrine of *forum non conveniens*" for "the subset of cases in which the transferee forum is within the federal system." *Martinez v. Bloomberg LP*, 740 F.3d 211, 221 (2d Cir. 2014) (quoting *Atl. Marine Constr. Co. v. U.S. Dist. Court for W. Dist. of Tex.*, 571 U.S. 49, 60 (2013)). "[I]n such cases, Congress has replaced the traditional remedy of outright dismissal with transfer." *Atl. Marine*, 571 U.S. at 60.

The Second Circuit has articulated a non-exhaustive list of factors to consider when determining whether to grant a motion to transfer venue:

> (1) the plaintiff's choice of forum, (2) the convenience of witnesses, (3) the location of relevant documents and relative ease of access to sources of proof, (4) the convenience of parties, (5) the locus of operative facts, (6) the availability of process to compel the attendance of unwilling witnesses, and (7) the relative means of the parties.

*N.Y. Marine & Gen. Ins. Co. v. Lafarge N. Am., Inc.*, 599 F.3d 102, 112 (2d Cir. 2010) (quoting *D.H. Blair & Co. v. Gottdiener*, 462 F.3d 95, 106–07 (2d Cir. 2006)). This court has also considered the forum's familiarity with the governing law, *E.C.C. Movers LLC v. FairPoint Commc'ns, Inc.*, 18-CV-769V(F), 2019 WL 1936322, at *2 (W.D.N.Y. May 1, 2019), as well as "trial efficiency" and "the interests of justice." *A&A Jewellers Ltd. v. Commemorative Brands, Inc.*, No. 03-CV-0651E(F), 2004 WL 912929, at *1 (W.D.N.Y. Mar. 30, 2004). "No one factor is determinative, nor is there a 'rigid formula for balancing these factors . . . .'" *Moog, Inc. v.*

*Newport Aeronautical, Inc.*, No. 14-CV-00504A(F), 2016 WL 3444238, at *3 (W.D.N.Y. June 23, 2016) (quoting *Citigroup Inc. v. City Holding Co.*, 97 F. Supp. 2d 549, 561 (S.D.N.Y. 2000)).

"[T]he party requesting transfer carries the 'burden of making out a strong case for transfer,'" and courts in this circuit apply a "clear and convincing evidence standard in determining whether to exercise discretion to grant a transfer motion." *N.Y. Marine*, 599 F.3d at 114 (quoting *Filmline (Cross-Country) Prods., Inc. v. United Artists Corp.*, 865 F.2d 513, 521 (2d Cir. 1989)). But the moving party's burden is "less stringent than under the . . . doctrine of *forum non conveniens* since transfer under § 1404(a) does not result in dismissal." *Bassili v. Chu*, 242 F. Supp. 2d 223, 232 (W.D.N.Y. 2002). "In deciding a motion to transfer, a court may consider material outside of the pleadings." *Matthews v. Bell*, No. 6:18-CV-06460 EAW, 2019 WL 1117512, at *1 (W.D.N.Y. Mar. 11, 2019) (quoting *Mohsen v. Morgan Stanley & Co.*, No. 11 Civ. 6751(PGG), 2013 WL 5312525, at *3 (S.D.N.Y. Sept. 23, 2013)).

Here, there is no dispute that this action could have been brought in WDVa. Since that requirement of § 1404(a) is satisfied, the court focuses on the factors and considerations relevant to the convenience of the parties and witnesses and the interest of justice. The parties disagree about each of the remaining factors, so the court reviews all of them in detail.[1]

---

[1] It is reply memorandum, Aramark invites the court to take judicial notice of an August 7, 2018 "Transfer Review" memorandum ("Transfer Memo") prepared by a legal intern at the U.S. Equal Employment Opportunity Commission ("EEOC") Buffalo Local Office. (Doc. 11-2.) The Transfer Memo includes analysis bearing on where the EEOC Buffalo office might transfer Ms. King's then-pending charge. Ms. King argues in a sur-reply that the Transfer Memo is irrelevant to the § 1404(a) motion because the question before the EEOC involved different criteria and facts. (Doc. 15-2 at 2.) She further contends that the Transfer Memo is not binding and does not reflect the EEOC's official position or conclusions. (*Id.*) The court has reviewed the Transfer Memo but comes to its own independent conclusion on the § 1404(a) issues presented here.

**A. Plaintiff's Choice of Forum**

"Ordinarily, the plaintiff's choice of forum is accorded great weight." *Bausch & Lomb Inc. v. Mimetogen Pharm. Inc.*, No. 14-CV-6640, 2015 WL 13574334, at *4 (W.D.N.Y. Sept. 28, 2015) (citing *In re Warrick*, 70 F.3d 736, 741 (2d Cir. 1995) (per curiam)); *see also EasyWeb Innovations, LLC v. Facebook, Inc.*, 888 F. Supp. 2d 342, 348 (E.D.N.Y. 2012) ("It is well settled that the plaintiff's choice of forum is 'given great weight.'" (quoting *D.H. Blair & Co.*, 462 F.3d at 107)). "This 'is particularly so when the plaintiff resides in the judicial district where the suit was filed.'" *Mimetogen*, 2015 WL 13574334, at *4 (quoting *Air-Flo M.G. Co. v. Louis Berkman Co.*, 933 F. Supp. 229, 233 (W.D.N.Y. 1996)); *see also Iragorri v. United Techs. Corp.*, 274 F.3d 65, 71 (2d Cir. 2001) (en banc) ("[P]laintiff's choice of forum is generally entitled to great deference when the plaintiff has sued in the plaintiff's home forum." (citing *Koster v. (Am.) Lumbermens Mut. Cas. Co.*, 330 U.S. 518, 524 (1947))); *Lencco Racing Co. v. Arctco, Inc.*, 953 F. Supp. 69, 72 (W.D.N.Y. 1997) ("[P]laintiff's choice of forum should not be changed lightly and should be accorded substantial weight, particularly when the plaintiff resides in the judicial district where the suit was filed.").

But the weight given to this factor is diminished where "(1) the operative facts have little or no connection with the forum chosen by the plaintiff . . . or (2) where plaintiff's residence is not the chosen forum." *EasyWeb*, 888 F. Supp. 2d at 348 (internal quotations omitted). "Where the selected forum is not connected in a meaningful way to the operative facts and is not the plaintiff's residence, the deference to the chosen forum is significantly diminished." *Id.* at 349. "If there is little or no connection of the operative facts to the chosen forum but it is the plaintiff's home district, the plaintiff's choice of forum is entitled to *less* deference even though it still carries some deference as the home district." *Id.* at 349 n.1. "Moreover, [w]here it

appears that the plaintiff was forum shopping and that the selected forum has little or no connection with the parties or the subject matter, plaintiff's choice of forum is entitled to no weight whatever, and the transfer of venue is appropriate.'" *Id.* at 349 (quoting *Pierce v. Coughlin*, 806 F. Supp. 426, 429 (S.D.N.Y. 1992)).

Here, there is no dispute that WDNY is Ms. King's home district. She states in her April 4, 2019 declaration that she "currently reside[s] in and ha[s] always resided in WDNY." (Doc. 8-1 ¶ 20.) She maintains that her selection of WDNY weighs heavily against transfer. She notes in her declaration that she cancelled her lease at her Stanley, Virginia residence after being terminated; that she has always resided in WDNY; and that she maintained a WDNY home office during her entire employment with Aramark. (*Id.* ¶¶ 18, 20.) She also states that she suffered severe emotional distress as a result of Aramark's alleged wrongs against her and that she is disabled and indigent. (*Id.* ¶ 19.) She claims that she would be "exceptionally burdened" if she were required to litigate outside of WDNY. (*Id.* ¶ 20.)

Aramark argues that Ms. King has failed to produce evidence to support her claims that she is disabled or indigent, or that either alleged condition prohibits her from traveling to WDVa. (*See* Doc. 11 at 11.) The court analyzes the convenience and the relative means of the parties (including Ms. King) below, but for present purposes has no difficulty concluding that Ms. King's choice of forum is entitled to deference as her home district.

Aramark does not argue that Ms. King's selection of WDNY is a result of forum shopping or that it should be afforded no weight. Instead, Aramark contends that Ms. King's choice should be afforded little weight because, in Aramark's view, there is "little or no connection" to WDNY in this case. As discussed in more detail below, the court concludes that the main set of operative facts relate to WDVa, but there are connections to WDNY in this case that go beyond the mere

fact that Ms. King is a New York resident. Even assuming that this factor should be accorded reduced weight, Ms. King's choice to bring this suit in WDNY still carries some deference.

**B. Convenience of Witnesses**

"The convenience of the witnesses is generally considered the most important factor in deciding a motion to transfer venue." *Moog*, 2016 WL 3444238, at *4 (quoting *Truk Int'l Fund, LP v. Wehlmann*, No. 08 Civ. 8462(PGG), 2009 WL 1456650, at *3 (S.D.N.Y. May 20, 2009)). "The convenience of non-party witnesses is accorded more weight than that of party witnesses." *Id.* (quoting *Truk*, 2009 WL 1456650, at *3). "The Court 'does not merely tally the number of witnesses who reside in the current forum in comparison to the number located in the proposed transferee forum'; but rather 'must qualitatively evaluate the materiality of the testimony that the witnesses may provide.'" *Id.* (quoting *Dickerson v. Novartis Corp.*, 315 F.R.D. 18, 27 (S.D.N.Y. 2016)). The party seeking transfer on account of the convenience of witnesses "must clearly specify the key witnesses to be called and must make a general statement of what their testimony will cover." *Id.* (quoting *Factors Etc., Inc. v. Pro Arts, Inc.*, 579 F.2d 215, 218 (2d Cir. 1978)).

Aramark asserts that all of the non-party potential witnesses identified in the Complaint live in Virginia, North Carolina, or other locations far from WDNY. (Doc. 6-1 at 13.) In support, Aramark cites the March 13, 2019 declaration of Griffith Thomas, which contains a list of 12 individuals who are mentioned in the Complaint and who Mr. Thomas says worked or lived outside of New York during the time that he supervised Ms. King. (*See* Doc. 6-2 ¶ 9.) Mr. Thomas states that he has lived and worked in Winchester, Virginia for the last nine years. (*Id.* ¶ 6.)

Initially, Ms. King asserts that Aramark has submitted no proof of the identity of the witnesses and the nature of their likely testimony. (Doc. 8-2 at 14.) Aramark replies that it has

identified the potentially relevant witnesses as Mr. Thomas plus the 12 individuals listed in his March 13, 2019 declaration. (*See* Doc. 11 at 9.) And Aramark asserts that the likely testimony of each witnesses appears in Ms. King's Complaint. (*Id.*) The court concludes that Aramark has adequately specified the individuals whom it claims are the key witnesses and their likely testimony.

Citing *Freeplay Music, LLC v. Gibson Brands, Inc.*, 195 F. Supp. 3d 613, 617–18 (S.D.N.Y. 2016), Ms. King also contends that Aramark's current employees are irrelevant on this factor. The court agrees with Aramark that *Freeplay Music* does not stand for the proposition that potential witnesses who are current Aramark employees should be ignored in the convenience-of-witnesses analysis. The court in *Freeplay Music* found that the party witness-employees who were likely to testify were located in both Tennessee and New York, so the location of those witnesses was neutral as to whether to retain the case in New York or transfer it to Tennessee. *See id.* at 617–18. *Freeplay Music* therefore actually supports the conclusion that the convenience of employee witnesses is relevant to the convenience analysis, even though in that particular case the employee witnesses were distributed such that neither New York nor Tennessee was more convenient for that group of witnesses as a whole.

That said, courts have held that "the inconvenience of employees or agents of the parties does not weigh as heavily as inconvenience to non-party witnesses." *Pecorino v. Vutec Corp.*, 934 F. Supp. 2d 422, 437 (E.D.N.Y. 2012) (citing *Payless Shoesource, Inc. v. Avalon Funding Corp.*, 666 F. Supp. 2d 356, 364 (E.D.N.Y. 2009)). Similarly, although *former* employees of a party are non-party witnesses, their inconvenience receives less weight in the analysis than the inconvenience of other non-party witnesses. *See id.* ("[F]ormer employees are not entitled to the same deference shown to other non-party witnesses because they are more likely willing to

attend trial than other non-party witnesses."). The court therefore considers the inconvenience each individual that Aramark has identified, adjusting the weight given to each accordingly.

**1. Griffith Thomas**

The Complaint alleges that Griffith Thomas created a sex-based hostile work environment and subjected Ms. King to sex-based harassment, discrimination, retaliation, and termination. (*See* Doc. 1 ¶ 22.) He is undoubtedly a key witness in this case. According to his March 13, 2019 declaration, he has lived and worked in Winchester, Virginia for the last nine years. (Doc. 6-2 ¶ 6.) Ms. King agrees that he resides within WDVa. (Doc. 8-1 ¶ 22.) The court accordingly concludes that WDVa is more convenient for Mr. Thomas than WDNY. It appears that Mr. Thomas still works for Aramark (*see* Doc. 6-2 ¶ 2; *see also* Doc. 8-1 ¶ 22), so the court gives less weight to his inconvenience than it would to an ordinary non-party witness.

**2. Kelly Barrett**

The Complaint alleges that Kelly Barrett assumed the position of Aramark Director of Regional Human Resources in or about July 2017 (about two months before Ms. King was terminated). (*See* Doc. 1 ¶ 63.) According to the Complaint, Ms. King complained to Ms. Barrett about Mr. Thomas's alleged discrimination, harassment, and retaliation, but Ms. Barrett took no action to stop that alleged conduct. (*Id.*) Also according to the Complaint, Ms. Barrett—together with Mr. Thomas—called Ms. King on September 21, 2017 to advise her that she was terminated. (*Id.* ¶ 73.)

Mr. Thomas states in his declaration that Ms. Barrett lived and worked in Charlotte, North Carolina during the time that he supervised Ms. King. (Doc. 6-2 ¶ 9(f).) According to Ms. King, Ms. Barrett now resides in the Eastern District of North Carolina, and the Harrisonburg federal courthouse in WDVa is about a five-hour drive for her. (Doc. 8-1 ¶ 22.) It

would obviously be a much longer drive from North Carolina to WDNY, but the court notes that direct flights are available from Raleigh/Durham, North Carolina to Buffalo.[2] The court concludes that WDNY might be slightly less convenient for Ms. Barrett, mainly because it is geographically further from North Carolina than WDVa is.

It appears that Ms. Barrett is currently an Aramark employee. (*See* Doc. 8-1 ¶ 22.) The court accordingly gives less weight to her inconvenience than it would to an ordinary non-party witness.

**3. Tracy Miller and Rebecca Adams**

According to the Complaint, Tracy Miller assumed the position of Aramark Regional Vice President in or about July 2016. (Doc. 1 ¶ 39.) Also at that time, Rebecca Adams was Aramark's Regional Director of Human Services. (*Id.*) Ms. King registered complaints about Mr. Thomas with Ms. Miller and Ms. Adams. (*Id.*) Generally, the Complaint includes allegations that Ms. Miller and Ms. Adams failed to properly respond to Ms. King's complaints and were involved in a discipline process that was flawed and that lacked any basis. (*See id.* ¶¶ 39, 40, 42, 44, 53, 55, 58, 73.)

Ms. Miller lives in Greenville, Delaware, which is about a four-hour drive from the Harrisonburg federal courthouse. (*See* Doc. 6-2 ¶ 9k; Doc. 8-1 ¶ 22.) It is a somewhat longer drive to WDNY, but the court notes that direct flights are available from Philadelphia to Buffalo. The court concludes that WDNY might be somewhat less convenient for Ms. Miller, mainly because it is geographically slightly further from Delaware than WDVa. It appears that

[2] As this court has noted, "[i]ts weather notwithstanding, [Buffalo] is not Siberia, and is easily accessible . . . by air or other means." *A & A Jewellers Ltd. v. Commemorative Brands, Inc.*, No. 03-CV-0651E(F), 2004 WL 912929, at *1 n.15 (W.D.N.Y. Mar. 30, 2004) (brackets in original) (quoting *Mpower Commc'ns Corp. v. Voipld.com, Inc.*, 304 F. Supp. 2d 473, 476 (W.D.N.Y. 2004)).

Ms. Miller is currently an Aramark employee. (Doc. 8-1 ¶ 22.) The court accordingly gives less weight to her inconvenience than it would to an ordinary non-party witness.

Ms. Adams lives in Cary, North Carolina, which is about a four-hour drive from the Harrisonburg federal courthouse. (*See* Doc. 6-2 ¶ 9g; Doc. 8-1 ¶ 23.) It would take her at least twice as long to drive to Buffalo, but the court notes that direct flights are available from Raleigh/Durham, North Carolina to Buffalo. The court concludes that WDNY would be less convenient for Ms. Miller because it is geographically further from her home than WDVa. It appears that Ms. Adams is a former Aramark employee. (Doc. 8-1 ¶ 23.) The court accordingly gives less weight to her inconvenience than it would to an ordinary non-party witness.

#### 4. Christopher Harriman, Thomas DeGori, John Wilson, Jacob Williford

The Complaint alleges that Mr. Thomas treated her unfavorably as compared to his male direct reports, including Christopher Harriman, Thomas DeGori, John Wilson, and Jacob Williford. (Doc. 1 ¶ 31.) All four of those individuals are apparently current Aramark employees. (Doc. 8-1 ¶ 22.) The court accordingly gives less weight to their inconvenience than it would to an ordinary non-party witness.

Mr. DeGori lives and works in the Western District of Pennsylvania. (*See* Doc. 6-2 ¶ 9(b); Doc. 8-1 ¶ 22.) By car, Mr. DeGori's location is a little bit closer to Buffalo (about three hours twenty minutes) than to Harrisonburg, Virginia (about four hours fifteen minutes). The court concludes that WDNY would be slightly more convenient for Mr. DeGori than WDVa.

Mr. Harriman lives and works in the Eastern District of Virginia. (*See* Doc. 6-2 ¶ 9(a); Doc. 8-1 ¶ 22.) The WDVa is substantially closer to his residence by car than WDNY. Flying to Buffalo would require taking a connecting flight or a multi-hour drive to get to a city offering a direct flight. The court concludes that WDVa would be more convenient for Mr. Harriman.

Mr. Wilson apparently currently lives in the Eastern District of Virginia. (Doc. 8-1 ¶ 22.) Like Mr. Harriman, WDVa would be more convenient for him than WDNY. Mr. Williford lives and works in WDVa. (*See* Doc. 6-2 ¶ 9(d); Doc. 8-1 ¶ 22.) The WDVa would therefore be substantially more convenient for him than WDNY.

**5. Deborah Hetrick, Carmine DiCicco, Alexis Duckett, Evelyn Miller, Colleen O'Donnell**

Ms. King alleges that she complained about Mr. Thomas's conduct to Deborah Hetrick, Carmine DiCicco, Alexis Duckett, Evelyn Miller, and Colleen O'Donnell. (*See* Doc. 1 ¶¶ 30, 35–36, 49–50, 55, 57–59.) All five of these individuals are apparently former Aramark employees. (Doc. 8-1 ¶ 23.) The court accordingly gives less weight to their inconvenience than it would to an ordinary non-party witness.

Ms. Hetrick resides in Wilmington, Delaware. (*See* Doc. 6-2 ¶ 9(h); Doc. 8-1 ¶ 23.) Similar to the analysis for Tracy Miller, the court concludes that WDNY might be somewhat less convenient for Ms. Hetrick, mainly because it is geographically slightly further from Delaware than WDVa.

Mr. DiCicco lives in the Northern District of Illinois. (*See* Doc. 6-2 ¶ 9(i); Doc. 8-1 ¶ 23.) That is approximately a nine-hour drive from Buffalo and almost a 12-hour drive from Harrisonburg, Virginia. Direct flights are available from Chicago to Buffalo and also to the Charlottesville Albemarle airport, although the latter requires approximately a one-hour drive to Harrisonburg, Virginia. The court concludes that WDNY is slightly more convenient for Mr. DiCicco than WDVa.

Ms. Duckett appears to currently reside in the Eastern District of North Carolina, which is approximately a five-hour drive from the Harrisonburg federal courthouse. (Doc. 8-1 ¶ 23.) Although direct flights are available from Raleigh/Durham, North Carolina to Buffalo, the court

concludes that WDVa is more convenient for Ms. Duckett, mainly because it is geographically closer to her than WDNY.

Evelyn Miller lives in the Eastern District of Pennsylvania. (*See* Doc. 6-2 ¶ 9(j); Doc. 8-1 ¶ 23.) That is approximately a six-hour drive from Buffalo and a four-hour drive from Harrisonburg, Virginia. Direct flights are available from Philadelphia to Buffalo and also to the Charlottesville Albemarle airport, although the latter requires approximately a one-hour drive to Harrisonburg, Virginia. The court concludes that WDVa is slightly more convenient for Evelyn Miller than WDNY.

Finally, Ms. O'Donnell lives in the District of New Jersey, about 4.3 hours by car from the Harrisonburg federal courthouse, and more than six hours from Buffalo. (Doc. 8-1 ¶ 23.) Direct flights are available from nearby Philadelphia to Buffalo and also to the Charlottesville Albemarle airport, although the latter requires approximately a one-hour drive to Harrisonburg, Virginia. The court concludes that WDVa is slightly more convenient for Ms. O'Donnell than WDNY.

**6. Non-Party Witnesses Identified by Ms. King**

Ms. King asserts that WDNY would be more convenient for three sets of non-party witnesses. First, she contends that WDNY would be more convenient for all of her relevant treating physicians and providers, who all reside and work in WDNY and whose testimony she would offer to prove damages. Second, she argues that WDNY would be more convenient for Heather O'Neil, a Hamburg, New York resident whom Aramark also allegedly subjected to discrimination, harassment, hostile work environment, and retaliation. Finally, she maintains that WDNY would be more convenient for her fiancé Robert Strade, who resides in Hamburg,

New York and is a "witness" to Aramark's treatment of Ms. King and to damages. (Doc. 8-2 at 15; *see also* Doc. 8-1 ¶ 21.)

Aramark argues that Mr. Strade and Ms. O'Neil are not particularly important witnesses because their testimony may not be admissible or may not be heard at all if Ms. King does not prevail on her claims. (Doc. 11 at 8–9.) And Aramark maintains that Ms. King's treatment providers are damages witnesses, so their testimony would be unnecessary if Ms. King fails to establish liability. (*Id.* at 9.)

The exact nature of Mr. Strade's and Ms. O'Neil's testimony is unclear at this stage of the case. Presumably Ms. O'Neil's alleged experiences at Aramark would be offered to support Ms. King's hostile-work-environment claim. Absent further details, it appears that Mr. Strade's testimony would probably relate primarily to damages. Based on the relative lack of detail about this testimony, the fact that WDNY might be more convenient for Mr. Strade and for Ms. O'Neil weighs only slightly against transfer to WDVa.

Since the treatment providers would be expert witnesses, their convenience is not particularly relevant to the present analysis. *See Donellan v. Ferag, Inc.*, No. 97 CV 6700(SJ), 1999 WL 33111, at *2 n.3 (E.D.N.Y. Jan. 22, 1999) (convenience of the plaintiff's expert physician and physical therapist was not relevant to transfer analysis). Their convenience is also somewhat less relevant because their testimony would relate solely to damages. *See Cordero v. Delta Air Lines, Inc.*, No. 16-CV-6803 (RA), 2017 WL 5997420, at *3 (S.D.N.Y. Dec. 1, 2017) (doctors' inconvenience was "less significant given that their testimony will go primarily to damages"); *Fuji Photo Film Co. v. Lexar Media, Inc.*, 415 F. Supp. 2d 370, 374 (S.D.N.Y. 2006) (convenience of plaintiff's witnesses was less significant because their testimony "relates to damages and becomes relevant only after the infringement issues are resolved").

#### 7. Conclusion as to Convenience of Witnesses

The WDNY is more convenient for the handful of witnesses that Ms. King highlights. But it appears that their testimony is qualitatively less material than the testimony of the other witnesses that the court is considering. Their convenience weighs only weakly against transfer.

For most of the dozen witnesses identified by Aramark, the court has concluded that WDVa is slightly more convenient than WDNY. On the other hand, that is only a relative measure of convenience, since for most of these witnesses travel to *either* WDNY or WDVa would require air travel or a multi-hour drive. Moreover, because all of these witnesses are current or former Aramark employees, their inconvenience weighs less heavily than ordinary non-party witnesses. On balance, the court concludes that the convenience of the witnesses weighs somewhat in favor of transfer to WDVa.

