# No. 22-1237

**UNITED STATES COURT OF APPEALS**
**FOR THE SECOND CIRCUIT**

KRISTEN KING,

*Plaintiff-Appellant,*

– v. –

ARAMARK SERVICES, INC.,

*Defendant-Appellee.*

On appeal from the United States District Court
for the Western District of New York, No. 1:19-cv-00077

**BRIEF OF APPELLEE**
**ARAMARK SERVICES, INC.**

MORGAN, LEWIS & BOCKIUS LLP

Anne Martinez
1701 Market Street
Philadelphia, PA 19103
Tel.: (215) 963-5718
anne.martinez@morganlewis.com

Jade Yee
110 North Wacker Drive
Chicago, IL 60606-1511
Tel.: (312) 324-1766
jade.yee@morganlewis.com
*Attorneys for Appellee*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, Aramark Services, Inc. states that it is wholly owned by Aramark Intermediate HoldCo Corp., which, in turn, is wholly owned by Aramark, a publicly traded company. No publicly held corporation owns 10% or more of Aramark's stock.

# TABLE OF CONTENTS

**Page**

CORPORATE DISCLOSURE STATEMENT .......................................................i
STATEMENT OF THE ISSUES.........................................................................1
PRELIMINARY STATEMENT ........................................................................2
STATEMENT OF THE CASE...........................................................................3
I. FACTUAL BACKGROUND ...........................................................3
II. THE DISTRICT COURT PROCEEDINGS ......................................19
SUMMARY OF THE ARGUMENT ...............................................................20
ARGUMENT ...................................................................................................24
I. THE DISTRICT COURT PROPERLY DISMISSED PLAINTIFF'S NYSHRL CLAIMS FOR FAILURE TO STATE A CLAIM BECAUSE PLAINTIFF LACKS A PRIVATE RIGHT OF ACTION. ......24
II. PLAINTIFF'S HOSTILE WORK ENVIRONMENT CLAIM IS TIME-BARRED. ........................................................................26
III. THE UNDISPUTED FACTS SHOW THAT PLAINTIFF CANNOT PROVE GENDER DISCRIMINATION OR RETALIATION. ..................29
CONCLUSION ................................................................................................34
CERTIFICATE OF COMPLIANCE...............................................................35

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Allaire Corp. v. Okumus*,
433 F.3d 248 (2d Cir. 2006) ....................24

*Baity v. Kralik*,
51 F. Supp. 3d 414 (S.D.N.Y. 2014) ....................29

*Bass v. World Wrestling Federation Entertainment, Inc.*,
129 F. Supp. 2d 491 (E.D.N.Y. 2001) ....................26

*Betterson v. HSBC Bank, N.A.*,
139 F. Supp. 3d 572 (W.D.N.Y. 2015), *aff'd*, 661 F. App'x 87 (2d Cir. 2016)
....................26

*Curto v. Med. World Commc'ns, Inc.*,
388 F. Supp. 2d 101 (E.D.N.Y. 2005) ....................25

*Cushman-Lagerstrom v. Citizen Ins. Co.*,
72 F. App'x 322 (6th Cir. 2003) ....................29

*Ferraro v. Kellwood Co.*,
440 F.3d 96 (2d Cir. 2006) ....................34

*Garcia v. Yonkers Bd. of Educ.*,
188 F. Supp. 3d 353 (S.D.N.Y. 2016) ....................26, 27, 28

*Harlen Assocs. v. Inc. Vill. of Mineola*,
273 F.3d 494 (2d Cir. 2001) ....................21

*Harte v. Woods Hole Oceanographic Inst.*,
495 F. App'x 171 (2d Cir. 2012) ....................24

*Lu v. Chase Inv. Servs. Corp.*,
412 F. App'x 413 (2d Cir. 2011) ....................33

*Meyers v. Medco Health Sols., Inc.*,
2012 WL 4747173 (S.D.N.Y. Oct. 04, 2012)....................25

*Naurnovski v. Norris*,
934 F.3d 200 (2d Cir. 2019) ....................................................................30

*Sassaman v. Gamache*,
566 F.3d 307 (2d Cir. 2009) ....................................................................30

*Sherwood v. Olin Corp.*,
772 F. Supp. 1418 (S.D.N.Y. 1991) .........................................................24

*Sorrentino v. Citicorp*,
755 N.Y.S.2d 78 (App. Div. 2003)............................................................24

*Taperell v. Tegan Lighting, Inc.*,
2019 WL 1118053 (E.D.N.Y. Mar. 11, 2019).............................................25

*Tepperwien v. Entergy Nuclear Operations, Inc.*,
663 F.3d 556 (2d Cir. 2011) ....................................................................24

*Weinstock v. Columbia Univ.*,
224 F.3d 33 (2d Cir. 2000) ......................................................................33

**STATUTES**

42 U.S.C. § 2000e-5..................................................................................26

Title VII of the Civil Rights Act of 1964.........................................passim

Family and Medical Leave Act.......................................................passim

New York State Human Rights Law ...............................................passim

**OTHER AUTHORITIES**

Federal Rule of Appellate Procedure 32(a)(7)(B) ......................................35

Federal Rule of Appellate Procedure 32(f)..................................................35

# GLOSSARY

| | |
|---|---|
| Aramark | Appellee Aramark Services, Inc. |

## STATEMENT OF THE ISSUES

1. Whether Plaintiff lacks a right to sue a non-New York company under the New York State Human Rights Law for alleged employment discrimination related to Plaintiff's job in Virginia and West Virginia.

2. Whether Plaintiff's hostile work environment claim is time-barred where the only conduct that occurred within the limitations period either did not involve the alleged wrongdoer or was not directed (or even known) to Plaintiff.

3. Whether Aramark was entitled to summary judgment on Plaintiff's gender discrimination and retaliation claims where Plaintiff failed to adduce non-speculative, admissible evidence that Aramark engaged in disparate treatment gender discrimination, or that Aramark's reasons for terminating her employment were a mere pretext for discrimination or retaliation.