### C. Location of Relevant Documents and Access to Proof

The location of relevant documents and access to proof is "entitled to little weight unless the defendant makes a detailed showing as to the burden it would incur absent transfer." *WD Encore Software, LLC v. The Software MacKiev Co.*, No. 6:15-cv-6566(MAT), 2016 WL 1056628, at *4 (W.D.N.Y. Mar. 17, 2016) (quoting *Royal Ins. Co. of Am. v. Tower Records, Inc.*, No. 02-Civ. 2612(PKL), 2002 WL 31385815, at *6 (S.D.N.Y. Oct. 22, 2002)). Here, Aramark argues that the location of relevant documents and access to proof weighs in favor of transfer to WDVa because relevant materials "likely remain housed in Virginia as well as in Aramark's offices in North Carolina, where key Human Resources witnesses live(d) and work(ed)." (Doc. 6-1 at 15–16.) Aramark also argues that certain relevant archived hard copies may only be available on-site at VHS facilities. (*Id.* at 16.)

The court concludes that these arguments fall short of the detailed showing of a burden that is necessary to imbue this factor with any substantial weight. The court presumes that with modern technology most or all relevant documents can be transferred to WDNY without "undue expense." *WD Encore*, 2016 WL 1056628, at *4 (quoting *Coker v. Bank of Am.*, 984 F. Supp. 757, 766 (S.D.N.Y. 1997)). To the extent that this factor weighs at all in favor of transfer to WDVa, it is entitled to little weight in this case.

**D. Convenience of the Parties**

"When analyzing the convenience to the parties, courts often look to the parties' principal places of business and the location of their offices." *Travelers Prop. Cas. Co. of Am. v. Ocean Reef Charters LLC*, 324 F. Supp. 3d 366, 376 (W.D.N.Y. 2018) (quoting *Freeplay Music*, 195 F. Supp. 3d at 618). "The convenience of the parties does not favor transfer when it would merely shift any inconvenience from defendant to plaintiff." *Id.* (quoting *Kiss My Face Corp. v. Bunting*, No. 02CIV2645 (RCC), 2003 WL 22244587, at *3 (S.D.N.Y. Sept. 30, 2003)).

**1. Aramark**

Aramark's principal place of business is in Philadelphia, Pennsylvania. By car, this is about four and a half hours from Harrisonburg, Virginia and over seven hours from Buffalo, New York. Considering geographical distance alone, WDVa is perhaps somewhat more convenient for Aramark than WDNY. But direct flights are available from Philadelphia to both Buffalo and to the Charlottesville Albemarle airport. And according to the Complaint, Aramark has substantial operations within WDNY, and has corporate, sales, and distribution operations in North Tonawanda, Grand Island, and Rochester, New York. (Doc. 1 ¶ 11.) In light of these

considerations, it appears that WDVa is at best only slightly more convenient for Aramark than WDNY.[3]

Apart from the convenience of Aramark employees themselves as witnesses (discussed above),[4] Aramark argues that its business operations would be substantially disrupted if its employees with responsibilities in the Virginia region were required to travel to WDNY. (Doc. 6-1 at 13.) Other courts have recognized the potential disruption to business posed by the imposition of court proceedings upon employee-witnesses. *See City of Pontiac Gen. Emps. Ret. Sys. v. Dell Inc.*, No. 14-CV-3644 (VSB), 2015 WL 12659925, at *5 (S.D.N.Y. Apr. 30, 2015) (convenience of the parties weighed in favor of transfer from New York to Texas because "lengthy proceedings in New York are more likely to lead to some disruption in Dell's [headquartered in Texas] day-to-day operations"); *Andrews v. A.C. Roman & Assocs., Inc.*, 914 F. Supp. 2d 230, 240 (N.D.N.Y. 2012) (due to potential disruption of business, convenience-of-parties factor weighed in favor of transfer to the Eastern District of New York, which was the place where the overwhelming number of employee-witnesses were located). Ms. King does not dispute this assertion, and the court concludes that potential disruption to Aramark's business operations weighs somewhat in favor of transfer to WDVa.

---

[3] Ms. King asserts that WDNY is not inconvenient for Aramark because Aramark and its affiliate entities are frequent litigants in this district and because Aramark has already retained WDNY-based counsel. (Doc. 8-2 at 18.) Those facts do not materially affect the court's analysis.

[4] Ms. King asserts that WDVa is not a convenient forum for Aramark's employee-witnesses because most of those witnesses do not reside in WDVa. (Doc. 8-2 at 18.) It is true that most of the employee-witnesses do not live in WDVa, but based on the court's analysis above, WDVa remains, on balance, somewhat more convenient than WDNY for most of the non-party witnesses.

All told, the analysis above suggests that WDVa is more convenient for Aramark than WDNY. Ms. King argues that "even assuming" that conclusion is true, the convenience-of-the-parties factor weighs against transfer because transferring the case to WDVa would only shift the inconvenience from one party to the other, and because it would be far more inconvenient for Ms. King to litigate in WDVa than for Aramark to litigate in WDNY. (*See* Doc. 8-2 at 17.) The court therefore considers the inconvenience to Ms. King of litigating this case in WDVa as opposed to her home district, WDNY.

**2. Ms. King**

In support of its motion to transfer, Aramark asserts that "the only convenience factor Plaintiff appears to rely on is that she currently lives in Hamburg, New York and has retained counsel in Buffalo, New York." (Doc. 6-1 at 14.) Aramark maintains that those facts are insufficient to avoid transfer. Aramark further suggests that WDVa would be within commuting distance for her "assuming Plaintiff still maintains her residence in Stanley, Virginia." (*Id.*)

Ms. King maintains that transfer to WDVa would impose an "incredible and disproportionate burden on her." (Doc. 8-2 at 17.) She states in her declaration that she no longer maintains a second residence in Virginia. (*See* Doc. 8-1 ¶ 18.) And she asserts that she suffered severe emotional distress as a result of the alleged discrimination, harassment, and retaliation. (*Id.* ¶ 19.) According to Ms. King, the Veterans Administration (VA) has determined that she is disabled. (*Id.*)[5] Aramark replies that Ms. King has failed to supply "actual evidence" of disability or that medical or financial considerations would make WDVa prohibitive for her. (Doc. 11 at 10–11.)

[5] Ms. King also asserts that she is indigent. The court considers that assertion below in its analysis of the relative means of the parties.

"[I]n considering whether the interest of justice would be served by transferring [a] case from plaintiff's home district to an alternative forum the Court may consider plaintiff's special medical difficulties." *Flores v. United States*, 142 F. Supp. 3d 279, 290 (E.D.N.Y. 2015) (quoting *Vassallo v. Niedermeyer*, 495 F. Supp. 757, 760 (S.D.N.Y. 1980)). But *Flores* and other cases suggest that a party resisting transfer on medical grounds should generally supply medical evidence to support such a claim. *See id.* (noting that the plaintiff submitted evidence of her condition in the form of a letter from her psychiatrist opining that travel posed a risk for potentially deadly illness); *NGC Worldwide, Inc. v. Siamon*, No. 3:02CV1760 (JBA), 2003 WL 1987001, at *2 (D. Conn. Apr. 21, 2003) (detrimental effect of travel on defendant's health was "confirmed 'firmly and with medical certainty' by his treating physician" and weighed strongly in favor of transfer to defendant's home state); *Vassallo*, 495 F. Supp. at 760 (plaintiff supplied medical records documenting substantial medical problems that weighed against transfer out of the plaintiff's home district).

Here, Ms. King has supplied her own declaration but no medical evidence or opinion. In particular, Ms. King has not produced any medical evidence or opinion regarding the impact of her VA disability determination or her mental health condition on her ability to travel. The court cannot conclude that the disability referenced in Ms. King's declaration constitutes a special medical difficulty that would weigh against transfer.

That said, the court concludes that, as to the convenience of the parties, transferring this case from WDNY to WDVa would largely just shift the inconvenience from Aramark to Ms. King. This is not a case where "inconvenience for the party moving for transfer could be completely eliminated without substantially adding to the nonmoving party's inconvenience." *Moog*, 2016 WL 3444238, at *5 (quoting *Ward v. Stewart*, 133 F. Supp. 3d 455, 466 (N.D.N.Y.

2015)). To the contrary, transferring this case to WDVa might reduce the inconvenience to Aramark somewhat, but would also substantially add to Ms. King's inconvenience. This factor does not weigh in favor of transfer.

**E. Locus of Operative Facts**

"The location of the operative events is [also] a primary factor in determining a § 1404(a) motion to transfer." *Matthews v. Bell*, No. 6:18-CV-06460 EAW, 2019 WL 1117512, at *5 (W.D.N.Y. Mar. 11, 2019) (alteration in original) (quoting *Billing v. Commerce One, Inc.*, 186 F. Supp. 2d 375, 377 (S.D.N.Y. 2002)); *see also Chen v. Arts Nail Putnam Valley Inc.*, No. 1:14-cv-03037 (ALC), 2017 WL 3017712, at *4 (S.D.N.Y. July 14, 2017) (same). "To determine where the locus of operative facts lies, courts look to the site of events from which the claim arises." *Ocean Reef Charters LLC*, 324 F. Supp. 3d at 379 (internal quotation marks omitted) (quoting *Age Grp. Ltd. v. Regal Logistics, Corp.*, No. 06 Civ. 4328(PKL), 2007 WL 2274024, at *3 (S.D.N.Y. Aug. 8, 2007)).

Aramark contends that the "central focus" of the Complaint is "the alleged actions and decisions of Mr. Thomas while he was living and working in Virginia." (Doc. 6-1 at 11.) Ms. King concedes that some operative facts occurred in WDVa but maintains that the locus-of-operative-facts factor does not support transfer because the operative facts occurred in at least ten judicial districts, including WDNY. (Doc. 8-2 at 21.) She lists various locations where she states that she was injured, where she worked, and where relevant decisions were made. (*Id.* at 21–22.) Aramark insists that the locus of operative facts is WDVa. (Doc. 11 at 8.)

Here, the central instigator as described in the Complaint is Mr. Thomas, who lived and worked in Winchester, Virginia at the relevant times. (*See* Doc. 6-2 ¶ 6.) Notwithstanding the fact that Ms. King alleges that she suffered at least some of the effects of Mr. Thomas's conduct

at her home in Hamburg, New York, Mr. Thomas's alleged conduct in Virginia suggests that the principal locus of operative facts is WDVa. *See Tillery v. NYS Office of Alcoholism & Substance Abuse Servs.*, No. 13 Civ. 0035(CM), 2013 WL 6405326, at *5 (S.D.N.Y. Dec. 5, 2013) ("Plaintiff argues that the alleged discrimination and retaliation she suffered affected her in the Southern District of New York; however, because her supervisors were located in Albany, the discriminatory acts occurred in Albany.").

Ms. King refers to other circumstances or events that occurred in WDNY and other districts. She correctly states that the connections to WDNY in this case go beyond the mere fact that she is a New York resident, especially because Aramark authorized her to work from her home in WDNY during parts of the relevant time period. She also refers to relevant events that occurred in other districts (*see* Doc. 8-2 at 21–22), including her complaints to Aramark management located in the Eastern District of Pennsylvania (Doc. 1 ¶¶ 36, 48, 50), Rebecca Adams's participation in issuing written discipline from the Western District of North Carolina, and Kelley Barrett's participation there in the decision to terminate Ms. King (*see* Doc. 1 ¶ 73).

It is true that in some cases there can be more than one locus or the locus can be split between multiple districts. Courts in some such cases have found the locus factor to be neutral. *See Ocean Reef Charters LLC*, 324 F. Supp. 3d at 381 ("Where the locus of operative facts is split amongst several forums, or is focused in a forum that is neither the transferor nor the transferee forum, courts have, at minimum, viewed this factor neutrally."); *Lihuan Wang v. Phoenix Satellite Television US, Inc.*, No. 13 Civ. 218(PKC), 2014 WL 116220, at *5 (S.D.N.Y. Jan. 13, 2014) (locus of operative facts in employment discrimination case was not wholly in New York or the District of Columbia; factor weighed against transfer because a portion of the allegedly wrongful conduct and plaintiff's injury occurred in New York); *Fairchild v. Eisai, Inc.*,

No. 3:11cv452 MRK, 2011 WL 3438408, at *3 (D. Conn. Aug. 4, 2011) (locus of operative facts in FLSA case was split between the New Jersey location of the defendant's headquarters and the various districts in which the plaintiffs worked; locus factor did not favor either New Jersey or Connecticut); *Atl. Recording Corp. v. Project Playlist, Inc.*, 603 F. Supp. 2d 690, 696–97 (S.D.N.Y. 2009) (finding locus factor neutral where both California and New York were loci of operative facts).

But just because operative facts might be located in multiple districts does not mean that the locus factor is invariably neutral. *See, e.g.*, *Tarzy v. Dwyer*, No. 18 Civ. 1456 (JFK), 2019 WL 132280, at *5 (S.D.N.Y. Jan. 8, 2019) (concluding that the "principal" locus of operative facts was New Jersey). In this case, the court perceives the main set of operative facts to be located in WDVa, where Mr. Thomas lived and worked. Events in other districts, and the effects of the alleged wrongful conduct that Ms. King felt in WDNY, do not alter this conclusion. This factor therefore favors transfer to WDVa. But because of the relevant events in other districts, the court gives this factor somewhat less weight.

**F. Availability of Process to Compel Unwilling Witnesses**

The court examines the availability of process to compel witnesses with reference to the witnesses discussed above in Part II.B. For the reasons discussed below, the court concludes that this factor is essentially neutral because Aramark has not shown that any of the relevant witnesses would be unwilling to testify. *See Stewart v. Stewart*, No. 1:18-cv-00201-GWC, at 19 (W.D.N.Y. June 4, 2019), ECF No. 33 (noting that availability-of-process factor "concerns the availability of process to compel *unwilling* witnesses").

**1. Griffith Thomas**

Aramark asserts that Mr. Thomas would be subject to WDVa's subpoena power because he lives and works within 100 miles of the courthouse there. (Doc. 6-1 at 15.) Ms. King maintains that Mr. Thomas's residence in Virginia is irrelevant because Aramark can compel his testimony without the need for a subpoena. (Doc. 8-2 at 15–16.) The court agrees with Ms. King that, since Mr. Thomas is Aramark's own employee, Aramark will presumably make him available for trial. *See A & A Jewellers Ltd. v. Commemorative Brands, Inc.*, No. 03-CV-0651E(F), 2004 WL 912929, at *1 n.15 (W.D.N.Y. Mar. 30, 2004) (defendant CBI's witnesses "are its own employees, whom CBI will presumably make available for trial"); *see also Fuji Photo Film Co. v. Lexar Media, Inc.*, 415 F. Supp. 2d 370, 375 (S.D.N.Y. 2006) (noting that "parties can compel the testimony of their own employees without the need for subpoena").

**2. Other Current Aramark Employees**

The court considers the following group of current Aramark employee-witnesses: Kelly Barrett, Tracy Miller, Thomas DeGori, Christopher Harriman, John Wilson, and Jacob Williford. Aramark argues that all of these witnesses live and work far enough outside WDNY that they would not be subject to this court's subpoena power. And according to Aramark, several of these individuals would be subject to WDVa's subpoena power because they work at VHS facilities or other facilities located in WDVa. Ms. King maintains that the location of Aramark's current employee witnesses has no impact on the availability-of-process factor because Aramark can make them available. For the reasons stated with respect to Mr. Thomas, the court agrees with Ms. King that Aramark can make these employee-witnesses available.

**3. Former Aramark Employees**

The court next considers the following group of former Aramark employees: Rebecca Adams, Deborah Hetrick, Carmine DiCicco, Alexis Duckett, Evelyn Miller, and Colleen O'Donnell. Aramark argues that all of these witnesses live and work far enough outside WDNY that they would not be subject to this court's subpoena power. Ms. King argues that Aramark has failed to supply any evidence that these witnesses would be unwilling to testify if called. The court agrees with Ms. King on this point. *See Encarnacion v. Goord*, No. 12-CV-6180CJS, 2018 WL 3491287, at *5 (W.D.N.Y. July 18, 2018) ("Where the movant fails to present evidence that its witnesses would be unwilling to testify, the ability to compel the attendance of witnesses is not a factor in the transfer-of-venue analysis." (quoting *Williams v. Swack*, No. 12-cv-1552 (CBA), 2013 WL 5423791, at *7 (E.D.N.Y. Sept. 26, 2013))), *report and recommendation adopted*, 2018 WL 3996423 (W.D.N.Y. Aug. 21, 2018).

**G. Relative Means of the Parties**

Aramark concedes that it has greater financial resources than Ms. King, but it maintains that this factor does not weigh against transfer to WDVa because, according to Aramark, Ms. King herself has substantial financial means, as evidenced by the fact that she maintained two residences and traveled frequently between them. Ms. King argues that transfer to WDVa would cause her financial difficulties because, according to her declaration, she is disabled, unemployed, and indigent. (Doc. 8-1 ¶ 19.)

This factor is more significant when one party is a corporation and the other party is an individual. *See Xerox Corp. v. Ariz. Digital Prods., Inc.*, No. 08-CV-6480 (CJS), 2011 WL 1432046, at *5 (W.D.N.Y. Apr. 14, 2011) ("[T]he relative means of the parties is a more significant factor when one party is an individual . . . ." (quoting *USA Interactive v. Savannah*

*Air Ctr., LLC*, No. 02 Civ. 3659(LLS), 2002 WL 1808236, at *2 (S.D.N.Y. Aug. 7, 2002))). Here, Aramark is indisputably a large corporation with substantial resources. Ms. King claims substantial difficulties in her declaration. For present purposes the court concludes that the declaration is sufficient to show that Aramark has substantially greater means than Ms. King. This factor weighs against transfer.

**H. Forum's Familiarity with Governing Law**

Aramark relies on the fact that this factor is "'generally given little weight in federal courts' because federal courts are deemed capable of applying the substantive law of other states." *Tole v. Glenn Miller Prods., Inc.*, No. 12 Civ. 6660(NRB), 2013 WL 4006134, at *5 (S.D.N.Y. Aug. 6, 2013) (quoting *AEC One Stop Grp., Inc. v. CD Listening Bar, Inc.*, 326 F. Supp. 2d 525, 531 (S.D.N.Y. 2004)). Ms. King argues that this factor weighs against transfer because New York is the most appropriate forum to adjudicate her NYSHRL claim, and because her NYSHRL retaliation claim raises a novel state-law issue. (Doc. 8-2 at 23.) The court concludes that New York is the preferable venue to resolve the NYSHRL claims. This factor accordingly weighs somewhat against transfer.

**I. Trial Efficiency and Interests of Justice**

Aramark cites data suggesting that WDNY has an increased caseload and a longer timeframe for adjudicating disputes than WDVa. (Doc. 6-1 at 18–19.) Ms. King argues that any difference in caseloads is due simply to the types of cases before each court, and that the small differential between WDNY and WDVa does not support transfer. Aramark maintains that it is undisputed that WDVa has fewer cases and faster resolution time than WDNY and that this factor is proper for the court's consideration and supports transfer to WDVa. (Doc. 11 at 13.) This court has considered relative congestion in venue analysis. *See Stewart*, No. 1:18-cv-

00201-GWC, at 21 (W.D.N.Y. June 4, 2019), ECF No. 33. The court concludes that this factor weighs somewhat in favor of transfer.

### J. Conclusion as to Venue Motion

As discussed above, the § 1404(a) factors point in different directions in this case. Perhaps the strongest factor favoring transfer to WDVa is the convenience-of-the-witnesses factor. On the other hand, several of the factors weigh against transfer. Given this mixed set of factors and the deference owed to Ms. King's choice of forum, the court concludes that Aramark has failed to show by clear and convincing evidence that transfer should be granted. The court accordingly turns to Aramark's motion for partial dismissal.

## II. Motion for Partial Dismissal (Doc. 5)

### A. Rule 12(b)(6) Standard

To survive a Rule 12(b)(6) motion, a pleading "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)); *see also* Fed. R. Civ. P. 8(a)(2). The court must also draw all reasonable inferences in the non-moving party's favor. *Lanier v. Bats Exch., Inc.*, 838 F.3d 139, 150 (2d Cir. 2016). But "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Empire Merchants, LLC v. Reliable Churchill LLLP*, 902 F.3d 132, 139 (2d Cir. 2018) (quoting *Iqbal*, 556 U.S. at 678). Dismissal is appropriate when "it is clear from the face of the complaint, and matters of which the court may take judicial notice, that the plaintiff's claims are barred as a matter of law." *Conopco, Inc. v. Roll Int'l*, 231 F.3d 82, 86 (2d Cir. 2000). "If, on a motion under Rule 12(b)(6) or 12(c), matters outside the pleadings are

presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56." Fed. R. Civ. P. 12(d).

**B. NYSHRL Claims (Counts 2, 4, and 6)**

Aramark argues that Ms. King has failed to state an NYSHRL claim because no discriminatory act against her was committed in New York and because she cannot meet the statutory "residency" requirement within that law's extraterritorial application. *See* N.Y. Exec. Law § 298-a. Aramark also argues that even if Ms. King could satisfy the "residency" requirement, she cannot maintain her NYSHRL claim because that law does not provide a private cause of action against Aramark, which is not a New York corporation.

In order to state a claim under the NYSHRL, "it is necessary to allege either that 'a discriminatory act was committed in New York or that a New York State resident was discriminated against.'" *Torrico v. Int'l Bus. Machs. Corp.*, 213 F. Supp. 2d 390, 407 (S.D.N.Y. 2002) (quoting *Iwankow v. Mobil Corp.*, 541 N.Y.S.2d 428, 429 (N.Y. App. Div. 1989)). Ms. King appears to argue that her allegations support both pathways to liability. The court begins by inquiring whether the allegations plausibly allege discrimination within New York.

**1. Was there a Discriminatory Act Within New York?**

Citing *Taperell v. Tegan Lighting, Inc.*, No. 18-CV-3343 (SJF)(ARL), 2019 WL 1118053, at *2 (E.D.N.Y. Mar. 11, 2019), Ms. King argues that the NYSHRL provides a cause of action when discriminatory conduct has an "impact" in New York. (*See* Doc. 9-1 at 11–12.) The court rejects that argument because it is an incomplete statement of the legal requirements. *Taperell* does not equate the "impact" of discriminatory conduct in New York with a discriminatory at committed "within" New York.

The *Taperell* court explained that, in order to allege discrimination "within" New York, the plaintiff "must allege that an unlawful discriminatory practice 'originated' within New York state, . . . that a discriminatory practice affected the 'terms, conditions or privileges of [her] employment' ([N.Y. Exec. Law] § 296(1)(a)) within New York, or that [defendants] retaliated against her because she complained about such discriminatory practices." *Taperell*, 2019 WL 1118053, at *2 (alterations in original) (quoting *Sherwood v. Olin Corp.*, 772 F. Supp. 1418, 1425–26 (S.D.N.Y. 1991)). In other words, the plaintiff's allegations "must satisfy either a 'conduct' or an 'effects' test." *Harte v. Woods Hole Oceanographic Inst.*, No. 10 CV 3916 (RJD) (MDG), 2012 WL 12951525, at *4 (E.D.N.Y. Jan. 6, 2012), *aff'd*, 495 F. App'x 171 (2d Cir. 2012) (summary order).

Here, Ms. King does not argue that her allegations support the "conduct" test—i.e., that any discriminatory act "originated" within New York. Instead, she appears to be arguing that her allegations satisfy the "effects" test—i.e., that Aramark perpetrated discriminatory acts that affected the "terms, conditions or privileges of employment." N.Y. Exec. Law § 296(1)(a). But the "employment" so affected must be employment "within New York." *Taperell*, 2019 WL 1118053, at *2; *see also Harte*, 2012 WL 12951525, at *5 (evaluating whether discrimination affected plaintiff's employment "in New York"); *Sherwood*, 772 F. Supp. at 1426 (evaluating whether discrimination affected plaintiff's employment "within New York").

Here, the complaint does not allege discrimination affecting the "terms, conditions or privileges" of employment *in New York*. Here, as in *Harte*, Ms. King was "not employed in New York." *Harte*, 2012 WL 12951525, at *5. As the allegations in the complaint make clear, she was employed at Aramark's operations at VHS, which consists of hospitals in Virginia and West Virginia. Indeed, she rented a home in Virginia because of her Aramark responsibilities in that

part of the country. She had an office at a VHS facility in 2012. (Doc. 1 ¶ 16.) Ms. King argues at some length that she is a New York resident. But that is insufficient to allege discrimination "within" New York. *See Sherwood*, 772 F. Supp. at 1425–26 ("In order to allege discrimination within New York, [the plaintiff] must allege more than her New York residence . . . .").