## PRELIMINARY STATEMENT

Plaintiff Kristen King, a former General Manager for Aramark Services, Inc.'s ("Aramark") food and facilities services account with the Valley Health System ("VHS"), which is a six-hospital system in Virginia and West Virginia, filed a lawsuit against Aramark for alleged gender-based hostile work environment harassment, gender-based discriminatory termination of her employment, and retaliatory termination of her employment under the New York State Human Rights Law ("NYSHRL") and Title VII of the Civil Rights Act. Plaintiff now seeks to relitigate issues that the District Court thoroughly considered and correctly resolved when granting Aramark's Partial Motion to Dismiss to dismiss Plaintiff's NYSHRL claims and granting Aramark's Motion for Summary Judgment to dismiss Plaintiff's Title VII claims. In the brief that Plaintiff filed with this Court, she makes sweeping accusations that the District Court "ignored critical evidence, failed to draw all reasonable inferences in King's favor as the non-moving party, and improperly made credibility determinations." (Pl. Br. 20.) In reality, the District Court carefully and meticulously considered all of the allegations in the Complaint and the evidence adduced by the parties, drew all reasonable inferences in Plaintiff's favor, and applied applicable precedent to reach well-reasoned conclusions. Plaintiff's Brief does not provide any legitimate basis for overturning either of the District Court's decisions.

# STATEMENT OF THE CASE

## I. FACTUAL BACKGROUND

On September 21, 2017, Aramark terminated Plaintiff's employment in light of persistent performance problems, culminating in a violation of Aramark policy. Plaintiff agreed to relocate closer to the facilities where Aramark serviced the six-hospital account Plaintiff managed, and she accepted thousands of dollars in relocation benefits. When Plaintiff refused to relocate, Aramark advised her that it would not seek to recover the paid relocation benefits but that, going forward, it would not provide mileage benefits for Plaintiff's 60-plus mile commute. Despite this knowledge, when her car later broke down, Plaintiff instructed a subordinate, who was assigned to a different facility, to drive Plaintiff to work; instructed that subordinate to seek mileage reimbursement for the drive; and then approved the subordinate's reimbursement request.

Plaintiff claims she was terminated not for her violation of company policy or ongoing performance deficits, but because her manager, Griffith Thomas, set her up for failure because she is a woman. Plaintiff also claims that Aramark fired her in retaliation for her complaints about Thomas.

### A. <u>Aramark Hired Plaintiff To Be The General Manager – Food and Nutritional Services For The VHS Account, Paid Her To Relocate To Winchester, VA Area, And Made Clear To Her That Aramark Policy Did Not Permit Her To Be Reimbursed For Her Commute Time.</u>

On April 5, 2012, Aramark hired Plaintiff as an at-will General Manager – Food and Nutritional Services for the VHS account, which included six core hospitals in Virginia and West Virginia, reporting to the District Manager, which is the position that Thomas was promoted into on or about February 1, 2015. (JA 260.) Plaintiff's job responsibilities included, but were not limited to, managing the food service employees working at each of the six facilities within the VHS account; delivering strong operational performance by executing against Aramark and regulatory agency standards and programs, continually monitoring operations, completing assessments, and developing necessary action plans; establishing and maintaining client satisfaction; interacting with client management, including rounding at the VHS facilities; having responsibility for the business plan and operating budget for the VHS account; and ensuring compliance with Aramark's standards of operation, client contract, and Aramark's Business Conduct Policy. Plaintiff's job required her to travel frequently between the six different VHS hospitals, which were spread out across Virginia and West Virginia. (JA 381.)

At the time Plaintiff was hired by Aramark, she lived in Hamburg, New York, but Aramark offered to facilitate Plaintiff's relocation to the Winchester, Virginia

area, which is where VHS' primary facility (*i.e.*, Winchester Medical Center or "WMC") is located, and gave her a significant relocation payment. (JA 217.) Instead, Plaintiff rented a home in Stanley, Virginia—approximately 64 miles from Winchester. In the Fall of 2015, Aramark gave her another substantial relocation payment to facilitate a move closer to Winchester, but Plaintiff never did so. (Id.)

On March 27, 2017 and April 6, 2017, Rebecca Adams, who was then an Aramark Regional HR Director with HR responsibility for the VHS account, emailed with Plaintiff about her failure to relocate to Winchester and the fact that her position required her to be in the VHS locations and not working from a home office. (JA 494.) Adams' email further explained that, in accordance with Aramark's Global Travel & Expense ("T&E") policy, Plaintiff should not be reimbursed for her mileage for traveling from her rental house in Stanley, VA to WMC, which would constitute her "normal commute" under the Global T&E policy. (JA 495.)

### B. Plaintiff Accepted A Position As Dual General Manager – Food and EVS For The VHS Account.

In January or February 2015, Aramark offered and Plaintiff accepted the position of dual General Manager – Food and EVS for the VHS account, which Plaintiff accepted. (JA 975.) In this role, Plaintiff managed both the food service operation and the facilities/environmental services ("EVS") operation for the VHS account. (JA 219.) In June 2016, Aramark decided at the corporate level to conduct

organizational restructuring, separating the EVS portion of the business into its own line of business—distinct from the "food" portion of the business—with separate Regional Vice Presidents and District Managers for the two separate lines of business. (JA 220.) As a result of Aramark's corporate-level decision, Plaintiff's dual General Manager – Food and EVS position ended; she remained as the General Manager – Food for the VHS account and in the Healthcare line of business; the General Manager – EVS position for the VHS account was eliminated; and Timothy Knight became the District Manager – EVS in the Facilities line of business with EVS responsibility for the VHS account. (JA 565.) Plaintiff's salary remained the same even after her dual position ended. (JA 572.)

### C. Plaintiff Received Approval To Take Leave For Her Own Medical Condition And For Extended Leave After Her Son Passed Away.

Plaintiff applied for and was approved to take a leave of absence, beginning in early December 2015, for her own medical condition related to her need for surgery on her Achilles. (JA 601.) During her leave, Plaintiff's son passed away unexpectedly. (Id.) Aramark then granted her approval for additional leave while she grieved the loss of her son. (Id.) In total, Plaintiff took her full twelve weeks of FMLA leave from early December 2015 – March 1, 2016. (JA 602, 760.) On the morning of February 29, 2016, just before she returned to work, Plaintiff sent an email to Aramark employees who reported to her, which stated, in part:

> I first want to thank you all for your professionalism and dedication during my absence. This has been a very difficult time for me and to have a team as strong as you all allowed me to focus on the personal matters. . . .
>
> I will begin my transition this Wednesday at WMC. I will reach out to you each individually to set up an informal catch up meeting. . . .