The fact that Ms. King performed some of her Aramark work at her home office in New York does not alter this conclusion. Ms. King's allegations do not suggest that she was hired as a New York-based employee to work out of her home in New York. This case is therefore unlike *Taperell*, where the employer hired the plaintiff as a New York-based regional sales manager to work out of her New York home office, which was established with the employer's assistance and supplies. *Taperell*, 2019 WL 1118053, at *3. Likewise, this case is distinguishable from *International Healthcare Exchange, Inc. v. Global Healthcare Exchange, LLC*, 470 F. Supp. 2d 345 (S.D.N.Y. 2007). The plaintiff's place of employment in that case was New York City. *Id.* at 362. This case is also unlike *Bass v. World Wrestling Federation Entertainment, Inc.*, 129 F. Supp. 2d 491, 506 (E.D.N.Y. 2001), because in *Bass* the complaint could be "read liberally to imply that New York was the situs for many of the discriminatory acts." Here, even when read liberally, Ms. King's complaint does not suggest that New York was the "situs" of any significant number of discriminatory acts.

Ms. King's circumstances are much more like the facts in *Meyers v. Medco Health Solutions, Inc.*, No. 09 Civ. 09216(RKE), 2012 WL 4747173 (S.D.N.Y. Oct. 4, 2012). The plaintiff in that case was employed in New Jersey, but regularly worked at least two days per week from her New York residence. *Id.* at *2, 5. The plaintiff's complaints of acts that took place in New Jersey could not sustain NYSHRL claims. *See id.* at *5 ("The mere fact that

plaintiff resided in New York, and may have periodically worked from home, is not sufficient to warrant the application of New York law.").

### 2. Has Ms. King Stated a Plausible Claim Under § 298-a?

Even if there was no discriminatory act "within" New York, the NYSHRL applies to certain acts committed outside of New York. *See* N.Y. Exec. Law § 298-a. Ms. King relies on § 298-a, which provides in pertinent part:

> 1. The provisions of this article shall apply as hereinafter provided to an act committed outside this state against a resident of this state . . . if such act would constitute an unlawful discriminatory practice if committed within this state. . . .
>
> 3. If a non-resident person or foreign corporation violates any provision of this article by virtue of the provisions of this section, such person or corporation shall be prohibited from transacting any business within this state. . . .

According to Aramark, Ms. King's complaint fails to allege that she was a New York resident during the relevant time period—i.e., early 2016 to September 21, 2017. Alternatively, Aramark maintains that the NYSHRL provides no cause of action to a New York resident for discriminatory acts committed outside of New York by a foreign corporation. The court assumes for present purposes that Ms. King satisfies § 298-a's residency requirement and begins with the latter argument.

Courts in this circuit have held that "the NYSHRL does not provide a cause of action to a New York resident for discriminatory acts committed outside of New York by a foreign corporation." *Curto v. Med. World Commc'ns, Inc.*, 388 F. Supp. 2d 101, 106 (E.D.N.Y. 2005); *see also Harte v. Woods Hole Oceanographic Inst.*, 495 F. App'x 171, 172 (2d Cir. 2012) (summary order) (applying same rule, noting that the New York Court of Appeals had not ruled on the question, but that one intermediate appellate court has consistently so ruled and that "no Appellate Division department has held otherwise, and there is no persuasive evidence that the New York Court of Appeals would decide the issue differently"); *Taperell*, 2019 WL 1118053,

at *2 (same; quoting *Harte*); *Beckett v. Prudential Ins. Co. of Am.*, 893 F. Supp. 234, 238 (S.D.N.Y. 1995) ("[T]he NYHRL does not provide a cause of action to a *New York* resident for discriminatory acts committed *outside* of New York by a *foreign* corporation."); *Hammell v. Banque Paribas*, 780 F. Supp. 196, 199 (S.D.N.Y. 1991) ("Although N.Y. Exec. L. § 298-a permits a New York resident to sue a domestic corporation for discriminatory acts committed outside New York, it does not provide a private civil cause of action to New York residents discriminated against out of state by a foreign corporation."); *Sherwood*, 772 F. Supp. at 1421 (holding that "§ 298-a does not provide claimants with a private civil remedy for out-of-state discrimination by foreign corporations").

Ms. King maintains that *Curto* and similar cases are inapplicable because they address the NYSHRL's administrative remedy instead of a private cause of action. Relying on *Taperell*, Ms. King asserts that the NYSHRL "provides an administrative remedy, rather than a private cause of action, for New York residents where an employer's conduct has no impact in New York." (Doc. 9-1 at 12.) She insists that when the conduct *does* have an impact in New York, then a private cause of action exists. (*Id.*)

Ms. King's argument conflates the distinct analyses for discriminatory conduct within New York and for discriminatory conduct outside New York against a New York resident. For the former, it is unnecessary to look within § 298-a for a private cause of action, since that provision relates to discriminatory acts committed outside of New York. In cases of discriminatory conduct within New York, a private cause of action is available under N.Y. Exec. Law § 297(9). As discussed above, to determine whether the discrimination occurred within New York, courts consider, among other things, whether the "effects" test is satisfied. For the reasons stated above, Ms. King has failed to allege discriminatory conduct within New York.

The same "effects" test does not apply for the latter mode of analysis concerning extraterritorial discriminatory conduct against a New York resident. It is true that non-residents are not protected by § 298-a because they are "unable to demonstrate that the impact of the discriminatory act was felt inside the state." *Ulrich v. Moody's Corp.*, No. 13 Civ. 0008 (VSB) (MHD), 2014 WL 12776746, at *16 (S.D.N.Y. Mar. 31, 2014) (quoting *Hoffman v. Parade Publ'ns*, 933 N.E.2d 744, 748 (N.Y. 2010)). But that statement does not mean that New York residents who are impacted by discriminatory conduct perpetrated by a foreign defendant have a private cause of action.

The "impact" relates to the direct effect on a protected individual. *See Maines v. Last Chance Funding, Inc.*, No. 2:17-cv-05453 (ADS)(ARL), 2018 WL 4558408, at *8 (E.D.N.Y. Sept. 21, 2018) ("The relevant 'impact' within the State that a plaintiff must plead (and later prove) is the direct effect of a discriminatory act on a protected individual—giving rise to a cause of action for that individual—not the attenuated reaction of third parties to such an individual's circumstance." (quoting *Doner-Hendrick v. New York Inst. of Tech.*, No. 11-cv-121, 2011 WL 2652460, at *8 (S.D.N.Y. July 6, 2011))). Pleading such an "impact" says nothing about whether the protected individual has a private cause of action against a foreign corporation. For the reasons stated in *Sherwood* and affirmed in *Curto* and other cases, § 298-a does not provide Ms. King with a private civil remedy for out-of-state discrimination by foreign corporations such as Aramark.

### C. Federal Gender-Based Discrimination Claim (Count 1)

There is no dispute that gender discrimination claims are analyzed under the *McDonnell Douglas* burden-shifting framework. Under the *McDonnell Douglas* test, "a plaintiff must first establish a *prima facie* case of discrimination by showing that: '(1) she is a member of a

protected class; (2) she is qualified for her position; (3) she suffered an adverse employment action; and (4) the circumstances give rise to an inference of discrimination.'" *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 83 (2d Cir. 2015) (quoting *Weinstock v. Columbia Univ.*, 224 F.3d 33, 42 (2d Cir. 2000)). "Once a plaintiff has established a *prima facie* case, a presumption arises that more likely than not the adverse conduct was based on the consideration of impermissible factors." *Id.* "The burden then shifts to the employer to 'articulate some legitimate, nondiscriminatory reason' for the disparate treatment." *Id.* (quoting *McDonnell Douglas*, 411 U.S. at 802). "If the employer articulates such a reason for its actions, the burden shifts back to the plaintiff to prove that the employer's reason 'was in fact pretext' for discrimination." *Id.* (quoting *McDonnell Douglas*, 411 U.S. at 804).

The Second Circuit has cautioned district courts "against imposing too high a burden on plaintiffs alleging discrimination at the 12(b)(6) stage." *Doe v. Columbia Univ.*, 831 F.3d 46, 55 n.8 (2d Cir. 2016). The court is mindful that "[t]he prima facie case under *McDonnell Douglas* . . . is an evidentiary standard, not a pleading requirement." *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 510 (2002). A plaintiff alleging gender discrimination "is not required to plead a *prima facie* case under *McDonnell Douglas*, at least as the test was originally formulated, to defeat a motion to dismiss." *Vega*, 801 F.3d at 84. "Rather, because 'a temporary "presumption" of discriminatory motivation' is created under the first prong of the *McDonnell Douglas* analysis, a plaintiff 'need only give plausible support to a minimal inference of discriminatory motivation.'" *Id.* (quoting *Littlejohn v. City of New York*, 795 F.3d 297, 307, 311 (2d Cir. 2015)).

At the pleadings stage, a plaintiff "must allege that the employer took adverse action against her at least in part for a discriminatory reason, and she may do so by alleging facts that

directly show discrimination or facts that indirectly show discrimination by giving rise to a plausible inference of discrimination." *Id.* at 87. As the Second Circuit has explained:

> An inference of discrimination can arise from circumstances including, but not limited to, "the employer's criticism of the plaintiff's performance in . . . degrading terms; or its invidious comments about others in the employee's protected group; or the more favorable treatment of employees not in the protected group; or the sequence of events leading to the plaintiff's discharge."

*Littlejohn*, 795 F.3d at 312 (quoting *Carlton v. Mystic Transp., Inc.*, 202 F.3d 129, 135 (2d Cir. 2000)). The *Littlejohn* court also noted that an inference of discrimination arises "when an employer replaces a terminated or demoted employee with an individual outside the employee's protected class." *Id.* at 312–13. "While the standard for alleging a claim of discrimination is not high, a complaint cannot rest on mere legal conclusions, and the Court 'cannot infer discrimination from thin air.'" *Kuder v. City of Rochester*, 992 F. Supp. 2d 204, 211 (W.D.N.Y. 2014) (quoting *Lizardo v. Denny's, Inc.*, 270 F.3d 94, 104 (2d Cir. 2001)).

Aramark contends that Ms. King's allegations do not establish that the termination decision was made for discriminatory reasons. Aramark asserts that Ms. King has not identified any statements indicating that the termination decision was based on gender, and that she has not identified any similarly situated male comparators who engaged in the same conduct but were not terminated. Aramark further contends that any suggestion of discriminatory bias against Ms. King is weakened because one of the decisionmakers, Ms. Barrett, is also female. Ms. King maintains that the complaint supports a minimal inference of discriminatory motivation because it alleges "(1) the more favorable treatment of employees not in the protected group; (2) that Defendant transferred Plaintiff's job duties to a male coworker; (3) the invidious treatment of others in Plaintiff's protected group; (4) and that Griffith Thomas referred to Plaintiff in gender-based degrading terms." (Doc. 9-1 at 13.)

**1. Statements or Comments**

Regarding gender-based degrading statements, Ms. King highlights the following allegations in the complaint. The complaint alleges that Mr. Thomas made "demeaning comments about her physical appearance." (Doc. 1 ¶ 52.) The complaint lists the following examples of alleged demeaning comments:

> [O]n multiple occasions, Griffith Thomas looked at MS. KING's lunch tray and said 'wow you must be hungry,' would stare with disapproval at her midsection, and say that she should visit the fitness center. On a few occasions, Griffith Thomas said that MS. KING should visit the fitness center early in the morning because the VHS CEO, Mark Merrill, was there at that time and would like to see that she was exercising.

(*Id.*) The complaint also alleges that Mr. Thomas "made additional demeaning and disparaging comments about MS. KING's weight." (*Id.* ¶ 62.) Aramark argues that the alleged comments about weight have no connection to gender, and that the absence of gender-based comments is fatal to Ms. King's claims. (Doc. 10 at 9.)

The court concludes that, by themselves, the allegations concerning Mr. Thomas's comments about Ms. King's weight are insufficient to give rise to a plausible inference of gender discrimination. *See Kamrowski v. Morrison Mgmt. Specialist*, No. 05-CV-9234, 2010 WL 3932354, at *14 (S.D.N.Y. Sept. 29, 2010) (ruling on summary judgment that comments directed at the plaintiff describing her as a "fat ass" were "certainly rude" but were "gender neutral statements that do not indicate gender animus"); *Ortega v. N.Y.C. Off-Track Betting Corp.*, No. 97 Civ. 7582(KMW), 1999 WL 342353, at *4 (S.D.N.Y. May 27, 1999) (comments directed at female plaintiff about being overweight failed to support claim that the alleged hostile environment was created by sex-related conduct). Cases where comments about the plaintiff's weight do support an inference of gender discrimination involve the use of gendered language. *See Forrest v. Brinker Int'l Payroll Co.*, 511 F.3d 225, 227–28 (1st Cir. 2007) (plaintiff

presented evidence on summary judgment that her co-worker told her she was fat and need to go to the gym, but also supplied evidence that co-worker called her a "whore" and a "bitch"); *Kanios v. UST, Inc.*, No. 3:03CV369 (DJS), 2005 WL 3579161, at *5 (D. Conn. Dec. 30, 2005) (terms like "fat bitch" are "specifically degrading to a woman"). Ms. King's complaint does not include any allegations of similar gendered language.

The court accordingly agrees with Aramark that the complaint in this case fails to allege *gender-based* degrading comments. However, the court disagrees with Aramark's contention that the failure to allege such comments is "fatal" to her gender-based discrimination claim. (Doc. 10 at 9.) Alleging such comments is not essential to a discrimination claim. *See Cao-Bossa v. New York State Dep't of Labor*, No. 1:18-CV-0509 (GTS/TWD), 2019 WL 2743505, at *8 (N.D.N.Y. July 1, 2019) (allegations of discriminatory comments "are not required to create a plausible inference" of discrimination); *Holmes v. Donahoe*, No. 10-CV-1031-A-Sr, 2014 WL 2882850, at *20 (W.D.N.Y. June 25, 2014) (a plaintiff can meet her burden under the fourth element of the *prima facie* case "by showing that the employer treated plaintiff less favorably than a similarly situated employee outside of the protected group"); *see also Littlejohn*, 795 F.3d at 312 (listing circumstances that might support an inference of discrimination in the disjunctive). The court accordingly considers the other alleged circumstances.

**2. More Favorable Treatment of Male Employees**

The complaint alleges that "Griffith Thomas's other direct reports who managed more than one unit were all male and included: Christopher Harriman, Thomas DeGori, and John Wilson, each who Griffith Thomas treated more favorably." (Doc. 1 ¶ 22; *see also id.* ¶ 31.) According to the complaint, Mr. Thomas treated those men more favorably even though her performance was better than Mr. Harriman and Mr. DeGori's. (*See id.* ¶¶ 49, 67.) The

complaint also includes allegations suggesting that male Aramark employees Jacob Williford, Brian Marsh, and Timothy Knight received more favorable treatment. (*See id.* ¶¶ 24, 37, 43.)

"At the pleading stage, allegations that the plaintiff and comparators worked in the same group and were accountable to the same supervisors, but were subjected to disparate treatment may be sufficient to raise an inference of discrimination." *Pagan v. Cty. of Dutchess*, No. 18 CV 1785 (VB), 2018 WL 6591578, at *5 (S.D.N.Y. Dec. 14, 2018) (quoting *Pothen v. Stony Brook Univ.*, 211 F. Supp. 3d 486, 495 (E.D.N.Y. 2016)). To raise an inference of discriminatory motive based on a defendant's more favorable treatment of a comparator, a plaintiff "must plead facts showing that the comparator was 'similarly situated in all material respects'—that is, 'subject to the same workplace standards' as Plaintiff and accused of conduct of 'comparable seriousness' to that of which Plaintiff was accused." *Rothbein v. City of New York*, 18-CV-5106 (VEC), 2019 WL 977878, at *10 (S.D.N.Y. Feb. 28, 2019) (quoting *LeBlanc v. United Parcel Serv.*, No. 11 Civ. 6983(KPF), 2014 WL 1407706, at *15 (S.D.N.Y. Apr. 11, 2014))); *Holmes*, 2014 WL 2882850, at *20 ("[T]o raise an inference of discrimination, plaintiff must show [s]he was similarly situated in all material respects to the individuals with whom [s]he seeks to compare [herself]."). "Plaintiff cannot survive a motion to dismiss by merely speculating that she was treated differently" than other similarly situated male employees. *Turner v. Nazareth Coll.*, No. 10-CV-6357T, 2011 WL 310787, at *5 (W.D.N.Y. Jan. 28, 2011).

Aramark argues that none of the alleged male comparators are similarly situated individuals who engaged in the same conduct that led to Ms. King's termination. (Doc. 5-1 at 17.) Ms. King maintains that Mr. Harriman, Mr. DeGori, and Mr. Wilson were similarly situated because they were Mr. Thomas's "other direct reports who managed more than one unit." (Doc. 1 ¶ 22.) She argues that Mr. Williford was similarly situated because he also

reported directly to Mr. Thomas, and that Mr. Marsh and Mr. Knight were similarly situated even though they reported to different managers because they held roughly the same rank and were subject to the same standards. The court begins with the allegations concerning Mr. Harriman, Mr. DeGori, and Mr. Wilson.

The complaint alleges that Mr. Thomas "micromanaged" Ms. King's operations at VHS but did not micromanage his male direct reports, including Mr. Harriman, Mr. DeGori, and Mr. Wilson. (Doc. 1 ¶ 28.) The complaint also alleges that Mr. Thomas reassigned one of Ms. King's direct-reports, Unit Controller Jacob Williford, to report to Mr. Thomas and to assist male managers who reported directly to Mr. Thomas, including Mr. Harriman, Mr. DeGori, and Mr. Wilson. (*Id.* ¶¶ 24, 32.) According to Ms. King, she lost approximately 50% of Mr. Williford's services while incurring 100% of his costs under her VHS budget. (*Id.*)

The complaint also alleges that Mr. Thomas required Ms. King to visit all VHS facilities immediately after she returned from leave but did not impose the same requirement on Mr. DeGori after he returned from a four-week leave after surgery. (*Id.* ¶ 29.) Mr. Thomas also ensured that Mr. DeGori's facilities had daily coverage while Mr. DeGori was on leave for surgery but failed to arrange for or provide support for several of Ms. King's facilities while she was on leave. (*Id.* ¶ 33.) Ms. King alleges that

> In or about May 2016, Griffith Thomas advised MS. KING that she would no longer be dual General Manager of Food and EVS and would be General Manager, Food only due to a company-wide restructuring. In comparison, Griffith Thomas permitted male General Manager, John Wilson, to remain as Dual General Manager of Food and Valet.

(Doc. 1 ¶ 37.)

Also according to the complaint, Mr. Thomas disciplined Ms. King for certain conduct for which he did not discipline male direct reports, including Mr. Harriman, Mr. DeGori, and Mr. Wilson. (*Id.* ¶¶ 42, 61.) Ms. King alleges that Mr. Thomas failed to meet with her to discuss

progress on the performance improvement plan ("PIP") on which he had placed her. (*Id.* ¶ 68.) In comparison, Mr. Thomas worked with Mr. DeGori on his performance in advance of any discipline or written improvement plan. (*Id.*)

In addition, Ms. King alleges that Mr. Thomas required her to complete a "Top 15" report with respect to each of her facilities without having provided a "Top 15" training. (*Id.* ¶ 46.) At the same time, according to the complaint, Mr. Thomas did not require Mr. Harriman, Mr. DeGori, or Mr. Wilson to complete "Top 15" reports. (*Id.*) And the complaint alleges that Mr. Thomas held meetings with Ms. King's clients outside of her presence and without notifying her, but ensured that male direct reports, including Mr. Harriman, Mr. DeGori, and Mr. Wilson, attended client meetings. (*Id.* ¶ 62.)

The complaint goes on to allege that in summer 2017, Mr. Thomas directed Ms. King to meet deadlines that he did not require other male direct-reports to meet. (*Id.* ¶ 64.) "For example, Griffith Thomas required that MS. KING meet a deadline for the 'Treat Yourself Program' that he did not require Thomas DeGori to meet. Also, Griffith Thomas did not require Christopher Harriman to implement this program at one of his facilities." (*Id.*) The complaint also alleges that Mr. Thomas did not support Ms. King in preparing and giving key presentations for clients, but that he did provide that support to male direct reports such as Mr. Harriman. (*Id.* ¶ 65.)

Aramark argues that Mr. Harriman, Mr. DeGori, and Mr. Wilson were not similarly situated to Ms. King because they held different job titles and worked in different locations. At least in the present procedural posture, those distinctions are insufficient by themselves to discount Mr. Harriman, Mr. DeGori, and Mr. Wilson as comparators. Those three men and Ms. King all reported directly to Ms. Thomas and all of them managed more than one unit. At

this stage, absent additional facts, it is reasonable to infer that Ms. King, Mr. Harriman, Mr. DeGori, and Mr. Wilson were of sufficiently equivalent rank. *See McKnight v. Graphic Controls Corp.*, No. 2000 WL 1887824, at *5 (W.D.N.Y. Dec. 11, 2000) ("[I]ntermediate managerial positions should . . . be compared with other intermediate managerial positions."). Moreover, there is no suggestion in the complaint that any workplace rules or standards relevant to the alleged disparate conduct varied with any of the relevant job titles or duty stations. The court concludes that the allegations recited above are sufficient to raise an inference of discrimination.[6]

**3. Treatment of Other Female Employees**

Ms. King maintains that the complaint also supports an inference of discrimination because it contains allegations regarding the invidious treatment of other female Aramark employees. She highlights the following passages in the complaint:

> At approximately the end of the fiscal year in September 2016, Griffith Thomas issued a 2.5% annual earned merit increase limit for MS. KING's entire team for the fiscal year October 1, 2015 through September 30, 2015, despite her team showing high performance in significant areas. In fiscal year 2015–16, Griffith Thomas also provided MS. KING with a 0% earned annual merit salary increase. Prior to this, she had received a salary increase during each year she worked for ARAMARK. Additionally Griffith Thomas directed that Heather Rizzo, who was a high performer, be rated a "0" and receive no salary increase. Under ARAMRK policy and procedure, the General Manager, not the District Manager, is responsible for allocating earned annual merit increases among his or her team. Griffith Thomas undermined MS. KING's authority by directing her as to what salary increase to provide her direct report, Heather Rizzo. Heather Rizzo had previously complained to ARAMARK that Griffith Thomas had asked her to falsify financial information, which she refused to do, and further that she felt that she was being discriminated against, harassed by, and retaliated against by Griffith Thomas because of her sex. In comparison, for fiscal year 2014–15, Griffith Thomas directed MS. KING to rate Jacob Williford a perfect 4 (the highest level), even though Jacob Williford had reported directly to MS. KING for approximately half of that fiscal year. Griffith Thomas never sought MS. KING's input, and MS.

[6] It is therefore unnecessary to proceed to the parties' arguments about the suitability of Mr. Williford, Mr. Marsh, and Mr. Knight as comparators.

> KING would not have rated Jacob Williford a perfect 4. Griffith Thomas then gave Jacob Williford both a 4% raise and a lump sum bonus. . . .
>
> Griffith Thomas and AR[A]MARK also subjected other female directors, managers and supervisors, including but not limited to Allison Siegel, Director of Food; Heather Rizzo, Manager of EVS; Sondra Davis, Director of EVS; Heather O'Neil, Director of Food and EVS; Penny Curry, Director of Food; Teresa Davis, Supervisor of EVS; and Charline Hite, Supervisor of EVS, to discrimination, harassment, hostile work environment, and retaliation based on their sex and complaints of discrimination, harassment, hostile work environment, and retaliation. For example, Griffith Thomas and Aramark subjected them to different terms and conditions of employment than other male employees, undermined their authority, and retaliated against them for complaints to ARAMARK.

(Doc. 1 ¶¶ 47, 75.) Aramark maintains that the complaint lacks any factual allegations to support Ms. King's assertions that Aramark discriminated against other female employees. (Doc. 10 at 12.)

The court agrees with Aramark that the allegations cited lack any non-conclusory factual allegations of invidious treatment of other female Aramark employees. The allegations regarding salary increases mention that Ms. Rizzo felt that she was being discriminated against because of her sex but supplies no details. The allegation that Mr. Thomas subjected other female directors, managers, and supervisors to discrimination is conclusory; the only "example" given is itself conclusory and again lacks specific details.

#### 4. Alleged Transfer of Plaintiff's Job Duties to a Male Coworker

According to the complaint, while Ms. King was on leave caring for her ill son, Mr. Thomas used Mr. Williford "to perform many of her job duties in an effort to replace her." (Doc. 1 ¶ 26.) Ms. King alleges that in summer 2017, Mr. Thomas "ma[de] efforts to remove her from the VHS Proposal, the multimillion dollar project that she had presented on in January and March 2017 and had been working on for about 18 months." (*Id.* ¶ 66.) "Griffith Thomas held frequent closed door meetings with Jacob Williford concerning the VHS Proposal." (*Id.*)

"When MS. KING asked to be included in these meetings, Griffith Thomas denied her request. He told her 'Jacob and I got this.'" (*Id.*)

Aramark points out that the complaint does not actually allege that Mr. Thomas replaced Ms. King with Mr. Williford as General Manager for VHS, or that Mr. Thomas actually succeeded in removing Ms. King from the VHS Proposal. But the complaint plainly does allege that Mr. Thomas reassigned many of Ms. King's job duties to Mr. Williford and excluded Ms. King from meetings about the VHS Proposal between himself and Mr. Williford. The court concludes that this alleged conduct supports an inference of discrimination. *See Shu-Chen Kuo v. Winklevoss Consultants, Inc.*, No. 3:16cv651(JBA), 2018 WL 4623023, at *13 (D. Conn. Sept. 26, 2018) (although a plaintiff can meet her burden by showing that she was replaced by someone outside the protected class, inference of discrimination also applies "where a plaintiff's responsibilities are taken over by existing employees who are not members of the protected class").