(JA 963.) Later that same day, Thomas responded to Plaintiff's email, but his email does not state that Plaintiff needed to visit all six hospitals on the same day or even within a three-day period like Plaintiff has alleged in her brief; rather, Thomas' email only states that he wanted her to visit two facilities over a two-day period. (JA 1641.) Thomas testified that he wanted her to do so in order to observe the operations the facilities and catch up with the employees there. (JA 765.) Thomas' request was consistent with Plaintiff's own email to her reports that she was going to "set up an informal catch up meeting" with each of them individually. (JA 963.) Moreover, Thomas did not actually make Plaintiff visit all six hospitals within her first week back. (JA 501.)

### D. <u>Adams And Thomas Issued A First Written Warning To Plaintiff.</u>

During Plaintiff's employment with Aramark, Thomas observed what he believed to be performance problems with Plaintiff. (JA 769, 776-777.) As these issues were happening, Thomas tried to address them with her. (JA 795-96.)

Ultimately, Adams and Thomas decided to issue a first written documentation (or "first written warning") to Plaintiff for ongoing performance problems. (JA 775-

77, 808-09.) When Adams and Thomas were discussing their decision to issue this first written warning, Thomas never said anything about Plaintiff's gender or her complaints about him, and Adams did not have any reason to believe that he wanted to issue that warning to Plaintiff because she is a woman or because she had complained about him. (JA 828.) When they were deciding to issue this first written warning to Plaintiff, Adams and Thomas also were not aware of any complaints of gender discrimination or gender-based harassment made by Plaintiff against Thomas. (JA 773, 828.)

On August 29, 2016, Adams and Thomas met with Plaintiff in a conference room at WMC and gave the first written warning to her. (JA 313, 810.) Adams did most of the talking during the meeting and covered the eleven items listed in the first written warning. (JA 593.) During this meeting, Thomas and Adams both felt that Plaintiff yelled and interrupted them. (JA 816.) Plaintiff alleges that during the August 29, 2016 meeting, Plaintiff expressed her disagreement with the first written warning and her opinion that it was "unfair," and said, "[t]he retaliation [for taking FMLA to care for her son] is continuing, the disparate treatment is continuing, the sexual harassment is continuing." (JA 593, 597.)

On September 2, 2016, Plaintiff gave Adams a written document that responded to each of the eleven items covered in the first written warning. (JA 317.) Her response did not establish that any of the items listed in the first written warning

were false, but rather it argued that she had improved her conduct since being previously counseled by Thomas on a particular issue, did not deny the issue but tried to justify it or shift the blame for it, or expressed her disagreement with the level of discipline that she received. (JA 595-96.) Nevertheless, on September 29, 2016, based on the conversations that they had about first written warning, Thomas and Adams issued a revised version of the first written warning that removed six of the eleven items listed on the original version. (JA 320.)

Neither the original first written warning nor the revised first written warning resulted in any change to Plaintiff's wages, title, or other terms and conditions of employment. (JA 411, 413.)

### E. Adams And Thomas Issued A Final Written Warning To Plaintiff.

In or around January 2017, Aramark decided that it wanted to try to convince VHS to switch the purchasing of its food products from US Foods, which was VHS' incumbent food supplier, to Sysco, which was Aramark's preferred food supplier. In connection with this effort, Aramark decided to conduct a market basket study to collect pricing and spending volume information in order to develop a proposal for VHS. (JA 412.) Thomas instructed Plaintiff not to tell US Foods about the 2017 market basket study. (JA 470.) However, on February 15, 2017, Plaintiff sent an email to Michael Katz of US Foods that stated, "[w]e will be conducting a market basket study again for 2017," and requested the pricing and volume information,

thereby putting US Foods on notice of the market basket study. (JA 595-96.) US Foods responded by requesting a meeting with VHS to re-negotiate prices, thereby making it more difficult for Aramark to gain purchasing valued at $450,000 per year. (JA 412.) Plaintiff's conduct was unlike the conduct of Jacob Williford, an Aramark Controller, who contacted US Foods to try to obtain information from it in order to complete the 2017 market basket study, because Williford did so *after* Plaintiff had already informed US Foods on March 3, 2017 that Aramark was conducting that market basket study. (JA 476.)

On March 3, 2017, Thomas learned that Plaintiff had informed US Foods about the market basket study. (JA 412.) On March 27, 2017, Adams and Thomas decided to issue a final written documentation (or "final written warning") to Plaintiff because of her conduct in connection with this US Foods incident. (JA 324.) When Adams and Thomas were discussing their decision to issue this final written warning to Plaintiff, Thomas never said anything about Plaintiff's gender or her complaints about him, and Adams did not have any reason to believe that Thomas wanted to issue that warning to Plaintiff because she is a woman or because she had complained about him. (JA 829-30.)

This final written warning did not result in any change to Plaintiff's wages, title, or other terms and conditions of employment. (JA 413.)

### F. Plaintiff Complained About Thomas After Being Disciplined.

On March 27, 2017, after receiving the final written warning, Plaintiff called the Aramark Employee Hotline to complain that Thomas had "been bullying [King]," "violated [her] FMLA benefits by forcing [her] to work while she was out of work on FMLA," and did "not offer [her] any training, coaching, or support." (JA 326.) Even though it is not referenced in the Hotline Call Report, Plaintiff alleges she also complained that she felt that Thomas was discriminating against her by treating her differently than male managers. (JA 697.)

Aramark's Employment Relations Department conducted an investigation into Plaintiff's hotline complaint during which Plaintiff talked to Evelyn Miller, who was then an Aramark Employment Relations Representative, and Colleen O'Donnell, who was then an Aramark Employment Relations Director. (JA 699, 885.) Miller later told Plaintiff that the investigators concluded that the allegations Plaintiff made in her hotline complaint were "completely unfounded." (JA 700.)