Considering the above conclusions, the court finds that Ms. King has alleged facts giving rise to a plausible inference of discrimination.

### D. Federal Gender-Based Hostile Work Environment Claim (Count 5)

The Second Circuit has explained that:

> To state a claim for a hostile work environment in violation of Title VII, a plaintiff must plead facts that would tend to show that the complained of conduct (1) "is objectively severe or pervasive—that is, . . . creates an environment that a reasonable person would find hostile or abusive"; (2) creates an environment "that the plaintiff subjectively perceives as hostile or abusive"; and (3) "creates such an environment because of the plaintiff's sex."

*Patane v. Clark*, 508 F.3d 106, 113 (2d Cir. 2007) (alteration in original) (quoting *Gregory v. Daly*, 243 F.3d 687, 691–92 (2d Cir. 2001)). A work environment's hostility should be assessed on the "totality of the circumstances." *Id.* (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23

(1993)). Potentially relevant factors include: "(1) the frequency of the discriminatory conduct; (2) its severity; (3) whether it is threatening and humiliating, or a mere offensive utterance; and (4) 'whether it unreasonably interferes with an employee's work performance.'" *Id.* (quoting *Harris*, 510 U.S. at 23). To avoid dismissal under Rule 12(b)(6), a plaintiff "need only plead facts sufficient to support the conclusion that she was faced with 'harassment . . . of such quality or quantity that a reasonable employee would find the conditions of her employment altered for the worse.'" *Id.* (alteration in original) (quoting *Terry v. Ashcroft*, 336 F.3d 128, 148 (2d Cir. 2003)). The Second Circuit has "repeatedly cautioned against setting the bar too high" in this context. *Id.* (quoting *Terry*, 336 F.3d at 148).

Aramark argues that the complaint fails to identify any offensive gender-based comments and that all of the alleged incidents constitute only non-actionable "normal workplace strife." (Doc. 5-1 at 14–15.) Ms. King maintains that sexually explicit and overtly gender-based comments are not essential to her claim, and that the totality of the factual assertions in the complaint plausibly allege a hostile work environment. (Doc. 9-1 at 20.) Aramark replies that Ms. King has alleged "nothing more than a series of isolated and mundane workplace interactions and minor indignities spread out over more than a year." (Doc. 10 at 13.)

Contrary to Aramark's contention, the lack of offensive gender-based comments is not fatal to Ms. King's hostile-work-environment claim. *See Alfano v. Costello*, 294 F.3d 365, 375 (2d Cir. 2002) (rejecting suggestion that sex-based hostile work environment claim can be supported "only by overtly sexual incidents"). The complaint does not state the precise frequency of the alleged discriminatory conduct, but the complaint recounts numerous instances of alleged discriminatory treatment. Those alleged instances include: denial of a request for extension of time in 2015 while granting a similar extension to Mr. Williford (Doc. 1 ¶ 24);

criticizing her for taking leave to care for her ill son without complaining about Mr. Williford's leave to care for his ill wife (*id.* ¶ 26); micromanaging her but not other male managers (*id.* ¶ 28); disciplining her for conduct for which male managers were not disciplined (*id.* ¶¶ 28, 42, 43); reassigning Mr. Williford (*id.* ¶ 32); failing to provide staffing and coverage for Ms. King (*id.* ¶ 33); excluding Ms. King from meetings (*id.* ¶¶ 35, 50, 62, 66, 70); removing Ms. King's dual General Manager position (*id.* ¶ 37); requiring Ms. King to complete a report and meet deadlines not required of male managers (*id.* ¶¶ 46, 64); undermining Ms. King's authority with respect to allocating merit pay increases (*id.* ¶ 47); making multiple comments about her physical appearance[7] (*id.* ¶ 52); and failing to meet and discuss progress on the PIP as required by Aramark policy (*id.* ¶ 68).

On their own, none of these instances constitute particularly severe conduct. But the quantity of the alleged conduct—and the reasonable inference that some of the conduct was recurrent during Ms. King's employment—plausibly suggests a pervasive hostile environment. Some of the alleged conduct goes beyond a "mere offensive utterance"; especially the alleged criticisms directed at Ms. King for caring for her ill son and the various actions to undermine her authority. The allegations plainly allege unreasonable interference with work performance, including a March 2017 anxiety attack allegedly caused by the discriminatory conduct and a four-day medical absence. (Doc. 1 ¶ 56.) In light of the Second Circuit's caution against setting the bar too high at the pleading stage, the court will not dismiss Ms. King's hostile-work-environment claim.

---

[7] The court concluded above that the alleged comments were not expressly gender-based. The court nevertheless considers the comments as part of the totality of the circumstances.

**Conclusion**

Defendant's Motion to Transfer Venue (Doc. 6) is DENIED.

Defendant's Partial Motion to Dismiss (Doc. 5) is GRANTED IN PART and DENIED IN PART. The motion is granted insofar as it seeks dismissal of Ms. King's NYSHRL claims (Counts 2, 4, and 6). The motion is otherwise denied.

Dated this 29 day of July, 2019.

Geoffrey W. Crawford, Judge
United States District Court

UNITED STATES DISTRICT COURT
FOR THE
WESTERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| KRISTEN KING, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:19-cv-77 |
| | ) | |
| ARAMARK SERVICES, INC., | ) | |
| | ) | |
| Defendant. | ) | |

**OPINION AND ORDER**
**(Doc. 62)**

On January 14, 2019, Plaintiff Kristen King filed this gender-based discrimination, hostile work environment, and retaliation action against her former employer Defendant Aramark Services, Inc. ("Aramark") under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. ("Title VII"), and under the New York State Human Rights Law, N.Y. Exec. Law § 290 et seq. ("NYSHRL"). The court dismissed the NYSHRL claims under Fed. R. Civ. P. 12(b)(6) in an order dated July 29, 2019. (Doc. 16.) The parties have since been engaged in discovery as to the remaining Title VII claims, which allege sex discrimination (Count 1), retaliation (Count 3), and a hostile work environment ("HWE") (Count 5).

Now pending is Aramark's motion for summary judgment under Fed. R. Civ. P. 56, filed on November 1, 2021. (Doc. 62.) Aramark argues that the HWE claim is time-barred. (Doc. 63 at 11.) Aramark further asserts that all three Title VII claims fail for lack of evidence to support essential elements of each claim. Finally, Aramark contends that, if any of Ms. King's Title VII claims survive, the court should limit her recoverable damages. (*Id.* at 30.) The court heard oral argument on the motion on February 16, 2022.

**Background**

The Second Circuit has observed that discrimination cases are "fact-intensive." *Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 466 (2d Cir. 2001). This case is no exception. Aramark has filed a 41-page, 181-paragraph statement of facts in support of its Rule 56 motion (Doc. 64) together with an appendix of exhibits cited in that motion (Doc. 65). Ms. King has filed a 105-page, 181-paragraph "Counterstatement of Contested Material Facts" (Doc. 69) and her own appendix of exhibits (Doc. 69-1). Drawing on the parties' statements and its own review of the record, the court sketches here an overview of the material facts in this case, arranged in generally chronological order.[1] Additional facts are set forth as necessary in the discussion below.

**Kaleida Health (2005–2010)**

Ms. King worked for an Aramark entity[2] at its account with Kaleida Health from June 2005 until June 2010. She first held the position of Retail Manager before being promoted to Director of Food and Nutrition (also known as Food Service Director). Ms. King's employment there ended after her employer lost its contract with Kaleida Health in June 2010.

---

[1] Both parties have made efforts to organize the multitude of facts in this case. For example, two of the numbered paragraphs in Aramark's statement of facts are tables purporting to summarize data about Ms. King's alleged male comparators and about Ms. King's allegations of how her District Manager, Griffith Thomas, treated her. (Doc. 64 ¶¶ 167–168.) Ms. King objects to both tables as improper. (Doc. 69 ¶¶ 167–168.) For her part, Ms. King has filed two timelines of events prepared as exhibits to her opposition memorandum. (Docs. 69-13, 70-31.) The court has made an independent effort to organize the facts that are material to the pending summary judgment motion.

[2] Ms. King states in her December 19, 2021 declaration that Aramark Services, Inc. hired her to work in the Aramark Healthcare Division. (Doc. 69-2 ¶ 2.) She stated at her July 12, 2021 deposition that she worked for "Aramark Healthcare," (Doc. 65-45 at 14), which Defendant asserts is Aramark Healthcare Support Services, LLC (Doc. 64 ¶ 1). The precise Aramark entity for which Ms. King worked from 2005 to 2010 is not material to any issue here.

Ms. King then went back to school and obtained a master's degree in Innovation, Creativity and Change Leadership in 2012.

**Acceptance of General Manager Position at VHS; FMLA Leave (2012–2013)**

On April 5, 2012, Aramark sent a letter to Ms. King offering her the position of General Manager – Food and Nutritional Services of Aramark's account with the Valley Health System ("VHS"). (Doc. 64-1.) At the relevant times, VHS contracted with Aramark to provide food and facility services to six health facilities in Virginia and West Virginia. (*See* Doc. 69-2 ¶¶ 8, 101.) Winchester Medical Center ("WMC") in Winchester, Virginia is VHS's flagship hospital and headquarters.

Ms. King accepted Aramark's employment offer. She was an at-will employee and she reported to the District Manager. She was given an office at WMC but lost that office in or about October 2012 due to space constraints. (*Id.* ¶ 10.) Ms. King's unit did about $10 million in business annually. (*Id.* ¶ 71.) She directly supervised between 150 and 200 employees. (*Id.* ¶¶ 4, 101.) VHS was one of the largest Aramark accounts in the area. (*Id.* ¶ 21.) The CEO of VHS, Bob Amos, was Ms. King's largest client. (Doc. 65-45 at 115; Doc. 69-2 ¶¶ 43, 103.)

At the time Ms. King was hired she lived in Hamburg, New York. The new job required frequent travel among the VHS hospitals. Aramark offered to facilitate Ms. King's relocation to the Winchester, Virginia area and made a $11,006.28 relocation payment to her on May 18, 2012. Ms. King used the payment to cover the costs of relocating to a home in Stanley, Virginia—approximately 64 miles from Winchester—which she preferred for its country atmosphere. (Doc. 69-2 ¶ 8.)

While renting the home in Stanley, Ms. King maintained her home in Hamburg. (Doc. 69-2 ¶ 8.) Her teenage son and her fiancé lived with her in Stanley periodically but their

primary residence was in Hamburg. (*Id.*) Ms. King's son had a mental health condition for which he received treatment. On or about October 30, 2013, Aramark approved Ms. King's application under the Family Medical Leave Act ("FMLA") to provide for intermittent leave to care for her ill son. (Doc. 69-2 ¶ 16.) At times before and after that FMLA approval, Aramark authorized Ms. King to work from her home in Hamburg to allow her to care for her son. (*See id.* ¶ 15.)

**Griffith Thomas Promoted to District Manager (2015)**

When the District Manager position became vacant in fall 2014, Ms. King interviewed for the position. (Doc. 69-2 ¶ 17.) Aramark also interviewed Griffith ("Griff") Thomas for the position. Mr. Thomas had experience as Director of Environmental Services ("EVS") at WMC and had worked as General Manager – EVS for VHS. Ms. King asserts that her interview was a "sham" because it lasted only 20 minutes and because she was only questioned about District Manager positions for locations other than VHS. (*Id.*) It is undisputed that Aramark promoted Griffith Thomas to District Manager for the district that included VHS in February 2015.

Ms. King testified that Mr. Thomas frequently looked at her midsection, where she is heavier, and then looked at her with a "look of disgust on his face" that included a furrowed brow. (Doc. 65-45 at 143–144.) She testified that this occurred two to three times per week, especially when she stood up or sat down. (*Id.* at 146; *see also* Doc. 69-2 ¶ 38.) Mr. Thomas did not say anything to Ms. King during these instances. (Doc. 65-45 at 146.) Ms. King asserts that these events continued to occur through 2017. (*See* Doc. 69-2 ¶ 85.)

Ms. King also testified that, at some point in 2015, while in the WMC cafeteria, Mr. Thomas made a comment about her lunch tray. (Doc. 65-45 at 143.) According to Ms. King, when she arrived at the table with her lunch tray Mr. Thomas said "wow, you must be hungry."

(*Id.*) Ms. King states that Mr. Thomas made that comment in the presence of the directors who reported to her. (Doc. 69-2 ¶ 38.)

Ms. King testified that Mr. Thomas made a similar comment at some time in 2016 before August 29. (Doc. 65-45 at 143, 145–46.) She recalls that Mr. Thomas made a comment similar to "wow, look at that tray" or "wow." (*Id.* at 143.) Another male employee, John Shingleton, was also present; Mr. Thomas did not comment on Mr. Shingleton's tray or on Mr. Thomas's own tray. (Doc. 69-2 ¶ 38.)

Ms. King further testified that at some point in 2015 Mr. Thomas commented that Ms. King "should go to the gym at 5:30 in the morning because Mr. Merrill, who was the CEO of Valley Health was there, and he [Mr. Merrill] would like to see [Ms. King] actively working out at the gym." (Doc. 65-45 at 142.) Ms. King testified that Mr. Thomas made a similar comment in 2016. (*Id.*; *see also* Doc. 69-2 ¶ 38.) She also states in her declaration that Mr. Thomas continued to make "demeaning and disparaging comments about my weight" at times in 2017. (*See* Doc. 69-2 ¶ 85.)

Ms. King testified that during the Valley Health Proposal review in 2015, Mr. Thomas made a joke about women in her presence and in the presence of other male executives. (Doc. 65-45 at 147–148.) She does not remember the content of the joke or whether it was sexually explicit. (*Id.* at 153.) She remembers it was uncomfortable. (*Id.*) All of the men who were present laughed at the joke. (Doc. 69-2 ¶ 39.)

According to Ms. King, her son's illness began to worsen shortly after Mr. Thomas became District Manager. (Doc. 69-2 ¶ 26.) She recertified for intermittent FMLA leave on March 24, 2015. (*Id.*) It is undisputed that Aramark approved intermittent FMLA leave through November 2015 due to Ms. King's son's health condition.

**Jacob Williford Hired as Controller (2015)**

Ms. King hired Jacob Williford in April 2015 to work as a controller reporting to her. (*Id.* ¶ 21; *see also id.* ¶ 94.) Ms. King states that Mr. Williford was heavy in the midsection and worked at WMC, where the gym was located. (*Id.* ¶ 38.) Ms. King never heard Mr. Thomas state that Mr. Williford should go to the gym. (*See id.*) She never saw Mr. Thomas stare at Mr. Williford in disgust. (*Id.*)

When a private office became available at WMC, Mr. Thomas directed that it be given to Mr. Williford. (Doc. 69-2 ¶ 22.) Mr. Thomas told Ms. King that this was because Mr. Williford's work required him to maintain financial documents. (Doc. 65-45 at 118.) Mr. Thomas suggested that Ms. King ask Mr. Amos for an office. (*See id.*) Ms. King did so but Mr. Amos told her "you have enough space down in that [sic] nutrition, I'm not allowing anymore offices." (*Id.*) A separate VHS facility—Cork Street Hospital—apparently had available office space but Ms. King asserts that it was a small facility and that she needed a private office at WMC, which was VHS's largest hospital. (*See* Doc. 69-2 ¶ 22.)

Mr. Thomas then told Ms. King that she would have to work in a WMC "fishbowl" conference room where hourly supervisors worked. (Doc. 65-45 at 118; *see also* Doc. 69-2 ¶ 22.) The "fishbowl" provided "zero privacy"; Ms. King states that she was unable to discuss financials on the phone. (Doc. 65-45 at 117.) She complained to Mr. Thomas about having to use the "fishbowl" as an office. (Doc. 69-2 ¶ 22.) She states that Mr. Thomas's male direct reports—Christopher Harriman, Thomas DeGori, Christopher Drayton, and John Wilson—all had private offices. (*Id.*)

According to Ms. King, three months after she hired Mr. Williford, Mr. Thomas began utilizing Mr. Williford's time on accounts other than VHS. (*Id.* ¶ 25.) Ms. King repeatedly

complained to Mr. Thomas about that. (*Id.*) In fall 2015, Mr. Thomas told Ms. King that Mr. Williford would no longer be reporting to her. (*Id.*)

**Ms. King Promoted to Dual General Manager (2015)**

In October 2015 Ms. King was officially promoted to dual General Manager of Food and EVS for VHS. (*Id.* ¶ 18.) In this role she managed both the food service operation and the facilities/environmental services operation for the VHS account. She reported to Mr. Thomas while she held this dual role. Ms. King asserts that, in the summer prior to her promotion to this dual rule, Mr. Thomas told her that she would need to relocate closer to WMC if she was officially awarded the dual General Manager position. (*Id.*)

It is undisputed that, on October 6, 2015, Mr. Thomas forwarded to Ms. King an email from Aramark Human Resources ("HR") Director Melanie Curry. Ms. Curry's email provided a summary of the decision "regarding Kristen King's salary and role as a multi-site General manager." (Doc. 65-39 at 1.) The email listed the following:

- **Salary Increase** – Kristen will receive a salary increase of 5% effective September

- **Merit Increase** – Kristen's increase in October 1st will not make her ineligible for a merit increase in 2016. Kristen's salary and increase should be reviewed based on the Merit guidelines and her overall performance in her General Manager role.

- **Relocation** – To assist Kristen in getting closer to the client's headquarters, she will be offered Renter's relocation assistance to move. Please let me know when she would like to move so I can initiate the process with our vendor Cartus.

- **Equity Increase** – In May/June, we can review Kristen's salary again and her overall job performance to consider requesting an equity increase.

(*Id.*) That same day Ms. King emailed Mr. Thomas advising him that she had been "working with a realtor and would like to relocate before the snow falls so please contact Cartus." (*Id.* at 3.) In fall 2015 Aramark made a total of $9,940.53 in relocation payments to Ms. King.

On October 14, 2015, Ms. King emailed Mr. Thomas requesting "a couple more days to complete my teams annual review as well as to enter results in mine." (Doc. 65-37 at 1.) She stated that "[i]t's important to be able to spend the needed time and with just coming back from FMLA, I am just getting caught up operationally." (*Id.*) Mr. Thomas replied the next morning stating: "They have to be in today by 5pm." (*Id.*)

On the evening of Friday, October 30, 2015, Mr. Thomas emailed Ms. King asserting that he had made "numerous attempts to contact you today with phone calls and emails with no response." (Doc. 70-40 at 3.) He referred to certain incomplete tasks and noted that she had not provided him with access to her calendar for two weeks. He wrote that her "lack of any response today and other times, make me suspicious." (*Id.*) He further stated that he had received comments from Ms. King's directors "that they don't know where you are at times." (*Id.*) He concluded that "[i]t would be unacceptable for me not to respond to my boss and it is unacceptable for you as well" and that "[w]e will discuss Monday." (*Id.*) Ms. King responded by email on the evening of Sunday, November 1, 2015 agreeing to discuss the issues and stating, among other things, that "[i]t is difficult to understand where your comment containing the word 'suspicious' is coming from and quite frankly makes me uneasy." (*Id.* at 2.)

**Ms. King's Leave of Absence (December 2015–March 2016)**

Ms. King underwent surgery on December 8, 2015 to address a heel injury that she sustained before April 2012. (Doc. 69-2 ¶ 31.) She was approved for short-term disability leave. Before her leave started she notified her teams about who would be standing in for her while she was on leave. Also before going on leave, Ms. King and Mr. Thomas met regarding coverage during Ms. King's absence. (Doc. 69-2 ¶ 36.) They agreed that Mr. Thomas would have "at

least weekly contact" with the VHS facilities for which Ms. King was responsible. (*Id.*; *see also* Doc. 65-45 at 94.)

During her leave of absence, on December 28, 2015, Ms. King's son passed away unexpectedly. Ms. King remained on leave until early March 2016.

According to Ms. King, during that period of time when she was on leave, Mr. Thomas made "frequent efforts" to communicate with her about her job duties and he "made clear to me that he was unhappy about the work that was backing up because of my absence." (Doc. 69-2 ¶ 33.) Mr. Thomas asked Ms. King multiple times when she would be returning to work. (*Id.*)

On the morning of Monday, February 29, 2016, just before she returned to work, Ms. King emailed Aramark employees who reported to her expressing her gratitude for their work during her absence, noting that she would be beginning her transition back to work on Wednesday (March 2) at WMC, and advising that she would be contacting each employee individually to set up an informal catch-up meeting. (Doc. 65-55.) Later on February 29, 2016, Mr. Thomas emailed Ms. King stating:

> I am concerned that you have twice declined meeting invites for March 2nd. I have explained the meetings are to take place at Winchester Medical Center in the Nutrition Services Conference Room starting at 9am and that the nature of the meetings requires your on-site attendance. Your role as General Manager requires an occasional office day, but the vast majority of your time is to be spent working in unit locations.
>
> I cannot approve the three office days you requested this week. There are many urgent matters to attend to and I expect you to tour at least two of your other facilities on March 3rd and 4th to reconnect with your team, clients and assess the operations. The meetings on the 2nd will provide more clarity on where to focus.

(Doc. 65-42.)

Ms. King interpreted Mr. Thomas's email as requiring her to spend her first day back at work at an all-day meeting with him and as requiring that she visit at least two of her locations each day on the two following days. (*See* Doc. 69-2 ¶ 34.) She found that plan unrealistic. (*Id.*

¶ 35.) In her view, she needed an opportunity to catch up on emails and telephone calls, to identify and prioritize operations, and to reacclimate back to work. (*Id.* ¶ 34.)

Ms. King contacted Mr. Thomas's immediate supervisor, Regional Vice President Deborah Hetrick. (*Id.* ¶ 35.) She advised that she felt Mr. Thomas was discriminatorily targeting her and retaliating against her. (*Id.*) She complained that she was uncomfortable reporting to Mr. Thomas and being alone with him because of his conduct. (*Id.*) She states that Ms. Hetrick laughed in response. (*Id.*) Ms. King asked Ms. Hetrick to arrange for a neutral third party to mediate a reporting relationship between Ms. King and Mr. Thomas. (*Id.*) Ms. Hetrick denied that request and required that Ms. King meet with Mr. Thomas without a neutral third party. (*Id.*)

On the afternoon of March 1, 2016, after speaking with Ms. Hetrick, Mr. Thomas emailed Ms. King regarding a "change of plans for this week." (Doc. 70-7 at 2.) He proposed that, rather than meeting in Winchester, they could meet at a location closer to the home that Ms. King was renting in Stanley. (*Id.*) Mr. Thomas advised that the meeting involved "[n]o heavy agenda: [1] check in, [2] update on the Valley System[,] [3] next steps." (*Id.*)

**Return to Work (March 2016)**

According to Ms. King, upon returning to work she learned that Mr. Thomas "did not arrange for or provide support for several of the Valley Health facilities I was responsible for while I was on leave." (Doc. 69-2 ¶ 36.) Then, on or about April 20, 2016, Ms. King reported again to Ms. Hetrick "that Thomas's discriminatory, harassing, retaliatory conduct toward me continued unabated, and Thomas was creating a hostile environment." (*Id.* ¶ 41.) She told Ms. Hetrick that "Thomas was excluding me from important financial meetings, meeting alone with my directors without notice to me, imposing unrealistic deadlines on me, and impeding my job

performance." (*Id.*) That same day, Ms. King made a similar report to Rebecca Adams, the new Regional Director of HR, whom Ms. Hetrick introduced that day at WMC after traveling from Ms. Hetrick's home office in Delaware. (*Id.*) According to Ms. King, Ms. Adams "took no action to stop such conduct." (*Id.*)

In May 2016, Ms. King reported to Aramark Vice President Carmine DiCicco that she had complained to Ms. Hetrick and to Ms. Adams about Mr. Thomas's conduct but that no action had been taken. (*Id.* ¶ 42.) Ms. King had begun working with Mr. DiCicco in March 2016 on a multimillion-dollar "Valley Health Proposal." (*Id.*) Later that day, in Ms. King's presence, Mr. DiCicco instructed Mr. Thomas to set up a conference call with HR to resolve the issues. (*Id.*)

**Aramark Restructuring (June 2016)**

In June 2016 Aramark decided at the corporate level to undergo organizational restructuring, separating the "facility" (or EVS) portion of the business into its own line of business—distinct from the "food" portion of the business—with separate Regional Vice Presidents and District Managers for the two separate lines of business. (*See, e.g.*, Doc. 65-46 at 3–4.) Aramark decided that the restructuring would take effect on October 1, 2016. (Doc. 65-48 at 40.) Aramark's corporate-level decision apparently eliminated the General Manager of EVS position (one of the two General Manager positions that Ms. King held) and replaced it with a District Manager of EVS, a job that Timothy Knight took. (Doc. 69-2 ¶ 43; *see also* Doc. 65-48 at 2.) According to Ms. King, Mr. Thomas told her in June 2016 that her dual role would be ending. (Doc. 69-2 ¶ 43.) Ms. King asserts that, in June 2016, after she was removed as a dual general manager, she learned that Brian Marsh was still a dual general manager. (Doc. 69-2 ¶ 43.)