### G. Adams And Thomas Issued Another Final Written Warning To Plaintiff.

Even after the first written warning and final written warning were issued to Plaintiff, Adams and Thomas continued to observe problems with Plaintiff's job performance. (JA 414, 824.) On May 9, 2017, they issued another final written warning to Plaintiff regarding her performance. (JA 328.) When Adams and Thomas were discussing their decision to issue this final written warning, Thomas

never said anything about Plaintiff's gender or her complaints about him, and Adams did not have any reason to believe that he wanted to issue that warning to Plaintiff because she is a woman or because she had complained about him. (JA 831.)

This disciplinary meeting took place in a conference room in WMC. (JA 665.)

This final written warning did not result in any change to Plaintiff's wages, title, or other terms and conditions of employment. (JA 414.)

### H. Aramark Issued A Performance Improvement Plan To Plaintiff.

Thomas believed that Plaintiff's performance problems still continued. (JA 798.) He consulted with Human Resources about what to do, including whether to terminate her employment. (Id.) During an August 2017 call that included Thomas, Human Resources (*i.e.*, Kelly Barrett) and Employment Relations (*i.e.*, Colleen O'Donnell), it was decided that Plaintiff should be placed on a ninety-day performance improvement plan ("PIP") instead of being terminated. (JA 332, 668.) Critically, until this litigation, Plaintiff did not know that Thomas had consulted with Human Resources and Employment Relations in the Summer of 2017 about whether to terminate Plaintiff's employment.

On or about August 14, 2017, Kelly Barrett, who had recently replaced Adams as the Aramark Regional HR Director with HR responsibility for the VHS account, and Thomas presented Plaintiff with the PIP. (JA 332, 668.) Plaintiff and Thomas

attended this meeting in person at War Memorial Hospital in Berkeley Springs, WV, and Barrett attended this meeting by telephone. (JA 669.)

### I. <u>On August 31, 2017, Plaintiff Had A Subordinate Drive Her To Work At Aramark's Expense.</u>

Sections 5 and 6 of Aramark's Global T&E Policy preclude reimbursement for the cost of a rental car used as part of an employee's normal commute and mileage reimbursement for the employee's normal commute. (JA 337.) Plaintiff was aware of this policy and had read these two sections of it. (JA 680, 843.)

In or around August 2017, Plaintiff's car broke down. (JA 678.) Plaintiff asked Thomas if Aramark would pay for a rental car for her to travel between the VHS facilities, and he told her, "No" and that Aramark does not pay for rental cars under such circumstances. (Id.) Plaintiff then asked Brittany Cubbage, who was one of her subordinates working at Page Memorial Hospital ("PMH") in Luray, VA, if she could borrow Cubbage's car and, after Cubbage told her "no," Plaintiff had Cubbage drive her to WMC on August 31, 2017. (JA 686-87, 890-91.) Plaintiff then instructed Cubbage to submit an expense reimbursement for her mileage for this drive and Plaintiff later approved it, which was essentially the same as if Plaintiff had rented a car, used it as part of Plaintiff's normal commute, and then tried to have Aramark pay for that expense even though it is not permitted under Aramark's Global T&E policy. (JA 366, 688.)

On September 18, 2017, after learning about this incident, Barrett investigated it. (JA 845.) Barrett had a telephone interview with Cubbage, who said Plaintiff had told her that her car was broken and asked to borrow Cubbage's car, and that after Cubbage told her that she could not borrow her car, Cubbage drove Plaintiff from Plaintiff's home to WMC, dropped her off at WMC, and then returned to PMH. (JA 909-10.) Cubbage did not say to Barrett that she was at WMC on August 31, 2017 to have a work meeting with Plaintiff – in fact, Cubbage does not remember ever having a one-on-one meeting with Plaintiff at WMC and only remembers being at WMC on August 31, 2017 to drop Plaintiff off. (JA 848-49, 858-59, 890-91.) Cubbage's expense report similarly indicates that on August 31, 2017, she "[t]ransported Kristin [sic] to WMC," and that she "dropped [Plaintiff] off and then went to work at PMH" – this expense report makes no mention of Cubbage going to WMC for a meeting. (JA 366.)

Barrett also had an investigation interview with Plaintiff – Plaintiff was at Warren Memorial Hospital in Front Royal, VA while Barrett participated by phone – during which Plaintiff was told that she was under investigation for a potential violation of Aramark's Business Conduct Policy because she approved mileage reimbursement for Cubbage driving her to WMC on August 31, 2017. (JA 676.) Like Cubbage, Plaintiff did not say during her interview that Cubbage was at WMC

on August 31, 2017 to have a work meeting with her as opposed to just driving and dropping her off. (JA 677, 851-54.)

During her deposition, Plaintiff said that on Wednesday, August 30, 2017, Cubbage also drove Plaintiff to WMC because Plaintiff needed to be at WMC for a Directors' Meeting on August 30 and she also needed to work with Cubbage on some documents together, so she had Cubbage drive her to WMC on August 30 and work with her on the documents there. (JA 679, 689.) However, the date at issue is *not* Wednesday, August 30, 2017, but rather Thursday, August 31, 2017. (JA 686-87.)

### J. Plaintiff Did Not Bring Requested Documentation To Her September 18, 2017 PIP Meeting.

On Monday, September 11, 2017, Plaintiff and Thomas met to discuss her PIP, and Thomas asked Plaintiff to collect specific information and documentation regarding her progress on the PIP to present to him at WMC on the following Monday, September 18, 2017. (JA 673.) However, it is undisputed that on September 18, 2019, Plaintiff did not have all of the items that Thomas had given her a week to collect. (JA 675-76.)

### K. On September 19, 2017, Barrett And O'Donnell Made The Decision To Terminate Plaintiff's Employment.

On September 19, 2017, Barrett and O'Donnell met, discussed what Barrett had determined based on her investigation, and decided to terminate Plaintiff's

employment based on their belief that Plaintiff had Cubbage drive her to WMC (*i.e.*, a drive that constituted Plaintiff's normal commute and should not have been paid for by Aramark) at Aramark's expense in violation of Aramark policy, and that her performance issues had not been corrected. (JA 863-64.)