**Coverage for Norton Hospital (Summer 2016)**

On July 8, 2016, Mr. Thomas emailed Ms. King, Mr. Harriman, and Allen Siegel advising of a need to provide ten weeks of coverage for Norton Hospital due to the departure of Aramark's food service director for that hospital. (Doc. 65-27 at 1.) Norton Hospital was within Mr. Thomas's district but not part of VHS. (Doc. 69-2 ¶ 37.) Ms. King mustered personnel from within her team at VHS to provide coverage at Norton for five weeks. (*See id.*) Mr. Thomas was satisfied with the VHS personnel who provided coverage (Doc. 69-4 at 20), and he believed Ms. King was competent to make the decision of who to send, but he disagreed with Ms. King's decision not to go to Norton herself (*id.* at 26).

**Complaints; First Written Warning (July–August 2016)**

In or about July 2016, Ms. King relayed complaints about Mr. Thomas to Tracy Miller, who had taken over from Ms. Hetrick as Regional Vice President. (Doc. 69-2 ¶ 46.) Ms. Miller advised that she would have HR schedule recurring calls with Mr. Thomas, HR, and Ms. King to monitor and address the issues. (*Id.*) That same day, Ms. King complained again to Ms. Adams, Regional Director of HR, and stated that Mr. Thomas's conduct had worsened since she raised the issue in April 2016. (*Id.*) Ms. Adams said that she would set up and attend recurring calls with Mr. Thomas and Ms. King. (*Id.*)

On August 29, 2016, Mr. Thomas met with Ms. King in a WMC conference room. Ms. Adams attended the meeting via telephone. At the meeting Mr. Thomas gave Ms. King an "Employment Action/Disciplinary Notice Form" (the "First Written Warning"). (Doc. 65-8.) A section of the form entitled "Brief Summary" stated:

> For us to have an inclusive and productive environment there has to be complete communication and follow through from you. Over the last few months there have been numerous asks from you which you have not complied. There also is an expectation that you escalate important business details to me, the District Manager.

The following items have been asked of you and you've not completed and/or you did not inform me appropriately.

1. Did not provide written work schedule as directed on multiple occasions May-Aug 2016
2. Did not notify DM of TJC visit site survey at Shenandoah week of July 25, 2016
3. Did not report to site for TJC survey at Shenandoa[h] as requested week of July 25, 2016
4. Assignments are not completed on time: Development plan, Capital Inventory June-July-Aug 2016
5. Made decision with significant financial impact without involving DM, Pepsi Coke Transition July 2016
6. Refused to provide coverage at Norton July 2016
7. Shared confidential organizational changes with client July 2016
8. Does not monitor payroll using Kronos
9. Need to update me about client visit schedule and cancellations for Valet August 10, 2016
10. David Bell incident was not reported immediately upon discovery, was not discovered in a timely matter 8/10
11. Multiple managers report not seeing or knowing how to reach you over past several months.

(*Id.* at 1.) The form bears Mr. Thomas's signature dated August 29, 2016. (*Id.* at 2.)

Ms. Adams did most of the talking during the meeting and covered the 11 items listed on the form. (Doc. 65-45 at 88.) Ms. King stated that she disagreed with the 11 charges. (*Id.*) She also stated that Mr. Thomas was retaliating against her and that Ms. Adams knew that because Ms. King had mentioned it to her before the meeting. (*Id.* at 88–89.) She asserted that "the retaliation is continuing, the disparate treatment is continuing, the sexual harassment is continuing" and that she thought this was unfair. (*Id.* at 89.)

On September 2, 2016, Ms. King gave Ms. Adams a three-page typewritten document that responded to each of the eleven items covered in the First Written Warning. (Doc. 65-9.) On September 10, 2016, Mr. Thomas gave Ms. Adams a three-page typewritten memo that addressed points made in Ms. King's written response. (Doc. 65-30.) On September 29, 2016, Mr. Thomas and Ms. Adams issued a revised version of the First Written Warning that removed six of the eleven items listed on the original version. (Doc. 65-10.) Ms. King requested that the

First Written Warning be changed to a verbal warning because she had no prior discipline; that request was denied. (Doc. 69-2 ¶ 61.) She requested a Performance Improvement Plan ("PIP"). That request was also denied; Ms. Adams stated: "It's simple, improve your performance." (*Id.*)

In December 2016 Mr. Thomas and Ms. King both signed a performance review of Ms. King's fiscal year 2016 work. (Doc. 70-11.) Ms. King assigned herself an overall rating of "3- Meets Expectations." (*Id.* at 6.) Mr. Thomas assigned her an overall rating of "2- Inconsistent." (*Id.*) In his year-end comments he wrote, among other things: "Needs to take a stronger role in delivering results and improving communication." (*Id.*)

**Further Complaints; Additional Written Warning (March 2017)**

On March 19, 2017, Aramark Director of Business Development Alexis Duckett told Ms. King that she had observed Mr. Thomas speaking to Ms. King in a rude and condescending way and it did not seem to her that Ms. King and Mr. Thomas were "on the same team." (Doc. 69-2 ¶ 67.) Ms. King complained to Ms. Duckett that Mr. Thomas "did not support me and undermined my management and career" and that Mr. Thomas "discriminated, harassed, and retaliated against me and targeted me relative to my performance even though there were other male employees with worse performance." (*Id.*) Ms. Duckett advised Ms. King that if she needed anything she could come to her. (*Id.*)

Ms. King states that she advised Mr. DiCicco on or about March 21, 2017 that Mr. Thomas's "unfair targeting, discrimination, harassment, and retaliation of/against me had increased since he and I last spoke of it in May 2016." (Doc. 69-2 ¶ 68.) According to Ms. King:

> I advised that Thomas was excluding my participation in team and client meetings, focusing on finding ways to identify and raise any perceived weakness, replacing many of my duties by working with the Unit Controller instead, and speaking to me in a rude, condescending, dismissive, and hostile tone. I advised Carmine

> DiCicco that Thomas was discriminating, harassing, and retaliating against me, and setting me up for termination. I also complained that Adams, Regional Director of Human Resources, knew about the situation but had failed to stop such conduct.

(*Id.*)

At a meeting with Mr. Thomas and Ms. Adams on March 27, 2017, Ms. King received a "Final Written Documentation" signed by Mr. Thomas on that date. (Doc. 65-11.) The "Brief Summary" section of that form states:

> Did not demonstrate Aramark Leadership Competency of Thinking Strategically by understanding long-term business and financial implications of day-to-day decisions, did not demonstrate an understanding of issues relevant to the broad organization.
>
> You communicated with USFoods about Market Basket 2.15.17 after being directed not to on 1.19.17 and 2.15.17.
>
> Your actions alerted a competitor and added risk to Aramark's ability to migrate purchasing and an estimated $400k+ in annual income and cost reductions for our client. I had instructed you to collect information with your team based on current spending levels and prices with your team.

(*Id.* at 1.) The "Action to be Taken" section of the form states: "Follow directions, review decisions with financial impact greater than $1,000 with District Manager in advance. Develop awareness of how financial decisions impact Client and Aramark." (*Id.*)

Ms. King stated at the March 27, 2017 meeting that the allegations were not true and that the written warning was retaliation for her prior complaints to Aramark leaders about Mr. Thomas's conduct. (Doc. 65-45 at 157.) She continues to assert that there was no basis for the discipline and that she complied with Aramark policy and procedure. (Doc. 69-2 ¶¶ 69, 70.)

**Ms. King Calls the Aramark Employee Hotline (March 2017)**

After the meeting, Ms. King complained to Mr. DiCicco about receiving the written warning. Mr. DiCicco advised Ms. King to call the Aramark Employee Hotline. (*Id.* ¶ 72.) Ms.

King called the Aramark Employee Hotline on March 27, 2017. The Aramark Employee Hotline call report summary states:

> Ongoing since February 2015, Griff Thomas has been bullying Kristen and he has been, "A nightmare to work for." Griff violated Kristen's FMLA benefits by forcing Kristen to work while she was out of work on FMLA grieving the loss of her son.
>
> Griff does not offer Kristen any training, coaching, or support. Kristen feels that Griff intentionally sets her up for failure.
>
> There have been numerous hotline calls made about Griff and the hotline calls are not being taken seriously. Kristen wants a full investigation launched against Griff.

(Doc. 65-12 at 1.) A "Supplemental Information" section of the report states that "Griff does not treat Kristen the same way that he treats the other employees." (*Id.*) Ms. King testified that she also complained during the hotline call that she felt that Mr. Thomas was discriminating against her, treating her differently than male managers, and continued to violate the FMLA. (Doc. 69-2 ¶ 74; Doc. 65-45 at 193.)

Aramark Employee Relations Representative Evelyn Miller was in charge of the resulting Hotline investigation. (Doc. 69-2 ¶ 74.) Ms. King spoke with Evelyn Miller on March 30, 2017 and provided the names of witnesses and further complained that Mr. Thomas was discriminating and retaliating against her and creating a hostile work environment. (*Id.*) On or about April 27, Ms. Miller told Ms. King that the Hotline investigation determined that her complaints were unfounded. (*Id.* ¶ 76.) According to Ms. King, the Hotline investigation arrived at that conclusion without ever seeking a written statement from Ms. King and without contacting any of the witnesses whose names she had supplied. (*Id.* ¶¶ 74, 76.)

**Changes to Mileage and Work-From-Home Arrangements (April 2017)**

Meanwhile on April 4, 2017—while the Hotline investigation was still open—Ms. King emailed Ms. Adams, cc'ing Mr. Thomas, requesting an "overview of what you are changing in

regards to relocation, mileage, home office, etc." (Doc. 65-40 at 1–2.) On April 6, 2017, Ms. Adams replied—cc'ing Mr. Thomas:

> As you know, you were offered relocation in October of 2015 to move from Stanley, VA (where you still currently live), to Winchester, because that is the largest hospital of the Valley Health System and where, as was discussed back in October 2015, the GM position is based. Because you were out on FMLA for three months, between December 2015-March 2016, we extended the relocation timeframe in good faith until February 2017. In exchange for your commitment to move to Winchester, you were given a lump sum payment of $6,000. Subsequently, after signing the relocation agreement (attached for your reference), you stated to Griff that you [would] be neither moving nor paying back the relocation money.
>
> Despite that your refusal to relocate and/or repay the relocation money constitutes [a] breach of the agreement, we nonetheless informed you on March 27, 2017 that we are not asking for you to repay the funds.
>
> Since, however, you will not be moving to Winchester, where your job is based, the following arrangement, which is aligned with our Global T&E policy, will apply going forward:
>
> - The mileage from your house to Winchester will not be expensed.
> - The miles from your home to other worksites will need to be adjusted for the miles from Winchester, as Winchester is your position's home base.
>
> During our call on March 27th, I reinforced that, as a GM, you do not have a home office and that you are expected to be in the locations. Since Winchester is the largest location, that is your home site and you need to be working from that location and have an office there. This was all originally explained to you back in October when you accepted the relocation package. We can review this email if needed via phone however this is effective as of 3.27.17.

(*Id.* at 1.) Ms. King replied that afternoon stating, among other things, that "[t]he relocation was based on acceptance of a dual role GM position which I no longer hold." (*Id.* at 6.) She further stated that working from her office at home was never an issue in the past five years she worked at the VHS account, and inquired, "Why would this all of a sudden change?" (*Id.*) Ms. Adams responded stating, among other things: "As part of the multi-site GM position this role does not have home office days" and that she could not speak to the past "but the expectation is that there are no more home office days moving forward." (*Id.* at 5.)

Ms. King believed that the changes to mileage and her work-from-home arrangements were in retaliation for her Hotline complaint and other complaints. (Doc. 69-2 ¶ 75.) She contacted Aramark Director of Employee Relations Colleen O'Donnell and asserted:

> Thomas had been discriminating against me by issuing unfair and untrue discipline, not adhering to Aramark's progressive discipline policy, making untrue statements about my job performance, and setting me up for termination as a result of discrimination, harassment, and retaliation for my prior complaints about his discrimination, harassment, and retaliation.

(*Id.*) She further complained that she needed help and that, to date, only Mr. DiCicco and Ms. Duckett had taken her complaints seriously. (*Id.*)

**Further Written Warning (May 2017)**

Sometime between April 27 and May 9, 2017, Ms. King contacted Ms. Adams "to schedule a meeting to discuss how to successfully continue my employment with Aramark." (Doc. 69-2 ¶ 77.) Ms. King requested that she be placed on a PIP "so that I could know clearly the areas needing improvement and identify specific goals to work toward." (*Id.*) She requested that the meeting be only between Ms. King and Ms. Adams; Ms. Adams agreed and scheduled the meeting for May 9, 2017. (*Id.*) However, on or about May 7, 2017, Ms. King received a meeting request—entitled "way forward"—from Mr. Thomas that scheduled a meeting with him, Ms. Adams, and Ms. King on May 9, 2017. (*Id.*)

At the May 9, 2017 meeting, Ms. King received another "Final Written Documentation," signed by Mr. Thomas. (Doc. 65-13.) The "Brief Summary" stated:

> The purpose of this document/discussion is to highlight essential elements of job performance and leadership competencies required to successfully and fully execute the role of General Manager and gaps in reaching them
>
> 1. During multiple conversations with multiple participants when discussing cou[n]selings Kristen has demonstrated unprofessional behavior, using loud voice, interrupting, not listening, inappropriate comments.

2. Kristen was instructed on Feb 1 to work with HR to develop a PIP or Warning for Penny Curry. After 6 requests a document was provided on 4/21 without signatures, not using the standard Aramark form and without HR review.

3. In April, Kristen mentioned she was presenting a catering growth plan to our client the next day. I reminded her the Final Written Warning requires review and approval for $1k decisions with me in advance. I intervened and reviewed the document which was incomplete and provided sales growth but no associated costs. The total scope was $450k.

4. Sent WMC CBR feedback to Kristen 4/20 asking for edit and review with me, spoke with J Shingleton week of 5/5, he was unaware of edits and had given unedited document to client. I had not received a response from Kristen.

5. Kristen met with a HCT employee and asked him about the leadership of his Aramark GM, DeWayne Jackson. DeWayne notified me and was upset that Kristen had not approached him and had asked on[e] of his employees to meet to discuss his performance. This is poor judgment and undermines another Aramark leader.

(*Id.* at 1.)

According to Ms. King, each of the five items on the May 9, 2017 warning "were either untrue or did not violate Aramark policy and procedure." (Doc. 69-2 ¶ 78; *see also id.* ¶¶ 79–83.) She asserts that she was not allowed to respond to the allegations at the May 9 meeting, that she was not allowed to submit documentation to dispute the allegations, and that the writeup was "not up for negotiation." (*Id.* ¶ 84.) Although Ms. Adams did most of the talking at the May 9 meeting, Ms. King asked to be put on a PIP "because I did not know what Thomas was expecting from me." (*Id.* ¶ 78.) Ms. Adams denied that request on the basis that it was unnecessary, that Ms. King was not a candidate for a PIP, and that she and Mr. Thomas had determined Ms. King would not benefit from it. (*Id.*)

**Complaint to Ms. Barrett: "Setting Me Up for Termination" (July 2017)**

In or about July 2017, Ms. King contacted Kelly Barrett, who had replaced Ms. Adams as Regional Director of HR. (*Id.* ¶ 86.) Ms. King conveyed her complaints about Mr. Thomas's

alleged discrimination, harassment, and retaliation, and about Mr. Thomas's alleged failure to provide support, excluding Ms. King from meetings, and "setting me up for termination." (*Id.*)

On July 24, 2017, Mr. Thomas emailed Ms. Adams—cc'ing Tracy Miller—asking that Ms. Adams "[p]lease review the attached termination form with supporting documents." (Doc. 70-23 at 2.) The attached unsigned "Employee Action/Disciplinary Notice Form" identified Ms. King as the subject and listed the category of notice as "Termination." (*Id.* at 4.) Ms. Adams forwarded the email and attachments to Ms. Barrett on July 25, 2017. (*Id.* at 2.) On July 26, 2017, at Ms. Adams's request, Mr. Thomas forwarded the email and attachments to Ms. O'Donnell. (Doc. 70-24 at 2.) Ms. O'Donnell replied on July 27, 2017 stating: "Thanks, Griff. An important factor in determining appropriate next steps is looking at how are these scores as compared to each of her peers? We need to look not only at her scores, but how she stacks up to peers. We can discuss tomorrow." (*Id.*)

According to Ms. King, in July or August 2017 Mr. Thomas had frequent closed-door meetings with Mr. Williford concerning the Valley Health Proposal that Ms. King had been working on for more than a year. (Doc. 69-2 ¶ 89.) Ms. King asked to be included in the meetings. (*Id.*) Mr. Thomas denied that request stating, "Jacob and I got this." (*Id.*)

**"Treat Yourself" Program (Summer 2017)**

Also in summer 2017, Ms. King was working at Mr. Thomas's direction to implement the "Treat Yourself" program throughout Mr. Thomas's district, including at VHS facilities for which Ms. King was responsible. (*Id.* ¶ 87.) According to Ms. King, she held weekly calls for all of Mr. Thomas's direct reports to ensure everyone was in compliance with the multi-step implementation process. (*Id.*) Ms. King testified that Mr. DeGori and Mr. Harriman did not implement the Treat Yourself Program at their facilities and that when she questioned Mr.

Thomas about that he advised her that it was "fine that they're not doing it." (Doc. 65-45 at 123.) Aramark notes that Mr. DeGori testified that he did implement the Treat Yourself program (Doc. 65-52 at 7) and Mr. Harriman testified that he implemented parts of the Treat Yourself program (Doc. 65-53 at 12–13).

**Performance Improvement Plan (August 2017)**

At an August 2017 meeting with Mr. Thomas and with Ms. Barrett present by telephone, Mr. Thomas gave Ms. King a 90-day PIP dated August 11, 2017. (Doc. 65-14.) The PIP listed three "areas of deficient performance": (1) "Patient Satisfaction is below incentive targets"; (2) Overall Retail Satisfaction YTD is below 60% VOC target"; and (3) "Employee Satisfaction is below target." (*Id.* at 3.) The PIP listed the following resources as available to assist Ms. King in completing the improvement plan: "Operating Template, Griff, Kelly, peer managers." (*Id.* at 4.)

Ms. King asserts that the three areas listed in the PIP "were not addressed in any of my prior discipline by Thomas." (Doc. 69-2 ¶ 92.) She states that she asked questions about the PIP at the August 2017 meeting. She asked "why it took so long for the PIP because I had been asking for a PIP . . . since my First Written Documentation." (*Id.*) She also asked "why the PIP did not have specific targets, specific locations or improvement goals." (*Id.*) Ms. King further states that Mr. Thomas failed to meet with her weekly or biweekly to discuss her progress on the PIP, which she states was required under Aramark policy. (*Id.* ¶ 94.)

**Travel with Brittany Cubbage (August 2017)**

Ms. King's car broke down in or around August 2017. Mr. Thomas had told Ms. King that she needed to be at WMC on August 31, 2017.[3] Ms. King asked Mr. Thomas if she could get reimbursed for a rental car and Mr. Thomas told her "no." Ms. King's home in Stanley was approximately one mile from her subordinate Brittany Cubbage, who was Aramark Director of Food at Page Memorial Hospital. (*See* Doc. 69-2 ¶ 97.) Ms. King states that she rode to and from WMC with Ms. Cubbage on August 30, 2017 because they were both required to attend a meeting there on that date. (*Id.*) Ms. Cubbage was approved for a $48.36 travel reimbursement for August 30. (Doc. 70-27.)

According to Ms. King, she also requested that Ms. Cubbage report to WMC on August 31, 2017 because they were both already scheduled to work together on that date. (Doc. 69-2 ¶¶ 96, 98, 99.) Ms. King rode to WMC with Ms. Cubbage on August 31, 2017. (*Id.* ¶ 98.) Ms. King states that Ms. Cubbage then left WMC because her dog had been bitten and she needed to bring him to the veterinarian. (*Id.* ¶ 99.) Ms. King rode home with her fiancé after work. (*Id.*) Ms. King approved a $56.68 travel reimbursement to Ms. Cubbage for August 31. (Doc. 65-16.) The "comment" section of the expense report for that reimbursement states: "Left home for Krist[e]n and dropped off and then went to work at PMH." (*Id.* at 1.)

On Sunday, September 17, 2017, Ms. King emailed Mr. Thomas requesting that her scheduled PIP meeting be rescheduled for Wednesday September 20 or Friday September 22. (Doc. 65-36 at 2.) Mr. Thomas replied that evening stating that "the PIP review is not something

[3] According to Ms. King, on that date Aramark was making the final presentation to VHS on the multimillion-dollar Valley Health Proposal that Ms. King had been working on for more than a year. (*See* Doc. 69-2 ¶ 96.)

we can reschedule" and offering to meet her on Monday morning at Warren Memorial Hospital ("WMH"). (*Id.*) On Monday at 6:21 a.m. Ms. King emailed Mr. Thomas stating:

> I am seeing your response now and did not think that it would be an issue to meet a different day this week. Especially because you stated that you could not meet at WMH when we scheduled this last Monday.
>
> Therefore I did not finish gathering all the needed items for review. I will not be able to show all that I've done which concerns me.

(Doc. 65-36 at 1.) Mr. Thomas replied at 7:34 a.m.: "Meeting at Warren is fine. I will see you at 9. Let's go over what you've got." (*Id.*)

According to Ms. King, when she arrived at the putative PIP meeting on Monday September 18, 2017, Mr. Thomas immediately called Ms. Barrett on the telephone. (Doc. 69-2 ¶ 100.) Ms. King states that she was then advised "that I was under investigation for violating the Business Code of Conduct because of my decision to authorize travel reimbursement for Brittany Cubbage." (*Id.*) Ms. King further states that her PIP was not discussed at any point during the meeting. (*Id.*)

Ms. King did not come to work on September 19 or September 20, 2017, and she did not have any in-person interactions or phone conversations with Mr. Thomas on those dates. She emailed Mr. Thomas advising that she was out on September 19 for "FML." (Doc. 70-30 at 2.) She testified at her deposition: "[A]fter that incident where they had told me about this code of conduct violation . . . . I had a sinking feeling and I was crying and extremely upset and emotional and I went to my doctor [on September 19, 2017] who pulled me out of work." (Doc. 65-45 at 186.)

**Second Hotline Complaint (September 19, 2017)**

Also on September 19, 2017, Ms. King called the Aramark Employee Hotline. (Doc. 65-17.) The call report summary includes notations about the May 9, 2017 Second Final Written

Warning, the August 2017 PIP, and the September 18, 2017 meeting regarding the charged business policy violation related to Ms. Cubbage's travel. A section entitled "Involved Parties" indicates that Kelly Barrett investigated Ms. King's report. (*Id.*) A "Supplemental Information" section summarizes: "Griff mistreats Kristen and picks on her. Kristen has filed reports against Griff but nothing has been done. The harassment continues with Griff since no action has been taken against him." (*Id.* at 2.)

**Termination (September 21, 2017)**

At 12:21 p.m. on September 20, 2017, Mr. Thomas emailed Ms. Barrett stating that he was "prepared to tell Bob [Amos] we are terminating Kristen for a BCP [business conduct policy] violation." (Doc. 70-30 at 2.) Later that afternoon, Ms. King sent an email to Mr. Amos and others, and cc'd Mr. Thomas, advising that she was "currently out of work on FML." (Doc. 70-35 at 2; *see also* Doc. 70-34 at 2.)

On September 21, 2017, Mr. Thomas and Ms. Barrett called Ms. King at her rental home in Stanley and told her that her employment was terminated. Ms. Barrett also signed a letter to Ms. King on that date confirming the termination. (Doc. 65-18.)