The decision to terminate Plaintiff was reviewed with Thomas, who agreed with it. (JA 802-03.) Barrett never heard Thomas say anything, nor saw him doing anything, that suggested he had a discriminatory bias against women. (JA 872-73.) Barrett also did not recall anyone ever complaining to her about Thomas engaging in alleged gender-based harassment, sexual harassment, gender discrimination, or retaliation. (Id.)

On September 20, 2017, Thomas then sent an email to Barrett asking if he could inform VHS' CFO about the termination of Plaintiff's employment. (JA 1775.) Critically, Plaintiff was unaware of this email until it was produced to her during discovery in this litigation. (Id.)

### L. After Plaintiff Was Told She Was Being Investigated For A Violation Of Aramark's Business Conduct Policy, She Stopped Coming To Work, Contacted Sedgwick To Request A Continuous Leave Of Absence And Called The Aramark Employee Hotline.

Plaintiff did not come to work on September 19, 2017 or September 20, 2017. (JA 690-91.) She did not have any in-person interactions or phone conversations with Thomas on those dates. (Id.) She testified, "after that incident where they had

told me about this code of conduct violation . . . . I had a sinking feeling . . . I went to my doctor [on September 19, 2017] who pulled me out of work." (Id.)

On September 19, 2017, Plaintiff contacted Sedgwick, which is Aramark's third-party claims administrator that administers its leaves of absence, and requested a continuous leave of absence. (JA 600, 860-61.) Aramark did not learn about Plaintiff's pending request for continuous FMLA leave until September 20, 2017. (JA 881-82.)

On September 19, 2017, Plaintiff also called the Aramark Employee Hotline to complain about her written warnings, her PIP, the fact that Aramark was investigating her for a violation of Aramark's Business Conduct Policy, and her belief that Thomas did not offer her any training, coaching, or support. (JA 695-96.) Even though it is not referenced in the Hotline Call Report, Plaintiff testified that she also complained during that hotline call that she felt that Thomas was discriminating against her, treating her differently than male managers, and violating the FMLA. (JA 696.)

Aramark was not notified about Plaintiff's hotline call, which was received initially by a third-party hotline administrator, until September 20, 2017. (JA 867.) After being notified of the hotline call, Aramark's Employment Relations and Human Resources Departments, *not Thomas*, investigated Plaintiff's allegations.

(JA 874-75.) They concluded that Plaintiff's employment termination was still justified. (JA 408.)

### M. Aramark Informs Plaintiff Of The Termination Decision, Requires Her To Return Aramark's Property To A VHS Facility, And Replaces Her With Another Female Manager.

Even though the termination decision was made on September 19, 2017, Aramark did not inform Plaintiff of the decision until September 21, 2017. (JA 877.) On that date, Barrett, with Thomas on the phone, called Plaintiff and informed her of the decision to terminate her employment. (JA 557, 587, 862.) Plaintiff was at her rental house in Virginia during this termination call. (JA 588.)

On September 21, 2017, Barrett also sent a letter to Plaintiff at her home in Virginia regarding her termination, which instructed Plaintiff that she needed to immediately return all Aramark and VHS property, including cell phones, computers, keys, and documents. (JA 377.) Although Plaintiff could have returned such Aramark and VHS property to a VHS facility before she left her rental house in Virginia and returned to her home in New York, she did not do so and became upset when Aramark refused to let her return it to a different Aramark entity's facility in Buffalo, New York. (JA 589-90.) Ultimately, she returned some things to one of the VHS facilities, used a shipping label and box provided by Aramark to later return other things, and had her attorney give Aramark's attorneys multiple bankers' boxes full of Aramark property after this litigation began. (JA 590.)

Mara Racowkski, who is also female, replaced Plaintiff as a General Manager for the VHS account. (JA 738.)

## II. THE DISTRICT COURT PROCEEDINGS

On January 14, 2019, Plaintiff filed her Complaint in the District Court, asserting hostile work environment ("HWE"), gender-based discriminatory discharge, and retaliatory discharge claims under the NYSHRL and Title VII. (JA 10.) On March 13, 2019, Aramark filed a Partial Motion to Dismiss the Complaint, which sought to dismiss all of Plaintiff's NYSHRL claims as well as her gender-based HWE and gender discrimination claims under Title VII. (JA 49.) On July 19, 2019, the Honorable Geoffrey W. Crawford of the District Court issued a Memorandum and Order granting Aramark's Motion to Dismiss in part, dismissing the NYSHRL claims only (the "Motion to Dismiss Decision"). (SPA 1-47.) On May 9, 2022, after more than sixteen months of discovery, and full briefing and oral argument on Aramark's Motion for Summary Judgment, Judge Crawford issued a Memorandum and Order granting Aramark's Motion for Summary Judgment in its entirety, thereby dismissing all of Plaintiff's remaining claims. (SPA 48-113.)

## SUMMARY OF THE ARGUMENT

Aramark requests that this Court affirm the District Court's Motion to Dismiss Decision and uphold the dismissal of the NYSHRL claims. The District Court correctly found that Plaintiff lacked standing to bring claims under the NYSHRL because she did not allege an unlawful discriminatory practice that "originated" within New York state, or any discriminatory practice that affected the terms, conditions or privileges of employment within New York. Indeed, the allegations in the Complaint and the undisputed evidence born out of discovery show that Aramark hired Plaintiff to work in the Virginia-West Virginia area, overseeing facilities there, and paid her to relocate there, and none of the alleged adverse employment actions occurred in New York. Therefore, this Court should affirm the District Court's decision to dismiss Plaintiff's NYSHRL claims.

Aramark also requests that this Court affirm the District Court's Summary Judgment Decision and uphold the dismissal of the HWE, gender-based discriminatory discharge, and retaliatory discharge claims under Title VII. In a 66-page Opinion, the District Court meticulously considered all of the evidence and arguments, and determined that Plaintiff had no direct evidence of gender discrimination, nor evidence that could create an inference of gender discrimination with respect to her termination, which was the only adverse employment action that she experienced. The District Court correctly recognized that Plaintiff never

identified any gender-specific comments made by the actual termination decisionmakers (*i.e.*, Kelly Barrett and Colleen O'Donnell) or by Thomas, who is the alleged discriminator/harasser and who Plaintiff alleges (and the District Court accepted as true) was also involved in the termination decision.