**Events After Termination; EEOC Complaint**

A notation regarding Ms. King's September 19, 2017 report to the Aramark Employee Hotline states that, as of November 13, 2017, "an investigation was conducted and appropriate action has been taken. This call is closed." (Doc. 65-17 at 3.) Ms. King states that no one interviewed her as part of the purported investigation. (Doc. 69-2 ¶ 102.)

Mara Rakowski assumed the position of Aramark general manager for VHS around December 2017. (*See* Doc. 69-8 at 17–18.) Since Ms. King's Aramark employment ended, she

has not held any job and her only sources of income were unemployment compensation, military benefits, and support from her fiancé.

On July 17, 2018, Ms. King signed a Charge of Discrimination to be submitted to the Equal Employment Opportunity Commission ("EEOC"). (Doc. 65-19.) The charge asserted claims of gender-based hostile work environment harassment, gender-based discriminatory discharge, and retaliation under Title VII. Ms. King's attorney signed a cover letter for transmittal of the Charge of Discrimination to the EEOC; the letter is dated July 17, 2018 and states "via hand delivery." (Doc. 70-38.) The EEOC stamped the charge as "received" on July 18, 2018. (Doc. 65-19 at 1.) On October 17, 2018, the EEOC issued a Dismissal and Notice of Right to Sue. (Doc. 65-56.) Ms. King filed her complaint in this court on January 14, 2019. (Doc. 1.)

## Analysis

### I. Rule 56 Standard

"The summary judgment standards are well established." *Lewis v. Siwicki*, 944 F.3d 427, 431 (2d Cir. 2019). Summary judgment may be granted only "if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When reviewing a motion for summary judgment, a court must construe all facts in the light most favorable to the non-moving party and draw all reasonable inferences in its favor. *See Davis-Garett v. Urban Outfitters, Inc.*, 921 F.3d 30, 45 (2d Cir. 2019). The role of the trial judge at the summary judgment stage is not to resolve issues of material fact, but rather to determine whether such issues exist to be decided at trial. *See id.* (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). This standard applies

"whether summary judgment is granted on the merits or on an affirmative defense such as the statute of limitations." *Giordano v. Mkt. Am., Inc.*, 599 F.3d 87, 93 (2d Cir. 2010).

The court is mindful that the Second Circuit has "repeatedly expressed the need for caution about granting summary judgment to an employer in a discrimination case where . . . the merits turn on a dispute as to the employer's intent." *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008). Still, "summary judgment may be appropriate even in the fact-intensive context of discrimination cases." *Feingold v. New York*, 366 F.3d 138, 149 (2d Cir. 2004).

## II. Hostile Work Environment (Count 5)

The court begins with the HWE claim—Count 5—because Aramark's summary judgment motion raises a time-bar argument unique to that claim.

Previously in this case, in a Rule 12(b) motion, Aramark attacked Ms. King's HWE claim but not on timeliness grounds. (*See* Doc. 5-1.) Aramark's subsequent Answer raised the statute of limitations as a defense. (Doc. 17 at 47.) Aramark has the burden of proving its limitations defense. *See Renaldi v. Mfrs. & Traders Tr. Co.*, 954 F. Supp. 614, 615 (W.D.N.Y. 1997) ("The burden of establishing an affirmative defense based on a statute of limitations is on the party asserting the defense."); *cf. Hardaway v. Hartford Pub. Works Dep't*, 879 F.3d 486, 491 (2d Cir. 2018) ("[T]he burden of pleading and proving Title VII exhaustion lies with defendants and operates as an affirmative defense.").

### A. Time Bar and the Continuing Violation Doctrine

"Title VII requires that individuals aggrieved by acts of discrimination file a charge with the EEOC within 180 or, in states like New York that have local administrative mechanisms for pursuing discrimination claims, 300 days 'after the alleged unlawful employment practice occurred.'" *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 78–79 (2d Cir. 2015)

(quoting 42 U.S.C. § 2000e-5(e)(1)). "[T]he word 'practice' in this context refers to a discrete act or single occurrence" and "a discrete retaliatory or discriminatory act 'occurred' on the day that it 'happened.'" *Id.* at 79 (cleaned up). "Consequently, 'discrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges.'" *Id.* (quoting *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002)).

> At the same time, however, identifiable discrete actions are not time-barred simply because they occurred as part of an ongoing pattern of discrimination or retaliation that began outside the statutory period: "Discrete acts such as termination, failure to promote, denial of transfer, or refusal to hire are easy to identify. Each incident of discrimination and each retaliatory adverse employment decision constitutes a separate actionable 'unlawful employment practice.'"

*Id.* (quoting *Morgan*, 536 U.S. at 114). "Accordingly, claims tied to discrete acts in an ongoing adverse employment action that occurred within the statute of limitations period are not time-barred." *Id.*

Because HWE claims are "different in kind from discrete acts," courts consider "the entire scope of a hostile work environment claim, including behavior alleged outside the statutory period . . . so long as an act contributing to that hostile environment takes place within the statutory period" and the acts complained of "are part of the same actionable hostile work environment practice." *McGullam v. Cedar Graphics, Inc.*, 609 F.3d 70, 75–76 (2d Cir. 2010) (quoting *Morgan*, 536 U.S. at 105, 120). Aramark agrees that this is the law, citing *Garcia v. Yonkers Board of Education*, 188 F. Supp. 3d 353 (S.D.N.Y. 2016). The court in that case noted that HWE claims "may be based on events outside the statute of limitations period as long as (1) the acts occurring before the cutoff constitute part of the same actionable hostile work environment practice, and (2) at least one act contributing to the claim occurs within the filing period." *Id.* at 359 (cleaned up).

Aramark argues that the latter requirement is absent here, asserting that the 300-day statutory period ran from September 21, 2017 to July 18, 2018, and that the only relevant event that occurred during that period was that Ms. King was advised that she was terminated on September 21, 2017. (Doc. 63 at 12.) Ms. King contends that the 300-day statutory period ran from September 20, 2017 to July 17, 2018, and that her termination "and the alleged sham investigation relating to it were withi[n] the statutory filing period" such that "all the prior acts in furtherance of that policy [of discrimination] warrant consideration of this Court." (Doc. 71-1 at 9.) In reply, Aramark insists that "no incident of harassment occurred within the statutory period." (Doc. 73 at 5.)

Counsel for Ms. King represented at the February 16, 2022 hearing that the Charge of Discrimination was hand-delivered to the EEOC on July 17, 2018. The court grants Plaintiff the inference that the July 17, 2018 cover letter accompanying the EEOC Charge of Discrimination marked "via hand delivery" indicates that the Charge of Discrimination was filed on that date. The court therefore concludes that the 300-day statutory period ran from September 20, 2017 to July 17, 2018.

The relevant events that occurred within that period are (1) Mr. Thomas's September 20, 2017 email to Ms. Barrett stating that he was prepared to tell Mr. Amos that Aramark is terminating Ms. King; (2) the September 21, 2017 phone call in which Ms. King was advised that her employment was terminated; and (3) the response to the call Ms. King placed to the Aramark Employee Hotline on September 19, 2017. The court considers these events in turn.

**1. The September 20 Email**

The court concludes that Mr. Thomas's September 20, 2017 email to Ms. Barrett (Doc. 70-30) is not sufficiently "tied" or "contributing" to the HWE claim to make that claim

timely. The court acknowledges that the email refers to terminating Ms. King for a business conduct policy violation, and that the charge against her for the alleged violation (concerning the travel reimbursement for Ms. Cubbage) was, in Ms. King's view, part of hostile work environment. But the email was not sent to Ms. King and nothing about an alleged improper travel reimbursement is, on its face, sex- or gender-based.

The court recognizes that "when the same individuals engage in some harassment that is explicitly discriminatory and some that is not, the entire course of conduct is relevant to a hostile work environment claim." *Rasmy v. Marriott Int'l, Inc.*, 952 F.3d 379, 388 (2d Cir. 2020); *see also Pucino v. Verizon Commc'ns, Inc.*, 618 F.3d 112, 118 (2d Cir. 2010) ("A plaintiff may rely on incidents of sex-based abuse to show that other ostensibly sex-neutral conduct was, in fact, sex-based."). However, Mr. Thomas's September 20, 2017 email to Ms. Barrett cannot qualify as harassment that is part of the entire alleged course of conduct underlying Ms. King's HWE claim. Mr. Thomas did not send the email to Ms. King. And the content of the email suggesting that Mr. Thomas was prepared to tell a client that Aramark was terminating Ms. King for a BCP violation was not abusive, especially since Ms. King was in fact terminated the next day.

**2. The September 21 Termination**

The court agrees with Aramark that the termination itself was a "discrete" act that cannot be part of the alleged hostile work environment. *See Brown v. N.Y.C. Dep't of Educ.*, 513 F. App'x 89, 91 (2d Cir. 2013) (summary order) (letter notifying plaintiff of her termination could not save her HWE claim "because her termination was a separate and discrete act"); *Garcia*, 188 F. Supp. 3d at 359 (transfer and eventual termination were "discrete acts of retaliation, not a continuing violation of discrimination").

**3. The Response to the September 19 Hotline Call**

Ms. King argues that the response to her September 19, 2017 call to the Aramark Employee Hotline reveals that the investigation was a "sham." (Doc. 71-1 at 9.) She faults the investigation for failing to interview her. (Doc. 69-2 ¶ 102.) But for purposes of the present inquiry, the court focuses on whether the "same individuals" engaged in any sex-neutral abuse within the 300-day statutory period. *Rasmy*, 952 F.3d at 388. Here, there is no evidence that Mr. Thomas directed the investigation procedures. Thus, even if the investigation was flawed, it could not constitute part of the same actionable HWE practice.

**B. Remaining Issues**

For the reasons stated above, the court concludes that Ms. King's HWE claim is time-barred. It is therefore unnecessary to address here Aramark's alternative arguments for summary judgment on that claim. (*See* Doc. 63 at 12–19.)

**III. Sex Discrimination (Count 1)**

"In 1973, the Supreme Court adopted a three-stage, burden-shifting framework for analyzing employment discrimination cases under Title VII where a plaintiff alleges disparate treatment but does not have direct evidence of discrimination." *Vega*, 801 F.3d at 82–83 (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)). Under the *McDonnell Douglas* test, "a plaintiff must first establish a *prima facie* case of discrimination by showing that: '(1) she is a member of a protected class; (2) she is qualified for her position; (3) she suffered an adverse employment action; and (4) the circumstances give rise to an inference of discrimination.'" *Id.* at 83 (quoting *Weinstock v. Columbia Univ.*, 224 F.3d 33, 42 (2d Cir. 2000)). If the plaintiff establishes her prima facie case, "[t]he burden then shifts to the employer to 'articulate some legitimate, nondiscriminatory reason' for the disparate treatment." *Id.* (quoting *McDonnell*

*Douglas*, 411 U.S. at 802). Finally, "[i]f the employer articulates such a reason for its actions, the burden shifts back to the plaintiff to prove that the employer's reason 'was in fact pretext' for discrimination." *Id.* (quoting *McDonnell Douglas*, 411 U.S. at 804).

Aramark argues that Ms. King cannot establish her prima facie discrimination case and that she cannot prove pretext. (Doc. 63 at 20, 27.) Ms. King disagrees (Doc. 71-1 at 20) but she first argues that the *McDonnell Douglas* test is inapplicable because she has direct evidence of discrimination (*id.* at 18). The court begins with the question of whether there is such direct evidence. *See Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 121 (1985) ("[T]he *McDonnell Douglas* test is inapplicable where the plaintiff presents direct evidence of discrimination."); *Villella v. City of Lockport*, No. 17-CV-898S, 2021 WL 3726103, at *6 (W.D.N.Y. Aug. 23, 2021) ("[A] Plaintiff establishes Title VII discrimination either by direct evidence . . . or by the burden shifting analysis from *McDonnell Douglas Corp. v. Green* . . . .").

**A. No Direct Evidence of Discrimination**

"For direct evidence of discrimination, Plaintiff must meet her 'initial burden of offering evidence adequate to create an inference that an employment decision was based on a discriminatory criterion illegal under the [Civil Rights] Act [of 1964].'" *Villella*, 2021 WL 3726103, at *6 (quoting *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 358 (1977)); *McCall v. Genpak, LLC*, No. 13-CV-1947 (KMK), 2015 WL 5730352, at *11 (S.D.N.Y. Sept. 30, 2015) (direct evidence "is essentially an outright admission that a challenged action was undertaken for one of the forbidden reasons covered in Title VII" (quoting *Cardoso v. Robert Bosch Corp.*, 427 F.3d 429, 432–33 (7th Cir. 2005))). "Plaintiff bears the burden of demonstrating that sex was a motivating factor in her adverse employment action . . . ." *Villella*, 2021 WL 3726103, at *6. Ms. King argues that Mr. Thomas's comments regarding Ms. King's

lunch tray and that the VHS CEO would like to see her at the gym constitute direct evidence that she was terminated due to sex discrimination. (Doc. 71-1 at 18.)[4]

The court concludes that Mr. Thomas's comments about the lunch tray and about working out are not direct evidence that Ms. King's termination was based on sex discrimination. Examining Ms. King's allegations at the Rule 12(b)(6) stage of this case, the court held that Mr. Thomas's alleged comments about Ms. King's weight were by themselves insufficient to give rise to a plausible inference of gender discrimination. (Doc. 16 at 37–38.) The evidence on summary judgment about these comments is essentially the same. There is no evidence that any of this conduct included any gender-based language.

Ms. King states in her declaration that Mr. Thomas did not make similar comments to Mr. Williford, Mr. Harriman, or Mr. DeGori, all of whom she says were also heavier in the stomach area. (Doc. 69-2 ¶ 38.) Aramark contends that Ms. King's statements on that point are not supported by personal knowledge because Ms. King was not present for most interactions between Mr. Thomas and Mr. Williford, Mr. Harriman, and Mr. DeGori. (Doc. 73 at 7.) Aramark also notes that Mr. Williford, Mr. Harriman, and Mr. DeGori were not asked at their depositions if Mr. Thomas ever made similar comments to them or looked at their midsections. (*Id.*) The court agrees with Aramark on these points.

Ms. King seeks to invoke a "stereotyping" theory under *Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989). (*See* Doc. 71-1 at 10.) In *Price Waterhouse*, the plaintiff had been called,

---

[4] Ms. King relies on a single instance where Mr. Thomas made a joke about women in support of her HWE claim. (*See* Doc. 71-1 at 14.) To the extent that the joke might be relevant to the sex discrimination claim, the court agrees with Aramark that it was no more than a "stray" remark. *See Naumovski v. Norris*, 934 F.3d 200, 216 (2d Cir. 2019) ("[S]tray remarks, even if made by a decisionmaker, do not constitute sufficient evidence to make out a case of employment discrimination." (quoting *Danzer v. Norden Sys., Inc.*, 151 F.3d 50, 56 (2d Cir. 1998))).

among other things, "macho"; was told she needed "a course at charm school"; and—the "*coup de grace*"—was instructed to walk, talk, and dress more "femininely" if she wanted to make partner at the accounting firm where she worked. 490 U.S. at 235 (plurality opinion). Six justices agreed that "such comments bespoke gender discrimination." *Back v. Hastings On Hudson Union Free Sch. Dist.*, 365 F.3d 107, 119 (2d Cir. 2004) (citing *Price Waterhouse* plurality and concurring opinions). "It is the law, then, that 'stereotyped remarks can certainly be evidence that gender played a part' in an adverse employment decision." *Id.*

To answer what constitutes a "gender-based stereotype," courts must examine "the particular context in which it arises, and without undue formalization." *Id.* at 120. Courts have held that certain comments reflect gender-based stereotyping and that such comments "constitute evidence that a jury could use to find the presence of discrimination." *Id.* (citing cases). But Mr. Thomas's comments about food, weight, and working out are different than the stereotyped and discriminatory remarks in *Price Waterhouse*. Ms. King seeks to add a gendered gloss to the comments—asserting that they demonstrate that Mr. Thomas disapproved of Ms. King "for not fitting his stereotypical image of a businesswoman." (Doc. 71-1 at 10.) But the court declines to join Ms. King in such speculation. *See Dawson v. Bumble & Bumble*, 246 F. Supp. 2d 301, 320 (S.D.N.Y. 2003) ("[A]s to both the costume and the haircut comments, the gender element here is injected by Dawson herself deductively, by conclusions she draws from those remarks and the inferences of discrimination she asks the Court to make and endorse as well. The Court cannot accept Dawson's invitation to speculate.").

Similar comments about body weight have been held insufficient to constitute direct evidence or even raise an inference of gender animus. *See, e.g.*, *Cushman-Lagerstrom v. Citizens Ins. Co. of Am.*, 72 F. App'x 322, 331–32 (6th Cir. 2003) (female certified public

accountant failed to adduce direct evidence of gender discrimination against male supervisor who made disparaging remarks about former female employees who were overweight); *Czerwinski v. N.Y.S. Dep't of Corr. & Cmty. Supervision*, 394 F. Supp. 3d 210, 220–21 (N.D.N.Y. 2019) (statements about female nurse administrator's weight and references to her working out that lacked any gender-based language were insufficient by themselves to raise a plausible inference that male supervisor's conduct was motivated by gender animus); *Aiello v. Stamford Hosp.*, No. 3:09cv1161(VLB), 2011 WL 3439459, at *14 (D. Conn. Aug. 8, 2011) (male director of radiology's statements to male subordinate radiology technologist regarding his weight were "not related to his gender and therefore cannot be used to support an inference of gender discrimination"); *Kamrowski v. Morrison Mgmt. Specialist*, No. 05-CV-9234 (KMK), 2010 WL 3932354, at *13–14 (S.D.N.Y. Sept. 29, 2010) (male supervisor's calling female plaintiff's female co-workers "fat ass" was "certainly rude" but was gender-neutral and did not indicate gender animus).

The decision in *Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456 (2d Cir. 2001), does not require a contrary conclusion. In that case, pilots hired by Delta Airlines, Inc. under an asset purchase agreement between Delta and the pilots' prior employer, Pan American World Airways, Inc., sued Delta alleging age discrimination. Analyzing those claims on summary judgment under the *McDonnell Douglas* framework, the Second Circuit noted that the Delta manager assigned to investigate and evaluate the Pan Am acquisition "made numerous comments about the age of the Pan Am pilot force, referring to them as 'contaminated' and 'Bad Apples.'" *Id.* at 468. The court concluded that when those comments were viewed "against the background of Delta's all-consuming interest in the age and projected retirement rates of the Pan

Am pilots, they inescapably lead to the conclusion that Delta's actions *may* indeed have been motivated by age-based animus." *Id.*[5]

Since the *Abdu-Brisson* court was applying the *McDonnell Douglas* framework, that case did not involve any direct evidence of discrimination. *See Trans World Airlines*, 469 U.S. at 121 ("[T]he *McDonnell Douglas* test is inapplicable where the plaintiff presents direct evidence of discrimination."). The court nevertheless notes that the fourth element of the *McDonnell Douglas* framework requires consideration of whether "the circumstances give rise to an inference of discrimination," *Vega*, 801 F.3d at 83, and will consider Mr. Thomas's comments about weight together with the other circumstances as necessary below.

### B. *McDonnell Douglas*

Having concluded that Ms. King has not met her burden to show direct evidence of sexual discrimination, the court turns to the burden-shifting *McDonnell Douglas* framework. Aramark does not challenge that Ms. King is a member of a protected class and that she suffered an adverse employment action. Rather, Aramark contends that Ms. King cannot establish her prima facie case of discrimination (Doc. 63 at 20) and that she cannot establish pretext (*id.* at 27). Ms. King disagrees on both points. (Doc. 71-1 at 21–25.) The court is mindful that Ms. King's burden to prove her prima facie case under *McDonnell Douglas* is "minimal." *Lenzi v. Systemax, Inc.*, 944 F.3d 97, 107 (2d Cir. 2019); *Woodman v. WWOR-TV, Inc.*, 411 F.3d 69, 76 (2d Cir. 2005). At the same time, this burden "is not totally illusory; the plaintiff must point to

---

[5] Although the court concluded that the pilots had established their prima facie case, the court ultimately affirmed the grant of summary judgment to Delta because the plaintiffs "failed to produce sufficient evidence to support a rational finding that the non-discriminatory business reasons proffered by the defendant for the challenged employment actions were false." *Id.* at 470.

*some* circumstance that permits an inference of discrimination." *Phillips v. Chertoff*, No. 03 Civ. 4266(GEL), 2005 WL 3466033, at *5 (S.D.N.Y. Dec. 16, 2005).

### 1. Prima Facie Case—Qualification for Position

Aramark argues that Ms. King has failed to demonstrate her qualification for the position she held at Aramark. The Second Circuit has held that "being 'qualified' refers to the criteria the employer has specified for the position." *Thornley v. Penton Pub., Inc.*, 104 F.3d 26, 29 (2d Cir. 1997). In cases of alleged discriminatory discharge, the Second Circuit has "occasionally analyzed this element in terms of whether plaintiff shows 'satisfactory job performance' at the time of the discharge." *Id.* (citing cases). "Whether job performance was satisfactory depends on the employer's criteria for the performance of the job—not the standards that may seem reasonable to the jury or judge." *Id.*

Relevant to the criteria that Aramark specified for the position that Ms. King held, both parties have submitted copies of an Aramark job description document for "General Manager – Multi Service" dated March 5, 2012. (Docs. 65-2, 69-16.) That document includes a position summary and a list of essential tasks. It also specifies required education and experience, required abilities to use certain equipment, travel requirements, plus lifting requirements and physical demands. But Aramark does not contend that Ms. King lacked any of the specified education or experience or the abilities to use equipment, travel, or meet physical demands.

Instead, Aramark asserts that Ms. King's performance was unsatisfactory because at the time of her termination she had:

- Received three written warnings and a PIP;
- Engaged in conduct during disciplinary meetings that was perceived as disrespectful;

- Directed Ms. Cubbage to submit for mileage reimbursement and approved the reimbursement in violation of Aramark policy; and
- Failed to bring requested documentation to her September 18, 2017 PIP meeting.

(Doc. 63 at 21.) Ms. King disputes or offers explanations for each of these points, including all of the issues cited in the written warnings. (*See* Doc. 69-2 ¶¶ 50–69 (regarding 11 points in the August 2016 written warning); ¶ 70 (regarding March 2017 written warning); ¶¶ 79–83 (regarding the five points in the May 2017 written warning, including point about alleged unprofessional or disrespectful behavior at disciplinary meetings); ¶¶ 96–100 (regarding alleged travel policy violation); ¶ 100 (regarding documents requested for September 18, 2017 meeting).)

Many of the issues that Aramark has raised regarding the "qualification" element of the prima facie case can be classified as alleged misconduct. The Second Circuit has recognized that "there is a distinction between unsatisfactory job performance and misconduct" and has explained that the "qualification" inquiry "should focus on the plaintiff's competence and whether she possesses the basic skills necessary for performance of the job." *Ruiz v. Cnty. of Rockland*, 609 F.3d 486, 492 (2d Cir. 2010) (cleaned up). Still, misconduct can potentially preclude a finding that a plaintiff is "qualified," depending "both on the *kind* of misconduct, i.e., whether it speaks to the plaintiff's competence and job skills, and the *seriousness* of the misconduct, i.e., whether 'in the aggregate' plaintiff still performed [her] job satisfactorily." *Id.*[6]

[6] *Jacob v. NYSARC, Inc.*, No. 13 Civ. 1677(KPF), 2014 WL 6750654 (S.D.N.Y. Dec. 1, 2014)—cited by Aramark—is an example of a case where misconduct precluded a finding that the plaintiff was qualified for her position. In that case, the plaintiff was employed as a per-diem direct support professional and was disciplined three times for largely undisputed or indisputable misconduct relating to failures to carry out her assigned duties (such as showering a client), completing required paperwork, arriving late, and leaving a residence before her coverage

Here—as in *Ruiz*—"it is inappropriate to evaluate the employee's misconduct in the context of the *prima facie* case." *Ruiz*, 609 F.3d at 493. As the *Ruiz* court observed, "if the employer is applying its criteria for satisfactory job performance in an inconsistent, arbitrary, or discriminatory manner, then there is a question of fact as to whether the criteria reflect the employer's 'honestly held expectations,' . . . or whether the criteria merely provided a pretext for unlawful discrimination." *Id.* (quoting *Thornley*, 104 F.3d at 30). Here, Ms. King has asserted—and complained—that Aramark applied its disciplinary criteria in a discriminatory manner beginning with the 11-point written warning in August 2016. (*See* Doc. 65-45 at 88–89.) Resolution of that factual issue is inappropriate here; Aramark is not entitled to summary judgment on this prong.