The District Court also properly rejected Plaintiff's attempt to add a gendered gloss to Thomas' alleged comments about the amount of food on her lunch tray, his alleged disapproving looks at her stomach, and his alleged suggestion that she go to the gym because VHS' CEO would like to see her using the gym based on Plaintiff's sheer speculation that Thomas must have disapproved of her "for not fitting his stereotypical image of a businesswoman." As this Court has recognized, "[a]lthough all inferences must be drawn in favor of the nonmoving party, mere speculation and conjecture is insufficient to preclude the granting of the motion." *Harlen Assocs. v. Inc. Vill. of Mineola*, 273 F.3d 494, 499 (2d Cir. 2001) (affirming decision granting summary judgment to defendant). As to Plaintiff's argument that Barrett[1] allegedly deviated from practice and policy relative to investigations and her termination was based on a "sham" investigation, the District Court, taking the facts in the light most favorable to Plaintiff, explained "even if Barrett's investigation was lacking, that

---

[1] It is important to remember that this investigation was not conducted or directed by Thomas, who is the only alleged discriminator. (JA 874-75.)

would be by itself insufficient to raise an inference of gender discrimination against Plaintiff."

Similarly, this Court should reject Plaintiff's attempt to create an inference of gender discrimination based on the requirement that she return her Aramark and VHS property to a VHS facility as opposed to another Aramark entity's facility in Buffalo, NY (Pl. Br. 62). It was two women, not Thomas, that communicated and reinforced this requirement with Plaintiff. (JA 377.)

With respect to Plaintiff's attempt to create an inference of gender discrimination based on Thomas' allegedly more favorable treatment of male comparators, the District Court considered each of Plaintiff's allegations about these alleged comparators and explained how they were not similarly situated to her in all material respects.

Finally, in response to Plaintiff's attempt to create an inference of gender discrimination by pointing to alleged discriminatory treatment by Thomas against other women, the District Court found that her allegations were conclusory – indeed, Plaintiff never adduced evidence that Thomas engaged in gender-based harassment, gender discrimination or retaliation against any employee, offering only her own inadmissible hearsay statement in support of this allegation. The District Court gave appropriate weight to the facts that two of the decisionmakers were women and that Plaintiff's replacement was a woman. The District Court did not, as Plaintiff

incorrectly implies, find these facts to be an absolute defense to gender discrimination claims. This Court should affirm.

## ARGUMENT

This Court reviews decisions on pre-trial dispositive motions *de novo*. *See, e.g.*, *Allaire Corp. v. Okumus*, 433 F.3d 248, 249-250 (2d Cir. 2006) (dismissal for failure to state a claim); *Tepperwien v. Entergy Nuclear Operations, Inc.*, 663 F.3d 556, 566 (2d Cir. 2011) (summary judgment).

### I. THE DISTRICT COURT PROPERLY DISMISSED PLAINTIFF'S NYSHRL CLAIMS FOR FAILURE TO STATE A CLAIM BECAUSE PLAINTIFF LACKS A PRIVATE RIGHT OF ACTION.

The NYSHRL does not convey a private right of action for allegedly unlawful conduct perpetrated out of state by a foreign corporation. *Harte v. Woods Hole Oceanographic Inst.*, 495 F. App'x 171, 172 (2d Cir. 2012) (noting all on-point intermediate court decisions so hold and concluding that "there is no persuasive evidence that the New York Court of Appeals would decide the issue differently"); *Sorrentino v. Citicorp*, 755 N.Y.S.2d 78, 79 (App. Div. 2003) ("[T]he Human Rights Law does not provide a private cause of action to New York residents discriminated against outside of New York by foreign corporations."). In order to give rise to a private right of action, the alleged discrimination must have originated in New York or affected the plaintiff's New York employment. *E.g.*, *Sherwood v. Olin Corp.*, 772 F. Supp. 1418, 1425–26 (S.D.N.Y. 1991) (collecting cases). Plaintiff does not contend that any wrongful conduct originated in New York, and, as the District

Court rightly concluded, Plaintiff failed to plausibly allege in-state employment. (SPA 29-31.)

In her Complaint, Plaintiff alleged (and her deposition testimony later confirmed) that Aramark hired her to work in Virginia and West Virginia; her job responsibilities required her to regularly visit multiple facilities in Virginia and West Virginia to supervise operations there; she rented a home in Virginia for that purpose; she reported to Thomas, who lived and worked in Virginia; and she was in Virginia when all of the adverse actions occurred. (JA 153.) To be sure, Plaintiff also alleges that she sometimes worked from her house in New York and fielded work-related emails and calls from that location. *See* Pl. Br. 60–61. But "the mere fact that [a] plaintiff resided in New York, and may have periodically worked from home, is not sufficient to warrant the application of New York law." *Meyers v. Medco Health Sols., Inc.*, 2012 WL 4747173 (S.D.N.Y. Oct. 04, 2012). For, unlike the plaintiffs in the decisions Plaintiff relies upon, Plaintiff's allegations do not plausibly suggest that she was hired as a New York-based employee to work out of her home in New York. *See Taperell v. Tegan Lighting, Inc.*, 18-CV-3343, 2019 WL 1118053, at *2-3 (E.D.N.Y. Mar. 11, 2019); *Int'l Healthcare Exch., Inc.*, 470 F. Supp. 2d at 362; *Curto v. Med. World Commc'ns, Inc.*, 388 F. Supp. 2d 101, 106-07 (E.D.N.Y. 2005).

Plaintiff's reliance on *Bass v. World Wrestling Federation Entertainment, Inc.,* 129 F. Supp. 2d 491, 506 (E.D.N.Y. 2001) is also misplaced. (Pl. Br. 59.) As the District Court correctly recognized (SPA 31), *Bass* is unlike this case because in *Bass,* the Complaint could be "read liberally to imply that New York was the situs for many of the discriminatory acts" whereas here New York was not the "situs" of any significant number of allegedly discriminatory acts. *See supra* pp. 4-18, 25. For these reasons, the Court should affirm the District Court's dismissal of Plaintiff's NYSHRL claims.