**2. Prima Facie Case—Circumstances of the Termination**

Aramark asserts that Ms. King has not shown that her termination occurred under circumstances giving rise to an inference of gender discrimination. (Doc. 63 at 22.) Ms. King disagrees, arguing that "Thomas' comments and conduct, Aramark's failure to follow routine procedures in terminating King and Thomas' disparate treatment between King and her male counterparts establish discriminatory animus towards King." (Doc. 71-1 at 21.) Aramark replies that Ms. King's assertions on these points are conclusory. (Doc. 73 at 10.)

An inference of discrimination can arise from circumstances including, but not limited to: "the employer's criticism of the plaintiff's performance in . . . degrading terms; or its invidious comments about others in the employee's protected group; or the more favorable treatment of employees not in the protected group; or the sequence of events leading to the plaintiff's

---

arrived (thereby jeopardizing the welfare of the clients). *Id.* at *9–10. The court concludes that *Jacob* is distinguishable.

discharge." *Littlejohn v. City of New York*, 795 F.3d 297, 312 (2d Cir. 2015) (quoting *Leibowitz v. Cornell Univ.*, 584 F.3d 487, 502 (2d Cir. 2009)). A showing of disparate treatment—that is, a showing that Plaintiff was treated "less favorably than a similarly situated employee outside [her] protected group"—also supports an inference of discrimination for purposes of making out a prima facie case. *Graham v. Long Island R.R.*, 230 F.3d 34, 39 (2d Cir. 2000). The court considers "the totality of the evidence" in the light most favorable to Ms. King to evaluate whether she has met the requirements of the fourth prong. *Zdunski v. Erie 2-Chautauqua-Cattaraugus Boces*, No. 1:19-cv-940-GWC, 2022 WL 816010, at *7 (W.D.N.Y. Feb. 16, 2022), *appeal docketed*, No. 22-547 (2d Cir. Mar. 16, 2022).

Ms. King relies on three main categories of circumstances to argue that she has proven the fourth element of her prima facie case: (1) Mr. Thomas's remarks and conduct relating to Ms. King's weight; (2) Aramark's alleged deviation from its practice and policy relative to investigations and terminations; and (3) Mr. Thomas's allegedly more favorable treatment of male comparators. (Doc. 71-1 at 22–25.) The court begins with those topics.

**a. Mr. Thomas's Statements and Conduct**

Aramark argues that Ms. King has presented no evidence that Mr. Thomas had a gender-based bias against her. (Doc. 63 at 22.) Ms. King maintains that Mr. Thomas's "remarks together with his continuous staring at and expressing disgust for her belly because she did not fit his stereotypical image of a businesswoman, establish an inference of discrimination based on her gender." (Doc. 71-1 at 22.) Aramark insists that Mr. Thomas made no statements about Ms. King's gender. (Doc. 73 at 10.)

The record on summary judgment regarding Mr. Thomas's statements and comments does not contain any overt *gender-based* degrading statements or conduct. *See supra*

Section III.A. Ms. King offers nothing more than her own speculation that Mr. Thomas's remarks and conduct about her weight were motivated by a belief on his part that she did not fit his stereotypical image of a businesswoman. Still, as noted above, the court considers Mr. Thomas's statements and conduct as part of its review of the totality of the evidence.

In addition to comments about weight, Ms. King asserts that Mr. Thomas "would speak to me in a condescending tone and was very short when he would answer questions." (Doc. 69-2 ¶ 20.) She states that she never heard him speak in a condescending tone to any male manager. (*Id.*) Ms. King further states that Mr. Thomas would use her performance with Valley Health as a negative example at meetings or on calls, but that she never heard him criticize any male manager during meetings or calls. (*Id.*) The court concludes that, even in the light most favorable to Ms. King, these additional facts do not create an inference of gender discrimination. *Cf., e.g., Stewart v. Fashion Inst. of Tech.*, No. 18-cv-12297 (LJL), 2020 WL 6712267, at *9 (S.D.N.Y. Nov. 16, 2020) ("Plaintiff's beliefs, without more, that the harsh tone and manner of the criticism she received was the product of racial bias is insufficient to create an inference of discrimination.").

**b. Alleged "Sham" Investigation**

Ms. King also contends that she can show circumstances giving rise to an inference of gender discrimination because, in her view, Aramark "deviated from its practice and policy relative to investigations and terminations." (Doc. 71-1 at 22.) Aramark maintains that Ms. King has no evidence of such deviations and that the cases that Ms. King cites do not hold that such deviations create an inference of gender discrimination. (Doc. 73 at 11 & n.6.)

Ms. Barrett testified that she investigated the "Brittany Cubbage issue." (Doc. 65-50 at 11.) She testified that, according to the investigation:

> Ms. King asked Brittany Cubbage to pick her up from home because her car was broken down, drive her into work that morning, and then there's an expense report showing that she [Ms. Cubbage] drove right back to Page, and she [Ms. King] had previously asked Griff Thomas if she could get a rental car and he told her no.

(Doc. 65-50 at 15.) According to Ms. Barrett, Ms. Cubbage did not say that she had to be at WMC for work. (*Id.*) Ms. Barrett elaborated:

> Brittany and I spoke on the phone verbally, where she shared her feedback on what occurred. She did not share that there was a meeting [at WMC], she did no[t] share that there was a need to be there, she implied that in the conversation, she said she [Ms. King] is my boss, what was I supposed to do. When she was asked why she expensed the mileage, she said again, what was I supposed to do. She did not tell me she needed to be there for work.

(*Id.* at 16.) Ms. Barrett testified that the version of the events as she understood them did not include any indication that Ms. Cubbage was reporting to WMC for work, worked with Ms. King at WMC that day, or that she only left WMC due to her dog's emergency. (*Id.* at 24–25.) Ms. King faults Ms. Barrett for failing to ask questions or take other investigatory steps that would have revealed those details. (*See generally* Doc. 69 ¶ 114.)

The Second Circuit has declined to hold "that an arguably insufficient investigation of a complaint of sexual harassment leading to an adverse employment action against the accused is, standing alone, sufficient to support an inference of discriminatory intent." *Sassaman v. Gamache*, 566 F.3d 307, 315 (2d Cir. 2009). Thus, even if Ms. Barrett's investigation was lacking, that would be by itself insufficient to raise an inference of gender discrimination against Ms. King. However, "where a plaintiff can point to evidence closely tied to the adverse employment action that could reasonably be interpreted as indicating that discrimination drove the decision, an arguably insufficient investigation may support an inference of discriminatory intent." *Id.* The court has therefore carefully considered the other evidence that Ms. King has presented.

Before proceeding, however, the court pauses to note that the cases that Ms. King cites do not support her position on this issue. The plaintiff in *Woodman*—an advertising sales employee for television stations affiliated with Chris-Craft Industries, Inc.—sought to establish an inference of age discrimination on the basis of the transfer of her sales responsibilities to a younger counterpart. 411 F.3d at 77. Challenging the district court's conclusion that no such inference could be drawn without some evidence that the defendants acted with knowledge of her age relative to that of her replacement, Woodman argued, among other things, that after a merger between Chris-Craft and The News Corporation Ltd., executives at News Corp.'s subsidiary Fox Television Stations, Inc. reviewed employee-specific age information. Woodman presented expert evidence that officials of acquiring companies generally have access to the personnel records of the acquired company and that they frequently review documents containing employee age information before finalizing a merger. *Id.* at 86. However, all of the Fox executives testified that they did not look at any document with age information. The Second Circuit concluded that, even assuming industry practice was to review employee age information before finalizing a merger, and that such evidence might be a basis to question the credibility of the Fox executives, "that, by itself, would not constitute significant probative evidence raising a genuine issue of material fact as to defendants' knowledge of Woodman's relative age." *Id.* Thus in *Woodman* deviation from industry practices was insufficient to establish an inference of discrimination.

The plaintiff in *Joseph v. Leavitt*, 465 F.3d 87 (2d Cir. 2006), brought a Title VII claim against his employer, the U.S. Food & Drug Administration, alleging race- and gender-based adverse employment action stemming from his placement on administrative leave with pay during the pendency of a criminal case against him and for five months afterwards while the

employer finished its own investigation. But the issue in *Joseph* was not whether an inadequate investigation could give rise to an inference of discrimination, but instead whether placing an employee on leave during the pendency of an investigation could constitute an adverse employment action. Here, as noted above, Aramark does not challenge the sufficiency of Ms. King's evidence on the "adverse employment action" prong of the prima facie case.

**c. Male Comparators**

Ms. King's third argument is that she can show gender discrimination because, she asserts, Mr. Thomas treated her differently than similarly situated male counterparts. (Doc. 71-1 at 23.) She suggests that Mr. DeGori, Mr. Harriman, Mr. Wilson, Mr. Drayton, and Mr. Williford are all comparators because each of them—like Ms. King—reported directly to Mr. Thomas. (*See id.*) She asserts that Mr. Knight (the individual who assumed the job of District Manager of EVS after the corporate restructuring), Mr. Marsh (whom Ms. King observed was still a dual general manager in June 2016), and Jeff Soloway (discussed below) are also comparators. (Doc. 69 ¶ 165.) Aramark insists that Ms. King "has no evidence that any of her alleged male comparators engaged in conduct comparable to her conduct that resulted in her termination." (Doc. 73 at 10.)

"A showing of disparate treatment—that is, a showing that an employer treated plaintiff 'less favorably than a similarly situated employee outside his protected group'—is a recognized method of raising an inference of discrimination for the purposes of making out a prima facie case." *Ruiz*, 609 F.3d at 493 (quoting *Mandell v. Cnty. of Suffolk*, 316 F.3d 368, 379 (2d Cir. 2003)). "An employee is similarly situated to co-employees if they were (1) 'subject to the same performance evaluation and discipline standards' and (2) 'engaged in comparable conduct.'" *Id.* at 493–94 (quoting *Graham*, 230 F.3d at 40). "[T]he comparator must be similarly situated to

the plaintiff 'in all material respects.'" *Id.* at 494 (quoting *Shumway v. United Parcel Serv., Inc.*, 118 F.3d 60, 64 (2d Cir. 1997)).

Ms. King argues that the determination of whether she is similarly situated to the comparators should be made by a jury. (Doc. 71-1 at 23.) It is true that "[w]hether two employees are similarly situated ordinarily presents a question of fact for the jury." *Graham*, 230 F.3d at 39; *see also Dotson v. City of Syracuse*, 763 F. App'x 39, 42 (2d Cir. 2019) (summary order) (same, quoting *Graham*). "But this rule is not absolute and 'a court can properly grant summary judgment where it is clear that no reasonable jury could find the similarly situated prong met.'" *Cine SK8, Inc. v. Town of Henrietta*, 507 F.3d 778, 790–91 (2d Cir. 2007) (quoting *Harlen Assocs. v. Inc. Vill. of Mineola*, 273 F.3d 494, 499 n.2 (2d Cir. 2001)). Aramark maintains that this is such a case. (*See* Doc. 63 at 23.) Applying these standards, the court concludes for the reasons below that no reasonable jury could find the alleged comparators to be similarly situated in all material respects.[7]

**i. Mr. DeGori**

Aramark argues that Mr. DeGori was not subject to the same workplace standards as Ms. King because Mr. DeGori was not the general manager of a six-hospital system (like VHS) during the relevant time period. (Doc. 63 at 15.) The evidence is that Mr. DeGori was the food service director at Ohio Valley Hospital (later renamed Heritage Valley Kennedy). He was responsible for two locations—the hospital and a nursing home across the street—with 45 employees reporting to him, and with a monthly budget of $60,000. (Doc. 65-52 at 3–5.) Ms.

[7] The court acknowledges that it found at the Rule 12 stage that Ms. King's allegations about Mr. Harriman, Mr. DeGori, and Mr. Wilson were sufficient to raise an inference of discrimination. (Doc. 16 at 42.) However, that determination was limited to Rule 12 procedural posture. (*Id.* at 41.) With a full factual record, the court is able to closely examine the "similarly situated" prong.

King therefore arguably held a superior title than Mr. DeGori and managed a larger account with a larger number of facilities.

On the other hand, Mr. DeGori—like Ms. King—reported directly to Mr. Thomas. *See Conway v. Microsoft Corp.*, 414 F. Supp. 2d 450, 465 (S.D.N.Y. 2006) ("[W]hether or not co-employees report to the same supervisor is an important factor in determining whether two employees are subject to the same workplace standards for purpose of finding them similarly situated."). And according to Ms. King, the District Manager (presumably including Mr. Thomas after his promotion to that position) would send group emails to all of his direct reports, including Mr. DeGori, relative to duties that they all shared. Those duties included: "interface with, maintain and retain the client; manage the day-to-day operations; grow the business; manage the budget; implement and oversee company standards, procedures and programs; supervise and manage employees; hire, fire and discipline employees." (Doc. 69-2 ¶ 19.) Furthermore, Mr. DeGori—like Ms. King and all other Aramark employees—was subject to the Aramark Business Conduct Policy. (Doc. 69-19.) An Aramark employee handbook also describes a four-step process of progressive discipline: verbal counseling, written warning, final written warning and/or suspension, and termination. (Doc. 69-18 at 13.)

Based on these facts, a reasonable jury could conclude that Ms. King and Mr. DeGori were subject to the same discipline standards. But Ms. King has not presented any facts about Mr. DeGori's conduct that could have been the basis for disciplinary action against him. At most, Ms. King notes that she was disciplined for not personally providing coverage at Norton, whereas Mr. DeGori was not disciplined even though he did not personally provide coverage there. (Doc. 69-2 ¶ 37.) But the evidence indicates that Mr. Thomas never asked Mr. DeGori to provide coverage at Norton in the first place. (Doc. 69-5 at 18.)

Apart from the issue of discipline, Ms. King asserts that Mr. DeGori received preferential treatment from Mr. Thomas in a variety of ways. Ms. King asserts that Mr. DeGori had a dedicated private office but she did not. (Doc. 69-2 ¶ 22.) The court concludes, however, that no reasonable jury could find that Ms. King and Mr. DeGori were similarly situated as relevant to that issue. Mr. DeGori was responsible for two facilities that were within walking distance of each other, while Ms. King was responsible for—and traveled to—six facilities in different locations. Ms. King and Mr. DeGori also worked in separate regions, and the evidence indicates that office space was limited at WMC. (*See* Doc. 69-2 ¶ 10 (noting space constraints).)

In her declaration, Ms. King asserts that Mr. Thomas would meet with her subordinates without her knowledge but would go through Mr. DeGori when communicating with Mr. DeGori's subordinates. (Doc. 69-2 ¶ 24.) But Ms. King does not explain how she has personal knowledge of that. And Mr. Thomas states in his declaration that he sometimes met with Aramark employees who worked in facilities that Mr. DeGori managed outside of Mr. DeGori's presence. (Doc. 65-21 ¶ 43.)

Ms. King further asserts that Mr. Thomas directed Mr. Williford to work on accounts other than VHS, but that Mr. Thomas did not assign anyone from Mr. DeGori's accounts to support VHS. (Doc. 69-2 ¶ 25.) The court concludes, however, that no reasonable jury could find that Ms. King and Mr. DeGori were similarly situated as relevant to this issue. The evidence shows that VHS and Heritage Valley Kennedy are two different systems of different sizes in different locations.

Ms. King states that Mr. Thomas required her to send her weekly calendar to him but did not impose the same requirement upon Mr. DeGori. (Doc. 69-2 ¶ 50.) Here again, no reasonable jury could find that Ms. King and Mr. DeGori were similarly situated as relevant to this issue.

Ms. King managed and traveled between six facilities whereas Mr. DeGori managed two that were essentially co-located.

Ms. King further states that Mr. Thomas required her to complete a "Top 15" report with respect to each of her facilities, whereas he started requiring Mr. DeGori to complete the reports later, and only after offering a thorough training on a conference call with a PowerPoint presentation. (Doc. 69-2 ¶ 63.) The court concludes that no reasonable jury could find that Ms. King and Mr. DeGori were similarly situated as relevant to this issue. As general manager of a larger account, Ms. King may have been in the vanguard of certain initiatives. Moreover, she testified that Mr. Thomas did communicate with her about how to complete the report and also sat with her on one occasion to go through it. (Doc. 69-3 at 35.)

Ms. King refers to four other instances where she says that Mr. Thomas scrutinized her job performance more closely or held her to a higher standard than male employees: "100% Prima compliance, restaurant rotation, VOC [the "Voice of the Customer" program], and Treat Yourself." (Doc. 69-2 ¶ 93.) With respect to Mr. DeGori, Ms. King focuses on the VOC program. The VOC program was designed to allow food customers to confidentially report on service and quality and to offer comments. (Doc. 69-2 ¶ 92.) Ms. King states that she observed Mr. DeGori's VOC scores were rising. (*Id.*) She asserts that Mr. DeGori was obtaining those improved results improperly by "entering the data for the customer as the customer was telling it to them or their staff or giving it to them." (*Id.*)

Ms. King states that she reported that conduct to Mr. Thomas, and Mr. Thomas responded: "well, it's working." (Doc. 69-3 at 32.) Thus, in the light most favorable to Ms. King, the evidence indicates that Mr. Thomas allowed the VOC program to be implemented improperly. But there is no evidence that he discriminated against Ms. King in that respect

because Ms. King never used the same allegedly improper technique and never asked Mr. Thomas to do so. (Doc. 69-3 at 31–32.)

Finally, the court considers Ms. King's assertion that Mr. Thomas required her to obtain his advance approval for any financial decisions exceeding $1,000 but never imposed the same requirement upon Mr. DeGori. (Doc. 69-2 ¶ 71.) The evidence shows that this requirement was a corrective action listed on the March 2017 "Final Written Documentation" after the incident involving US Foods. (Doc. 65-11.) Ms. King has supplied a detailed response regarding that incident arguing that her conduct was proper. (Doc. 69-2 ¶ 70.) She asserts that in the incident for which she was written up she followed "the same Aramark standard procedure regarding Market Basket in 2015" for which she was not disciplined. (*Id.* ¶ 69.)

Mr. Thomas apparently does not dispute that Ms. King was not disciplined for her conduct regarding the market basket in 2015 but his notes indicate that he did caution her about that incident in 2016. (Doc. 65-31 at 1.) He also maintains that the 2017 market basket study differed from the 2015 study "because the 2015 market basket study was done at the request of VHS *after* US Foods had already submitted its own market basket study to VHS whereas Aramark wanted to do a 2017 market basket study without the knowledge of US Foods." (Doc. 65-21 ¶ 12.)

Regardless of whether Ms. King's conduct on this issue was proper, the court notes that the only other person that she suggests engaged in similar conduct was Mr. Williford. (*See* Doc. 69-2 ¶ 70.) The court discusses Mr. Williford's suitability as a comparator below. No reasonable jury could find that Mr. DeGori engaged in comparable conduct.

**ii. Mr. Drayton**

Aramark argues that Mr. Drayton was not subject to the same workplace standards as Ms. King because Mr. Drayton was not the general manager of a six-hospital system (like VHS) during the relevant time period. (Doc. 63 at 15.) The evidence is that Mr. Drayton was the director of food and nutrition at Holy Cross Germantown Hospital, with one location. (Doc. 69-2 ¶ 19.) Ms. King therefore arguably held a superior title than Mr. Drayton and managed a larger account with a larger number of facilities.

Mr. Drayton—like Ms. King—reported directly to Mr. Thomas. And according to Ms. King, the District Manager (presumably including Mr. Thomas after his promotion to that position) would send group emails to all of his direct reports, including Mr. Drayton, relative to duties that they all shared. Furthermore, Mr. Drayton—like Ms. King—was subject to the Aramark Business Conduct Policy and presumably also the discipline procedures in the employee handbook.

Based on these facts, a reasonable jury could conclude that Ms. King and Mr. Drayton were subject to the same discipline standards. But Ms. King has not presented any facts about Mr. Drayton's conduct that could have been the basis for disciplinary action against him. She does assert that when Mr. Drayton's performance lagged, Mr. Thomas worked with him and also directed Ms. King to provide Mr. Drayton with assistance and training. (Doc. 69-2 ¶ 94.) But she has not supplied any evidence that Mr. Drayton was disciplined on this basis or for any other reason.

Relevant to performance standards, Ms. King asserts that Mr. Thomas did not provide her with the same level of assistance as he provided to Mr. Drayton. (*Id.*) But the assistance given to Mr. Drayton was for different issues than any issue Mr. Thomas identified with Ms. King

because Mr. Thomas sent Ms. King herself to help Mr. Drayton. (*See id.*; *see also id.* ¶ 20.) No reasonable jury could conclude that Mr. Drayton and Ms. King were similarly situated on this issue.

Ms. King also asserts that Mr. Drayton received preferential treatment from Mr. Thomas in a variety of ways. But a reasonable jury could not find that Ms. King and Mr. Drayton were similarly situated as relevant to these issues for reasons similar to those described above with respect to Mr. DeGori. Mr. Drayton had a private office but he worked in a different location with different space constraints. Ms. King further contends that Mr. Thomas scrutinized her job performance more closely or held her to a higher standard than Mr. Drayton with respect to the "Treat Yourself" program. (Doc. 69-2 ¶ 87.) She states that Mr. Thomas required her to meet a "Treat Yourself" deadline that he did not require Mr. Drayton to meet. (*Id.*) But since Mr. Thomas had selected Ms. King to implement the program district-wide, Ms. King and Mr. Drayton were not similarly situated regarding that program.

**iii. Mr. Harriman**

Aramark argues that Mr. Harriman was not subject to the same workplace standards as Ms. King because Mr. Harriman was not the general manager of a six-hospital system (like VHS) during the relevant time period. (Doc. 63 at 15.) The evidence is that at the relevant times Mr. Harriman was the food service director at Chesapeake Regional Medical Center, a single-unit client. (Doc. 65-53 at 4–7.) On the other hand, Mr. Harriman—like Ms. King—reported directly to Mr. Thomas. And according to Ms. King, the District Manager would send group emails to all of his direct reports, including Mr. Harriman, relative to duties that they all shared. Furthermore, Mr. Harriman—like Ms. King—was subject to the Aramark Business Conduct Policy and presumably also the discipline procedures in the employee handbook.

Based on these facts, a reasonable jury could conclude that Ms. King and Mr. Harriman were subject to the same discipline standards. The record indicates that for a year prior to December 2018 Mr. Thomas discussed food safety issues with Mr. Harriman but did not issue him a written discipline on that topic until December 17, 2018. (Doc. 70-9 at 2 (discipline for "job performance").) Although the record does not suggest that Ms. King was terminated for food safety issues,[8] the written discipline she received was also for "job performance." (Docs. 65-8, 65-10, 65-11, 65-13.) And Mr. Harriman arguably received more lenient treatment by receiving multiple verbal counselings before receiving a written warning. Nevertheless, the issues for which Ms. King was disciplined are not sufficiently similar to the food safety issues for which Mr. Harriman was disciplined.

As with Mr. Drayton, Ms. King states that Mr. Thomas required her to meet a "Treat Yourself" deadline that he did not require Mr. Harriman to meet. (Doc. 69-2 ¶ 87.) But since Mr. Thomas had selected Ms. King to implement the program district-wide, Ms. King and Mr. Harriman were not similarly situated regarding that program.

Ms. King also asserts that Mr. Harriman received preferential treatment from Mr. Thomas because Mr. Harriman had a dedicated private office but she did not. (Doc. 69-2 ¶ 22.) The court concludes, however, that no reasonable jury could find that Ms. King and Mr. Harriman were similarly situated as relevant to that issue. Ms. King and Mr. Harriman worked in separate regions, and the evidence indicates that office space was limited at WMC.

In her declaration, Ms. King asserts that Mr. Thomas would meet with her subordinates without her knowledge but would go through Mr. Harriman when communicating with Mr.

[8] Ms. Barrett testified that Ms. King was not terminated for food safety violations. (Doc. 65-50 at 37–38.)

Harriman's subordinates. (*See* Doc. 69-2 ¶ 24.) But Ms. King does not explain how she has personal knowledge of that. And Mr. Thomas states in his declaration that he sometimes met with Aramark employees who worked in facilities that Mr. Harriman managed outside of Mr. Harriman's presence. (Doc. 65-21 ¶ 43.)

Ms. King states that Mr. Thomas required her to send her weekly calendar to him but did not impose the same requirement upon Mr. Harriman. (Doc. 69-2 ¶ 50.) Here again, no reasonable jury could find that Ms. King and Mr. Harriman were similarly situated as relevant to this issue. Ms. King managed and traveled between six facilities whereas Mr. Harriman managed a single facility.

**iv. Mr. Knight**

Ms. King presents very few specific factual allegations with respect to Mr. Knight as a comparator other than to assert that he held a "comparable intermediate managerial position[]." (Doc. 69 ¶ 165.) The court perceives Ms. King's main allegation concerning Mr. Knight as a comparator to be that he was responsible for the EVS portion of a joint commission site survey in July 2016 but was not personally present, whereas Ms. King's August 2016 First Written Warning faulted her for not being present at that survey. (*See id.* ¶ 51; *see also* Doc. 65-8.) Notably, however, the September 29, 2016 revised written warning removed the points about failing to appear for the joint commission site survey. (*Compare* Doc. 65-8 *with* Doc. 65-10.)