## II. PLAINTIFF'S HOSTILE WORK ENVIRONMENT CLAIM IS TIME-BARRED.

Title VII claims are untimely unless the plaintiff filed a charge with the Equal Employment Opportunity Commission or equivalent state agency within 300 days of the alleged unlawful practice. 42 U.S.C. § 2000e-5; *Betterson v. HSBC Bank, N.A.*, 139 F. Supp. 3d 572, 582 (W.D.N.Y. 2015), *aff'd*, 661 F. App'x 87 (2d Cir. 2016). The record shows that the earliest date on which Plaintiff filed her charge was July 17, 2018 (SPA 75), so claims based on incidents before September 20, 2017 (300 days later) are time-barred. (SPA 75-77.) A hostile work environment claim may be based on events outside the limitations period, but only if those events are (1) "part of the same actionable hostile work environment practice, and (2) at least one act contributing to the claim occurs within the filing period." *Garcia v. Yonkers Bd. of Educ.*, 188 F. Supp. 3d 353, 359 (S.D.N.Y. 2016). As the District Court

correctly found, the only three acts that occurred on or after September 20, 2017 were, as a matter of law and undisputed fact, not part of the same alleged hostile work environment. (Id.)

*First*, Plaintiff contends that Aramark responded to her September 19, 2017 call to the Aramark Employee Hotline with a sham investigation (Pl. Br. 55-56). As the District Court observed, however, the person Plaintiff claims created a hostile work environment, *Thomas*, did not conduct or direct that investigation. (SPA 77.) That the investigation report references Thomas with notes that say "per Griff," "Griff felt," and "Griff points to" (as page 55 of Plaintiff's Brief points out) shows only that Thomas was interviewed in connection with the investigation (which makes sense because Plaintiff's allegations were about him). Contrary to Plaintiff's illogical assertion (Pl. Br. 55), no reasonable jury could conclude that these notations somehow show that Thomas was responsible for the investigation or had any say in how it was conducted. This does not, as Plaintiff contends (Pl. Br. 55), establish that Thomas conducted the investigation and directed how the investigation would be conducted. Therefore, as the District Court correctly found, this investigation cannot be part of the alleged hostile work environment created by *Thomas*. (Id.)

*Second*, Thomas sent Barrett an email on September 20, 2017 about notifying Aramark's client about the fact that Aramark was terminating Plaintiff's employment. (JA 1774.) This act involved Thomas, but it cannot be part of the

alleged hostile work environment as matter of law because the email was not sent to Plaintiff. (Id.) Indeed, Plaintiff did not even know the email existed until Aramark produced it in discovery. (SPA 110.)

*Third*, Aramark terminated Plaintiff's employment on September 21, 2017. (JA 877.) That decision was made on September 19, 2017 by two women (*i.e.*, Barrett and O'Donnell)[2] who Plaintiff does not allege engaged in harassment or created a hostile work environment. That decision, moreover, was based on Barrett's investigation. (JA 863-64, 868, 879.) The termination decision, therefore, is a discrete act that Plaintiff cannot use to revive her untimely allegations about alleged harassment by *Thomas*. *See Garcia v. Yonkers Bd. of Educ.*, 188 F. Supp. 3d 353, 359 (S.D.N.Y. 2016) (dismissing Title VII hostile work environment claim on grounds that it was time-barred, and reasoning plaintiff's transfer and eventual termination, which were only incidents within 300-day statutory period, were "discrete acts" and did not constitute continuing violation of discrimination for purposes of hostile work environment claim).

---

[2] Plaintiff attempts to cast Thomas as the sole decision-maker, *see*, *e.g.*, Pl. Br. 55, 63, but that is plainly contrary to the record. (JA 863-64, 868-70.)

## III. THE UNDISPUTED FACTS SHOW THAT PLAINTIFF CANNOT PROVE GENDER DISCRIMINATION OR RETALIATION.

### A. Plaintiff Lacks Direct Or Inferential Evidence Of Gender Discrimination.

Plaintiff grounds her theory of *gender* discrimination in Thomas' alleged comments and perceived looks concerning her *weight*. (Pl. Br. 23-25.) However, comments about a person's weight are not gender-based comments and are insufficient to show direct discrimination or raise an inference of discrimination on the basis of gender. *See, e.g.*, *Cushman-Lagerstrom v. Citizen Ins. Co.*, 72 F. App'x 322, 331-32 (6th Cir. 2003). Plaintiff's attempts to link these alleged weight-related comments to gender are based on mere speculation (*see* Pl. Br. 10), and as the District Court rightly concluded, speculation is insufficient to defeat summary judgment. (SPA 80.) And while Plaintiff asserts in her brief and her declaration that Thomas did not make such weight-related comments to men (Pl. Br. 25-27), she fails to demonstrate personal knowledge to support that assertion. (Id.) Sworn statements not based on personal knowledge are not sufficient to create a triable issue of fact. *Baity v. Kralik*, 51 F. Supp. 3d 414, 419 (S.D.N.Y. 2014) (disregarding portions of affidavit "contain[ing] a surfeit of improper averments, including statements not based on plaintiff's personal knowledge and conclusory statements that are nothing more than speculation").

Nor can Plaintiff use her appellate brief to change her sworn deposition testimony. In her brief, Plaintiff contends that Thomas made multiple gender-based jokes. Pl. Br. 6, 27. Under oath, however, Plaintiff clarified that Thomas only made one joke about women—though she could not remember the substance of the joke—in 2015, more than two years before her employment termination. (JA 652-53, 656-57, Pl. Dep. at 253:6-254:5, 258:8-15, 260:4-10.) The evidence is what matters, and at most, the evidence shows that Thomas made a single, stray remark untethered to Plaintiff or her termination. "[S]tray remarks, even if made by a decisionmaker, do not constitute sufficient evidence to make out a case of employment discrimination." *Naurnovski v. Norris*, 934 F.3d 200, 216 (2d Cir. 2019).