**v. Mr. Marsh**

Mr. Marsh also held a dual general manager position with Aramark. (Doc. 69-2 ¶ 43.) The primary fact that Ms. King presents regarding Mr. Marsh is that he remained a dual general manager until "well after" she was removed from that dual role. (*See id.*) But there is no evidence that, like Ms. King, Mr. Marsh was a dual general manager of food and EVS. Instead,

he was dual general manager of food and valet. (*See* Doc. 69-7 at 4–5.) The VHS account did not have valet services at any relevant time. (Doc. 65-21 ¶ 33.) No reasonable jury could conclude that Mr. Marsh and Ms. King were similarly situated on this issue.

**vi. Mr. Soloway**

Ms. King refers to Mr. Soloway in the context of asserting that Mr. Thomas interfered with her ability to hire, fire, and discipline employees, but she does not dispute that Mr. Soloway was a director who reported to her, and was not a general manager and did not report to Mr. Thomas. (*See* Doc. 69-2 ¶¶ 94–95.) It is unnecessary to reach the "comparable conduct" prong of the inquiry as to Mr. Soloway because the workplace-standards prong is not met. No reasonable jury could find that Mr. Soloway was similarly situated to Ms. King in all material respects.

**vii. Mr. Williford**

The evidence in the light most favorable to Ms. King is that she hired Mr. Williford in April 2015 and he initially reported directly to her, but by fall 2015 Mr. Thomas had Mr. Williford reporting directly to him. The court acknowledges that "whether or not co-employees report to the same supervisor is an important factor in determining whether two employees are subject to the same workplace standards for purpose of finding them similarly situated." *Conway*, 414 F. Supp. 2d at 465. But this factor is not dispositive. Two employees are not "similarly situated" merely because they both report directly to the same superior. *See Batiste v. City Univ. of N.Y.*, No. 16-CV-3358 (VEC), 2017 WL 2912525, at *9 (S.D.N.Y. July 7, 2017) (coworker with same direct supervisor as plaintiff was not "similarly situated").

Ms. King asserts that Mr. Thomas treated Mr. Williford favorably because—even though Mr. Williford had an office a few miles from his home—Mr. Thomas allowed Mr. Williford to

work from home to care for his wife, who suffered from the same mental health condition that Ms. King's son had. (Doc. 65-45 at 112–13; Doc. 69-2 ¶¶ 29, 75.) Ms. King does not dispute that she was also authorized to work from home to care for her son. (Doc. 69-2 ¶ 15.) But she states that she was no longer allowed to work from home after April 6, 2017. (*Id.* ¶ 75.) No reasonable jury could find that she and Mr. Williford were similarly situated at that time, however, because Ms. King's son had passed away by then.

To the extent he received preferential treatment over Ms. King in the form of a private office at WMC, Mr. Williford's situation was substantially different. As a controller, he was presumably subordinate to a general manager. But he was located full-time at WMC, whereas Ms. King's duties required her to travel between the six facilities for which she was responsible.

Ms. King further asserts that Mr. Thomas did not discipline Mr. Williford for reaching out to US Foods in 2017 after Mr. Thomas had assigned Mr. Williford to work on the market basket. (Doc. 69-2 ¶ 70.) However, the circumstances were substantially different by that time since US Foods had already been made aware that Aramark wanted to do a market basket study.

**viii. Mr. Wilson**

Aramark argues that Mr. Wilson was not subject to the same workplace standards as Ms. King because Mr. Wilson was not the general manager of a six-hospital system (like VHS) during the relevant time period. (Doc. 63 at 15.) The evidence is that Mr. Wilson was initially the dual director of food and valet until 2014 or 2015, when he became "General Manager/Director of Food and Nutrition and Valet" at the Western Maryland Regional Health System. (Doc. 69-2 ¶ 19; *see also* Doc. 65-54 at 3–4.) That account had two facilities that were located 14–15 miles apart: a hospital and an 88-bed nursing rehabilitation center. (Doc. 65-54 at 5.)

Mr. Wilson—like Ms. King—reported directly to Mr. Thomas. And according to Ms. King, the District Manager would send group emails to all of his direct reports, including Mr. Wilson, relative to duties that they all shared. Furthermore, Mr. Wilson—like Ms. King—was subject to the Aramark Business Conduct Policy and presumably also the discipline procedures in the employee handbook.

The court nevertheless concludes that no reasonable jury could find that Mr. Wilson was similarly situated to Ms. King in all material respects. All of the items of alleged disparate treatment involve different circumstances or conduct for the reasons discussed above regarding other alleged male comparators. Although Mr. Wilson retained a dual "general manager" position after Ms. King's dual role was eliminated, Mr. Wilson's dual role was for food and valet, not food and EVS. Insofar as Mr. Thomas required Ms. King to begin completing "Top 15" reports before Mr. Wilson, Ms. King's role as general manager of a larger account put her in a different position regarding the rollout of initiatives.

Regarding Mr. Wilson's private office, Ms. King and Mr. Wilson worked in separate regions, and the evidence indicates that office space was limited at WMC. Regarding Mr. Wilson's alleged deviation from the VOC protocols, there is no evidence that Mr. Thomas discriminated against Ms. King in that respect because Ms. King never used the same allegedly improper technique and never asked Mr. Thomas to do so.

Ms. King further asserts that Mr. Thomas directed Mr. Williford to work on accounts other than VHS, but that Mr. Thomas did not assign anyone from Mr. Wilson's accounts to support VHS. (Doc. 69-2 ¶ 25.) The court concludes, however, that no reasonable jury could find that Ms. King and Mr. Wilson were similarly situated as relevant to this issue because they managed different facilities in different regions.

In her declaration, Ms. King asserts that Mr. Thomas would meet with her subordinates without her knowledge but would go through Mr. Wilson when communicating with Mr. Wilson's subordinates. (*See* Doc. 69-2 ¶ 24.) But Ms. King does not explain how she has personal knowledge of that. And Mr. Thomas states in his declaration that he sometimes met with Aramark employees who worked in facilities that Mr. Wilson managed outside of Mr. Wilson's presence. (Doc. 65-21 ¶ 43.)

Ms. King states that Mr. Thomas required her to send her weekly calendar to him but did not impose the same requirement upon Mr. Wilson. (Doc. 69-2 ¶ 50.) Here again, no reasonable jury could find that Ms. King and Mr. Wilson were similarly situated as relevant to this issue. Ms. King managed and traveled between six facilities whereas Mr. Wilson managed two that were only 15 miles apart.

**d. Other Female Employees**

In her complaint, Ms. King raised the issue of alleged discrimination against other female Aramark employees. (*See* Doc. 1 ¶¶ 47, 75.) Ruling on Aramark's motion to dismiss, the court found that Ms. King's allegations on this issue were conclusory. (Doc. 16 at 43.) Although Ms. King refers to certain other female Aramark employees in her Counterstatement of Contested Material Facts, her written declaration, and in her deposition testimony, her memorandum in opposition to Aramark's summary judgment motion does not discuss this alleged discrimination against other female employees. Moreover, Ms. King's claims that other female Aramark employees also experienced or claimed discrimination remain conclusory.

**e. Decisionmakers**

Aramark argues that two of the decisionmakers involved in Ms. King's termination—Ms. Barrett and Ms. O'Donnell—are female and that this undercuts Ms. King's assertion that she was

terminated on the basis of her gender. (Doc. 63 at 22.) Ms. King does not seriously dispute the fact that that Ms. Barrett and Ms. O'Donnell were involved in the termination decision. She repeatedly highlights the draft termination notice that Mr. Thomas circulated to Rebecca Adams and Tracy Miller on July 24, 2017 (Doc. 70-23) in support of her contention that Mr. Thomas had decided to terminate her by that date. But Ms. O'Donnell did not think that termination was the next step at that time. (*See* Doc. 70-24 at 2 (discussing need to compare Ms. King's scores to those of her peers).) And Ms. King herself cites evidence showing that Ms. Barrett and Ms. O'Donnell were also decisionmakers. (*See, e.g.*, Doc. 69-11 at 56 (Ms. Barrett's testimony that she, Ms. O'Donnell, and Mr. Thomas reviewed Ms. King's termination).) The evidence in the light most favorable to Ms. King is that Ms. Barrett and Ms. O'Donnell were decisionmakers but they were not the only decisionmakers because Mr. Thomas was also involved in the termination decision.

As this court has observed, where the decisionmaker "is in the same protected class as plaintiff, claims discrimination become less plausible." *Betterson v. HSBC Bank, USA, N.A.*, 139 F. Supp. 3d 572, 587 (W.D.N.Y. 2015) (citing *Toliver v. Cmty. Action Comm'n to Help the Econ., Inc.*, 613 F. Supp. 1070, 1074 (S.D.N.Y. 1985)). Here, two of the three primary decisionmakers are women, and the court agrees that to some extent this undercuts the plausibility of Ms. King's claim that she was terminated because she is female.

**f. Mara Rakowski**

As noted above, Mara Rakowski assumed the position of Aramark general manager for VHS around December 2017—after Ms. King's termination in September that year. Aramark contends that Ms. King's prima facie case is further undermined by the fact that her replacement was a woman. (Doc. 63 at 24.) The court agrees. *Cf. Inguanzo v. Hous. & Servs., Inc.*,

621 F. App'x 91, 92 (2d Cir. 2015) (summary order) ("Inguanzo's replacement by another Hispanic woman further undermines her race and gender discrimination claims."); *Bratek v. Merck & Co.*, No. 91-CV-0252E(F), 1993 WL 124747, at *5 (W.D.N.Y. Apr. 16, 1993) (hiring of a female to replace female plaintiff undermined inference of discrimination); *see also Randolph v. CIBC World Mkts.*, No. 01 Civ.11589(RWS), 2005 WL 704804, at *12 (S.D.N.Y. Mar. 29, 2005) ("Where no evidence giving rise to an inference of discrimination has been presented, the fact that a plaintiff is replaced with an individual within his protected class undermines his attempt to establish a *prima facie* case of discrimination." (quoting *Morris v. N.Y.C. Dep't of Sanitation*, No. 99 CV 4376(WK), 2003 WL 1739009, at *5 (S.D.N.Y. Apr. 2, 2003))).

For all of the above reasons, the court concludes that Ms. King has failed to establish her prima facie case of discrimination. For completeness, the court considers the remaining prongs of the *McDonnell Douglas* framework.

### 3. Legitimate, Non-Discriminatory Basis for Termination

The second prong of the framework imposes a burden on Aramark to articulate a legitimate, non-discriminatory basis for Ms. King's termination. Aramark asserts that there is such a basis because Ms. King violated Aramark policy in connection with the travel reimbursement for Ms. Cubbage and because of "continued performance issues." (Doc. 63 at 28.) Ms. King argues that her performance "was always at least satisfactory" (Doc. 69 ¶ 7) and that it is, in her view, "highly suspect" that Aramark would terminate a longstanding employee for approving a $56.58 mileage reimbursement. (Doc. 71-1 at 28.)

On this prong of the *McDonnell Douglas* framework, Aramark's burden is one of "production," not proof. *Tex. Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 255 (1981);

*Greenway v. Buffalo Hilton Hotel*, 143 F.3d 47, 52 (2d Cir. 1998). Aramark's burden here is "light"; it need not "*persuade* the court that it was motivated by the reason it provides; rather, it must simply *articulate* an explanation that, *if true*, would connote lawful behavior." *Id.* (emphasis on "articulate" and "if true" added). Aramark has done that. Although Ms. King argues that Aramark's explanation is untrue, it is unnecessary to make that determination here.

#### 4. Pretext

On the final prong of the *McDonnell Douglas* framework, the burden is on Ms. King to show that the reasons that Aramark's explanation for the termination are a pretext for discrimination. "Temporal proximity alone is insufficient to defeat summary judgment at the pretext stage, but a plaintiff may rely on evidence comprising her prima facie case, including temporal proximity, together with other evidence such as inconsistencies, implausibilities, and contradictions in the employer's explanation, to defeat summary judgment at this stage." *Litten v. GM Components Holdings, LLC*, No. 19-CV-926S, 2022 WL 706971, at *8 (W.D.N.Y. Mar. 9, 2022) (cleaned up).

Aramark argues that Ms. King cannot establish that its explanation is a pretext for discrimination or that discrimination was the "but-for" cause of the termination. (Doc. 63 at 28.) According to Aramark, Ms. King cannot meet her burden by arguing that her conduct did not warrant termination because, in Aramark's view, "her subjective disagreement with Aramark's business determination is insufficient to establish that Aramark's proffered reason was false, or that the true motivation for its decision was unlawful discrimination or retaliation." (*Id.* at 29.) Ms. King insists that she has identified "strong evidence of an inference of discrimination" based upon "the same evidence that comprised her prima facie case, without more." (Doc. 71-1 at 25.) Aramark argues that "[t]his is not enough." (Doc. 73 at 12.)

The Second Circuit has stated that "[t]o meet his or her ultimate burden, the plaintiff may, depending on how strong it is, rely upon the same evidence that comprised her prima facie case, without more." *Back v. Hastings On Hudson Union Free Sch. Dist.*, 365 F.3d 107, 124 (2d Cir. 2004). Aramark attempts to distinguish *Back* by noting that there was "direct evidence" of discrimination in that case. *Back*, 365 F.3d at 124. There is no such direct evidence in this case, *see supra* Section III.A, but that does not necessarily preclude a showing of pretext. Even absent direct evidence, it is theoretically possible for a plaintiff to demonstrate pretext by relying only upon "the evidence comprising the prima facie case, without more." *Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 38 (2d Cir. 1994) (no direct proof of discriminatory animus).

However, for the reasons discussed above, the evidence comprising Ms. King's prima facie case is insufficient to demonstrate pretext. *See supra* Section III.B. In her discussion of the retaliation count, Ms. King offers further argument on the pretext prong. She argues that Aramark's explanation suffers weaknesses and implausibilities because: (1) it is "highly suspect" that Aramark would terminate a longstanding employee for approving a $56.58 mileage reimbursement; and (2) the investigation into her alleged BCP violation was a "sham." (Doc. 71-1 at 28.) The court considers those arguments here.

**a. Termination for Allegedly Minor Violation; "Sham" Investigation**

Ms. King suggests that it is implausible that she might be terminated for an alleged violation that she asserts was valued only at $56.58; in her view, the "punishment" cannot plausibly fit the "crime." But courts have rejected similar arguments. *See Bourara v. N.Y. Hotel Trades Council & Hotel Ass'n of N.Y.C., Inc. Emp. Benefit Funds*, No. 17cv7895 (DF), 2020 WL 5209779, at *12 (S.D.N.Y. Sept. 1, 2020) (whether alleged "minor infraction" was "significant enough to warrant Plaintiff's termination" is for the employer—not the court—to decide).

Moreover, Aramark's conclusion at the time it terminated Ms. King was not simply that Ms. King had improperly approved a $56.58 mileage reimbursement, but that Ms. King had improperly directed a subordinate to drive out of her way to deliver Ms. King to her workplace. (*See* Doc. 65-50 at 22 (Ms. Barrett's testimony that she would be concerned if Ms. King had utilized Ms. Cubbage as a "taxi service").)

Ms. King maintains that her travel with Ms. Cubbage did not violate policy and that Aramark would have realized that if its investigation had not been a "sham." The court considered the "sham investigation" argument above in the context of the prima facie case of discrimination. *See supra* Section III.B.2.b. The court returns to that issue briefly here for purposes of the pretext prong.

An employer's investigatory procedures can be relevant "if they give rise to an inference that the investigation was a sham designed to mask Defendant's discriminatory agenda." *Saenger v. Montefiore Med. Ctr.*, 706 F. Supp. 2d 494, 515 (S.D.N.Y. 2010). On the other hand, "[a]n employer is entitled to summary judgment even if the investigation into the alleged misconduct was inadequate and the employee was disciplined based upon a hastily formed conclusion, so long as the employer was not motivated by discriminatory animus." *Del Pozo v. Bellevue Hosp. Ctr.*, No. 09 Civ. 4729(SAS)(DF), 2011 WL 797464, at *5 (S.D.N.Y. Mar. 3, 2011); *see also Jordan v. Olsten Corp.*, 111 F. Supp. 2d 227, 236 (W.D.N.Y. 2000) ("Title VII does not protect Jordan if, as she alleges, Markiewicz conducted a shoddy investigation into the allegations and subsequently made a poorly informed decision to fire her."). Here, Ms. King has pointed to potential flaws in Ms. Barrett's investigatory procedures, but nothing about the procedures themselves give rise to any inference of retaliatory motive.

**b. Performance**

Aramark further maintains that Ms. King was terminated due to "continued performance issues." (Doc. 63 at 28.) As noted above, Ms. King argues that her performance "was always at least satisfactory." (Doc. 69 ¶ 7.) The parties plainly disagree about how to characterize Ms. King's work performance. But that does not create a triable issue because the role of the court is not to "delve into the question of which portrayal is the correct one because this Court does not sit as a super-personnel department that reexamines an entity's business decisions." *Dorman v. Webster Cent. Sch. Dist.*, 576 F. Supp. 2d 426, 431 (W.D.N.Y. 2008) (quoting *Weiss v. Morgan Stanley Inv. Mgmt.*, No. 05 CV 3310(GBD), 2008 WL 821813, at *6 (S.D.N.Y. Mar. 27. 2008)).

For all of these reasons, Aramark is entitled to summary judgment on Count 1.

**IV. Retaliation (Count 3)**

The court evaluates Ms. King's Title VII retaliation claim under the *McDonnell Douglas* burden-shifting test described above. *Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 110 (2d Cir. 2010). To establish a prima facie case of Title VII retaliation, Ms. King must show that: (1) she "engaged in a protected activity"; (2) Aramark "was aware of that activity"; (3) she suffered "a materially adverse action"; and (4) there was "a causal connection between the protected activity and that adverse action." *Agosto v. N.Y.C. Dep't of Educ.*, 982 F.3d 86, 104 (2d Cir. 2020) (quoting *Rivera v. Rochester Genesee Reg'l Transp. Auth.*, 743 F.3d 11, 24 (2d Cir. 2014)). Aramark argues that Ms. King cannot establish the fourth element. (Doc. 63 at 25.) Aramark further contends that even if Ms. King could establish a prima facie case of retaliation, her claim still fails because Aramark has shown a legitimate non-retaliatory basis for the termination and Ms. King cannot establish pretext. (*Id.* at 27–30.)

**A. Prima Facie Case—Causation**

Aramark maintains that Ms. King cannot establish the requisite causal connection for her retaliation claim because the only protected activity that she engaged in within two months of her September 21, 2017 termination was her September 19, 2017 hotline complaint, about which, according to Aramark, Ms. Barrett and Ms. O'Donnell had no knowledge at the time they had decided to terminate Ms. King. (*See* Doc. 63 at 26–27.) Ms. King asserts that she can establish causation because of her September 19, 2017 hotline complaint and because of her July 2017 complaint to Ms. Barrett. (Doc. 71-1 at 27.)

The Second Circuit has stated that a plaintiff "can indirectly establish a causal connection to support a . . . retaliation claim by showing that the protected activity was closely followed in time by the adverse employment action." *Gorzynski*, 596 F.3d at 110 (quoting *Gorman-Bakos v. Cornell Coop. Extension of Schenectady Cnty.*, 252 F.3d 545, 554 (2d Cir. 2001)). The Second Circuit "has not drawn a bright line defining, for purposes of a prima facie case, the outer limits beyond which a temporal relationship is too attenuated to establish causation." *Id.* But the Second Circuit has held "that five months is not too long to find the causal relationship." *Id.* (citing *Gorman-Bakos*, 252 F.3d at 555).

Ms. King's complaint to the hotline on September 19, 2017 was indeed very close in time to her termination on September 21, 2017. However, Ms. Barrett testified that when she met with Ms. O'Donnell on September 19, she did not know that Ms. King had called the hotline, and that Aramark was not made aware of the hotline call until September 20, 2017. (Doc. 65-50 at 33, 44.)[9] By that time, Aramark had already decided to terminate Ms. King. *See LaMarca v.*

[9] Ms. King attempts to dispute this (*see* Doc. 69 ¶ 142) but the only evidence she cites is a record of the hotline call confirming that Ms. King placed the call at 7:36 a.m. on September 19, 2017. (Doc. 70-37.) That does not prove that *Aramark* knew of the hotline call at

*City of Niagara Falls, N.Y.*, No. 13-CV-00970-WMS-JJM, 2016 WL 8674161, at *13 (W.D.N.Y. Feb. 12, 2016) ("Employers need not suspend previously planned employment actions upon discovering that a discrimination complaint has been filed, and their proceeding along lines previously contemplated, though not yet definitively determined, is no evidence whatever of causality." (cleaned up)), *report and recommendation adopted* (W.D.N.Y. May 23, 2016), ECF No. 56.

Ms. King states that in July 2017 she complained to Ms. Barrett about Mr. Thomas's alleged discrimination, harassment, and retaliation. (Doc. 69-2 ¶ 86.) She was terminated on September 21, 2017—within three months of that complaint. Aramark cites *Jean v. Acme Bus Corp.*, No. CV 08-4885(ARL), 2012 WL 4171226, at *12 (E.D.N.Y. Sept. 19, 2012), for the proposition that no inference of causation can be drawn when the gap in time is greater than two months. But the court in *Jean* did not so hold; the temporal gap in that case was only five to seven weeks. And the *Jean* court specifically acknowledged the Second Circuit's statement in *Gorzynski* that a five-month gap is not too long. *Id.*

Aramark also argues that Ms. King must present some evidence beyond timing to establish the requisite causal connection. (Doc. 63 at 26.) In support of that argument, Aramark cites *Garone v. United Parcel Service, Inc.*, No. 00-CV-6722 (ILG), 2001 WL 984914 (E.D.N.Y. July 12, 2001). The court in that case stated that "[e]vidence of temporal proximity alone . . . is insufficient as a matter of law to prove the causal connection element of a retaliation claim." *Id.* at *4. This court, however, has held otherwise. *See Martin v. Performance Trans. Inc.*, 408 F. Supp. 3d 272, 280 (W.D.N.Y. 2019) (timing "might be enough to establish a prima facie

---

that time, however, because the hotline is staffed by a third-party provider. (*See* Doc. 65-45 at 189.)

case" (quoting *Abrams v. Dep't of Pub. Safety*, 764 F.3d 244, 254 (2d Cir. 2014)); *see also Stewart v. Fashion Inst. of Tech.*, No. 18-cv-12297 (LJL), 2020 WL 6712267, at *14 (S.D.N.Y. Nov. 16, 2020) ("[T]emporal proximity alone can support a causal connection at the prima facie stage . . . ."). The court concludes that Aramark is not entitled to summary judgment on Count 3 on this basis. Since Aramark does not challenge any of the other elements of the prima facie case, the court proceeds to consider the remaining prongs of the *McDonnell Douglas* retaliation framework.

### B. Legitimate, Non-Retaliatory Basis for Termination

The second prong of the framework imposes a burden on Aramark to articulate a legitimate, non-retaliatory basis for Ms. King's termination. Aramark has done so for the reasons stated above. *See supra* Section III.B.3.

### C. Pretext

On the final prong of the *McDonnell Douglas* framework, the burden is on Ms. King to show that the reasons that Aramark's explanation for the termination are a pretext for retaliation. For the reasons stated above in the context of the discrimination claim, no reasonable jury could conclude that Ms. King has met that burden. *See supra* Section III.B.4.

## V. Remaining Issues

Because the court concludes that Aramark is entitled to summary judgment on all of the remaining counts, it is unnecessary to reach Aramark's additional arguments seeking to limit recoverable damages.

**Conclusion**

Aramark Services, Inc.'s Motion for Summary Judgment (Doc. 63) is GRANTED.

Dated this 9th day of May, 2022.

Geoffrey W. Crawford, Judge
United States District Court

Judgment in a Civil Case

United States District Court
WESTERN DISTRICT OF NEW YORK

KRISTEN KING

v.

ARAMARK SERVICES, INC.

**JUDGMENT IN A CIVIL CASE**
CASE NUMBER: 19-CV-77

☐ **Jury Verdict**. This action came before the Court for a trial by jury. The issues have been tried and the jury has rendered its verdict.

☒ **Decision by Court**. This action came to trial or hearing before the Court. The issues have been tried or heard and a decision has been rendered.

IT IS ORDERED AND ADJUDGED: that the Defendant's Motion for Summary Judgment is Granted.

Date: May 9, 2022

MARY C. LOEWENGUTH
CLERK OF COURT

By: s/Jennifer V.
Deputy Clerk