Plaintiff claims that Aramark's investigation into Plaintiff improperly instructing a subordinate to drive her to work and seek reimbursement deviated from Company practice and that this supposed deviation shows gender discrimination. Pl. Br. 29-33. As this Court opined, "we do not hold that an arguably insufficient investigation of a complaint of sexual harassment leading to an adverse employment action against the accused is, standing alone, sufficient to support an inference of discriminatory intent." *Sassaman v. Gamache*, 566 F.3d 307, 315 (2d Cir. 2009). Moreover, the evidence shows that Aramark's investigation—conducted by Barrett, not Thomas—was conducted appropriately. Barrett conducted a full investigation consistent with her training, including reviewing the relevant reimbursement form

that Plaintiff instructed the subordinate to submit and then approved, interviewing the subordinate, and interviewing Plaintiff. (JA 863-64, 868, 871-72, 879). Plaintiff's disagreements with the *outcome* of this investigation do not make it a "sham."

Finally, Plaintiff's lengthy discussion of alleged better treatment of male employees (Pl. Br. 36-46) fails to grapple with the actual evidence. As the District Court concluded after a painstaking assessment of each putative comparator, none of the male employees Plaintiff identified was similarly situated. (SPA 90-103.) The supposed comparators had different jobs and responsibilities. (Id.) And perhaps more fundamentally, Plaintiff failed to adduce evidence from which a reasonable jury could conclude that Plaintiff and the purported comparators were treated differently in like circumstances. (Id.) She cites no evidence that they engaged in the same conduct as she had that resulted in her termination. (Id.)

For example, Plaintiff contends that Harriman violated the Business Conduct Policy, but the evidence does not support that contention. She points to a written warning issued to Harriman in December 2018 that states: "Ongoing, numerous and frequent Food Safety Issues persist." Pl. Br. 34-35. But contrary to Plaintiff's unsupported assertions, there is no evidence that these issues constituted a violation of the Business Conduct Policy. (SPA 97-98.)

Similarly, Plaintiff's attempt to make Thomas a comparator (*see* Pl. Br. 35-36) fails because Thomas was not similarly situated to Plaintiff: he was her manager and is the person who Plaintiff claims allegedly treated her differently than he treated male employees. (SPA 13.) She cites no evidence that Thomas committed an actual and known violation of the Business Conduct Policy, or that he engaged in the same conduct as she had that resulted in her termination. (SPA 76.) How Aramark treated Thomas says nothing about whether Thomas's conduct reflects disparate treatment or that Aramark terminated Plaintiff's employment because of her gender.

### B. Plaintiff Failed To Adduce Evidence From Which A Reasonable Jury Could Find That Aramark's Grounds For Terminating Plaintiff Were Pretextual.

Aramark articulated legitimate, non-discriminatory, non-retaliatory reasons for terminating Plaintiff's at-will employment: Plaintiff violated Aramark policy by having Aramark essentially cover the expense of her normal commute and, in the process, improperly exercised her authority over a subordinate, and her performance issues continued, such as her failure to follow her manager's instructions as to what she needed to bring to her September 18, 2017 PIP meeting. (JA 673.) More specifically, Aramark's investigation showed that, on August 31, 2017, Plaintiff instructed a subordinate employee to give her a ride to work—a 60-plus mile commute; told that employee to submit a mileage reimbursement request for the drive; and then approved that reimbursement request. (JA 686-87, 890-91.) As the

District Court found, this misconduct, combined with Plaintiff's persistent performance problems, constituted legitimate, nondiscriminatory, and nonretaliatory reasons for discharge. (SPA 112.)

The burden thus shifted to Plaintiff to prove that these legitimate grounds for her firing were a mere pretext for discrimination or retaliation. *Weinstock v. Columbia Univ.*, 224 F.3d 33, 42 (2d Cir. 2000). This required that Plaintiff "produce not simply 'some' evidence, but 'sufficient evidence to support a rational finding that the legitimate, non-discriminatory reasons proffered by the [employer] were false, *and* that more likely than not [discrimination] was the real reason for the [employment action].'" *Id.* (emphasis added) (citations omitted).

Plaintiff insists that Aramark's reasons for her termination were false (*see* Pl. Br. 50-52), but Plaintiff fails to point to any evidence from which a jury could conclude that the real reason for her termination was gender discrimination or retaliation for complaining about alleged gender discrimination. Plaintiff cites only her subjective belief that Aramark's investigation into her misconduct was a "sham" and that her performance was not that bad. *Id.* Neither Plaintiff's disagreement with the termination decision nor her self-serving speculation that it must have been made for discriminatory or retaliatory reasons is sufficient to prove pretext. *See, e.g.*, *Lu v. Chase Inv. Servs. Corp.*, 412 F. App'x 413, 417 (2d Cir. 2011) (explaining self-serving and conclusory allegations of pretext cannot defeat summary judgment);

*Ferraro v. Kellwood Co.*, 440 F.3d 96, 100 (2d Cir. 2006) (affirming grant of summary judgment in discrimination case where plaintiff's claim of pretext was unsupported by any evidence other than her own speculation).

**CONCLUSION**

The District Court's two decisions and judgment should be affirmed.

Respectfully submitted,

MORGAN, LEWIS & BOCKIUS LLP

Dated: December 12, 2022

By: s/ *Anne Martinez*

Anne Martinez
1701 Market Street
Philadelphia, PA 19103
Tel.: (215) 963-5718
Fax: (215) 963-5001
anne.martinez@morganlewis.com

Jade Yee
110 North Wacker Drive
Chicago, IL 60606-1511
Tel.: (312) 324-1766
Fax: (312) 324-1001
jade.yee@morganlewis.com

*Attorneys for Appellee*

**CERTIFICATE OF COMPLIANCE**

The foregoing brief complies with the type-volume limitation provided in Federal Rule of Appellate Procedure 32(a)(7)(B) because this brief contains 7,300 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f).

This document complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Rule 32(a)(6) because this document has been prepared in a proportionally spaced typeface in 14 point Times New Roman font.

*s/ Anne Martinez*
Anne Martinez